FILED

**FEE DUE**

2023 FEB -2  AM 9: 39

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY: _BEE_____

1  Lanell Craig Harris
2  # D-03812
3  Mule Creek State Prison
   P.O. Box 409099
4  Ione, CA 95640

5

6

7

8

9              UNITED STATES DISTRICT COURT

10        FOR THE CENTRAL DISTRICT OF CALIFORNIA

11  LANELL CRAIG HARRIS,

12              Petitioner,              **Petition for Writ of Habeas Corpus**

13        v.                             **by a Prisoner in State Custody**

14  PATRICK COVELLO, Warden of           (28 U.S.C. § 2254)
15  Mule Creek State Prison,
                                          2:23-CV-00783-PA-DFM
16              Respondent.

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2     I.    Introduction...................................................................................1

3     II.   Jurisdiction...................................................................................3

4     III.  Procedural History and Background.............................................3

5           A. Conviction Upon Which the Judgment Is Based.................3

6           B. Pretrial and Trial Proceedings............................................4

7           C. Automatic Appeal (California Supreme Court Case No.
            S037625)..............................................................................7

8           D. State Habeas Corpus Proceedings (California Supreme Court
9              Case No. S144756)..............................................................9

10          E. Current State Habeas Corpus Proceedings........................13

11          F. Other Petitions..................................................................13

12    IV.   AEDPA.......................................................................................13

13          A. AEDPA Standards..............................................................13

14          B. Suspension of the Writ......................................................16

15    V.    Incorporation of Exhibits and Request for Judicial Notice.........18

16    VI.   Allegations Applicable to Each and Every Claim.......................19

17    VII.  Claims for Relief........................................................................21

18          A. Claim One: The State Prosecuted, Convicted, and Sentenced
               Mr. Harris While He Was Mentally Incompetent to Stand Trial..............21

19          B. Claim Two: Mr. Harris Was Deprived of His Right to the
               Effective Assistance of Counsel and to a Fair Trial and
               Reliable Determination of Guilt by Trial Counsel's
               Prejudicially Deficient Performance.................................154

20          C. Claim Three: The State Engaged in a Pervasive Pattern of
               Prejudicial Misconduct That Violated Mr. Harris's
               Constitutional Rights.......................................................283

i

D. Claim Four: The Trial Court Repeatedly Violated Mr. Harris's Constitutional Rights. ........................................................................328

E. Claim Five: As a Matter of Double Jeopardy, the Trial Court's Erroneous Denial of Mr. Harris's Motion for Acquittal of First-Degree Murder in Count 6 Precludes Any Retrial for the Offense Because There Was Legally Insufficient Evidence of First-Degree Murder. ........................................................................409

F. Claim Six: Mr. Harris's Constitutional Rights were Violated by the Denial of a Complete and Accurate Record on Appeal....................414

G. Claim Seven: The Cumulative Effect of the Errors Renders Mr. Harris's Convictions and Sentence Unreliable and Unconstitutional. ........................................................................421

Prayer for Relief..........................................................................................426

Verification...................................................................................................428

ii

Petition for Writ of Habeas Corpus

# TABLE OF AUTHORITIES

**Cases**

*Alcala v. Woodford,*
  334 F.3d 862 (9th Cir. 2003) ...............................................................422, 423

*Apprendi v. New Jersey,*
  530 U.S. 466 (2000)....................................................380, 401, 406, 409

*Arizona v. Fulminante,*
  499 U.S. 279 (1991)....................................................310, 363, 366, 419

*Arizona v. Youngblood,*
  488 U.S. 51 (1988)...............................................................................285

*Atkins v. Virginia,*
  536 U.S. 304 (2002)...............................................................................29

*Bates v. Bell,*
  402 F.3d 635 (6th Cir. 2005) ...............................................................287

*Bean v. Calderon,*
  163 F.3d 1073 (9th Cir. 1998) ................................................................50

*Beck v. Alabama,*
  447 U.S. 625 (1980)........................................................................passim

*Benn v. Lambert,*
  283 F.3d 1040 (9th Cir. 2002) ...............................................................14

*Bennett v. Mueller,*
  322 F.3d 573 (9th Cir. 2003) .................................................................21

*Bennett v. Stirling,*
  842 F.3d 319 (4th Cir. 2016) .......................................................283, 322

*Berger v. United States,*
  295 U.S. 78 (1935)...............................................................................287

*Blakely v. Washington,*
  542 U.S. 296 (2004)....................................................380, 396, 409

Petition for Writ of Habeas Corpus

*Blazak v. Ricketts,*
  1 F.3d 891 (9th Cir. 1993) ................................................................. 53

*Blockburger v. United States,*
  284 U.S. 299 (1932) .............................................. 404, 405, 406

*Bloom v. Calderon,*
  132 F.3d 1267 (9th Cir. 1997) ................................................. 50, 262

*Bolius v. Wainwright,*
  795 F.2d 986 (5th Cir. 1979) .................................................... 154

*Boumediene v. Bush,*
  553 U.S. 723 (2008) ................................................................ 16, 17

*Boyle v. Million,*
  201 F.3d 711 (6th Cir. 2000) ..................................................... 326

*Brady v. Maryland,*
  373 U.S. 83 (1963) .................................................. 285, 286, 296

*Brecht v. Abrahamson,*
  507 U.S. 619 (1993) ........................................................... *passim*

*Britt v. North Carolina,*
  404 U.S. 226 (1971) ................................................ 414, 419

*Brown v. Mississippi,*
  297 U.S. 278 (1936) .................................................... 327

*Burks v. United States,*
  437 U.S. 1 (1978) ............................................................. 410

*Cage v. Louisiana,*
  498 U.S. 39 (1990) ........................................................... 368

*Caldwell v. Mississippi,*
  472 U.S. 320 (1985) ........................................................ 423

*California v. Trombetta,*
  467 U.S. 479 (1984) ................................................. 285, 293, 296

*Cannedy v. Adams,*
  706 F.3d 1148 (9th Cir. 2013) ............................................. 15

Petition for Writ of Habeas Corpus

*Cargle v. Mullin,*
   317 F.3d 1196 (10th Cir. 2003) ............................................................423

*Caro v. Woodford,*
   280 F.3d 1247 (9th Cir. 2002) ..............................................................50

*Case v. Nebraska,*
   381 U.S. 336 (1965) (Clark, J., concurring) .......................................17

*Chambers v. Florida,*
   309 U.S. 227 (1940) ...........................................................................327

*Chambers v. Mississippi,*
   410 U.S. 284 (1973) .............................................................20, 286, 422

*Chapman v. California,*
   386 U.S. 18 (1967) ......................................................................423, 425

*Chessman v. Teets,*
   354 U.S. 156 (1957) ...........................................................................414

*Clabourne v. Lewis,*
   64 F.3d 1373 (1995) .............................................................................50

*Coleman v. Thompson,*
   501 U.S. 722 (1991) .............................................................................21

*Conde v. Henry,*
   198 F.3d 734 (9th Cir. 2000) ..............................................375, 377, 396

*Cone v. Bell,*
   556 U.S. 449 (2009) .............................................................................16

*Cooper v. Fitzharris,*
   586 F.2d 1325 (9th Cir. 1978) ...........................................................425

*Cooper v. Oklahoma,*
   517 U.S. 348 (1996) .............................................................................23

*Correll v. Ryan,*
   539 F.3d 938 (9th Cir. 2008) .......................................................48, 266

*Cullen v. Pinholster,*
   563 U.S. 170 (2011) .......................................................................15, 16

Petition for Writ of Habeas Corpus

*Cummiskey v. Superior Court,*
   3 Cal. 4th 1018 (1992)................................................................398

*Daniels v. Woodford,*
   428 F.3d 1181 (9th Cir. 2005) ...........................................50, 262

*Davis v. Alaska,*
   415 U.S. 308 (1974)...............................343, 344, 345, 351

*Davis v. Ayala,*
   576 U.S. 257 (2015)..............................................................*passim*

*Deere v. Woodford,*
   339 F.3d 1084 (2003)..................................................................24

*DeJonge v. Oregon,*
   299 U.S. 353 (1937)..................................................................402

*Delaware v. Van Arsdall,*
   475 U.S. 673 (1986)..................................................................343

*Dobbs v. Zant,*
   506 U.S. 357 (1993)..................................................................415

*Doe v. Ayers,*
   782 F.3d 425 (9th Cir. 2015) .....................................................49

*Donnelly v. DeChristoforo,*
   416 U.S. 637 (1974)........................................................287, 425

*Douglas v. Woodford,*
   316 F.3d 1079 (9th Cir. 2003) ...........................................52, 262

*Draper v. Washington,*
   372 U.S. 487 (1963)........................................................414, 416

*Drope v. Missouri,*
   420 U.S. 162 (1975)................................................23, 24, 52

*Dudley v. Duckworth,*
   854 F.2d 967 (7th Cir. 1988) ..............................335, 336, 337

*Duhaime v. Ducharme,*
   200 F.3d 597 (9th Cir. 2000) .....................................................14

vi

*Duncan v. Ornoski,*
  286 Fed. Appx. 361 (9th Cir. 2008)........................................................300

*Duncan v. Ornoski,*
  528 F.3d 1222 (9th Cir. 2008) .....................................................50, 266

*Dusky v. United States,*
  362 U.S. 402 (1960)...........................................................................25

*Entsminger v. Iowa,*
  386 U.S. 748 (1967)..........................................................................414

*Evitts v. Lucey,*
  469 U.S. 387 (1985)...........................................................................21

*Faretta v. United States,*
  422 U.S. 806 (1975)..........................................................................348

*In re Figueroa,*
  4 Cal. 5th 576 (2018) ........................................................................289

*Florida v. Nixon,*
  543 U.S. 175 (2004)...........................................................................49

*Ford v. Wainwright,*
  477 U.S. 399 (1986)....................................................................17, 264

*Foster v. California*
  394 U.S. 440 (1969)..........................................................................320

*Francis v. Franklin,*
  471 U.S. 307 (1985)...................................................................337, 370

*Frantz v. Hazey,*
  533 F.3d 724 (9th Cir. 2008) ..............................................................16

*Gardner v. Florida,*
  430 U.S. 349 (1977)..............................................................414, 416, 417

*Gibson v. Clanon,*
  633 F.2d 851 (9th Cir. 1980) .............................................................321

*Giglio v. United States,*
  405 U.S. 150 (1972)..........................................................................286

Petition for Writ of Habeas Corpus

*Green v. United States,*
  355 U.S. 184 (1957)..................................................................................401

*Greene v. Massey,*
  437 U.S. 19 (1978)....................................................................................410

*Greer v. Miller,*
  483 U.S. 756 (1987)..................................................................................425

*Gregg v. Georgia,*
  428 U.S. 153 (1976)..................................................................................415

*Griffin v. Illinois,*
  351 U.S. 12 (1956)............................................................................414, 420

*Guzman v. Sec'y, Dep't of Corr.,*
  663 F.3d 1336 (11th Cir. 2011) ...............................................................289

*Hamling v. United States,*
  418 U.S. 87 (1974)...................................................................................401

*Hardy v. United States,*
  375 U.S. 277 (1964)..................................................................................415

*Harmon v. Marshall,*
  69 F.3d 963 (9th Cir. 1995) .....................................................................380

*Harrington v. Richter,*
  562 U.S. 86 (2011)................................................................................14, 16

*Harris v. California,*
  555 U.S. 1111 (2009)....................................................................................9

*Harris v. Nelson,*
  394 U.S. 286 (1969)....................................................................................17

*Harris v. Wood,*
  64 F.3d 1432 (9th Cir. 1995) ...................................................................423

*In re Hess,*
  45 Cal. 2d 171 (1955) ..............................................................................402

*Hicks v. Oklahoma,*
  447 U.S. 343 (1980)............................................................264, 338, 393, 406

*Hopper v. Evans,*
   456 U.S. 605 (1982)...............................................................387, 391

*Hopt v. Utah,*
   110 U.S. 574 (1884)...............................................................348

*House v. Bell,*
   547 U.S. 518 (2006)...............................................................21

*Illinois v. Allen,*
   397 U.S. 337 (1970)...............................................................349, 350

*In People v. Steger,*
   16 Cal. 3d 539 (1976)............................................................407, 408

*Jackson v. Denno,*
   378 U.S. 368 (1964)...............................................................285, 296

*Jackson v. Virginia,*
   443 U.S. 307 (1979)...............................................................368, 413

*In re Jackson,*
   3 Cal. 4th 578 (1992).............................................................287

*Jefferson v. Upton,*
   560 U.S. 284 (2010)...............................................................17

*Jennings v. Wood,*
   290 F.3d 1006 (9th Cir. 2002).................................................50, 272

*Jones v. United States,*
   526 U.S. 227 (1999)...............................................................404

*Juan H. v. Allen,*
   408 F.3d 1262 (9th Cir. 2005).................................................263

*Kampshoff v. Smith,*
   698 F.2d 581 (2d Cir. 1983)....................................................185

*Keeble v. United States,*
   412 U.S. 205 (1973)...............................................................392

*Kennaugh v. Miller,*
   289 F.3d 36 (2d Cir. 2002)......................................................319

ix

*Kennedy v. Lockyer,*
  379 F.3d 1041 (9th Cir. 2004) ................................................................414

*Kentucky v. Stincer,*
  482 U.S. 730 (1987).............................................................................348, 351

*Killian v. Poole,*
  282 F.3d 1204 (9th Cir. 2002) ...............................................17, 422, 423

*Kimmelman v. Morrison,*
  477 U.S. 365 (1986)...................................................................................48

*Kyles v. Whitley,*
  514 U.S. 419 (1995).........................................................285, 286, 321, 422

*Lafler v. Cooper,*
  566 U.S. 156 (2012)................................................................................156

*Lambert v. Blodgett,*
  393 F.3d 943 (9th Cir. 2004) .............................................................14, 17

*Lewis v. United States,*
  146 U.S. 370 (1892).................................................................................347

*Lindh v. Murphy,*
  521 U.S. 320 (1997)...................................................................................13

*Locken v. United States,*
  383 F.2d 340 (9th Cir. 1967) .................................................................319

*Lockyer v. Andrade,*
  538 U.S. 63 (2003)....................................................................................14

*Los Angeles Cty. Office of the Dist. Attorney v. Civil Serv. Com.,*
  55 Cal. App. 4th 187 (1997) ..................................................................301

*Madera v. Risley,*
  885 F.2d 646 (9th Cir. 1989) .................................................................419

*Madison v. United States,*
  365 F.2d 959 (D.C. Cir. 1966)................................................................319

*Mak v. Blodgett,*
  970 F.2d 614 (9th Cir. 1992) ...........................................................422, 423

x

*Manson v. Braithewaite,*
   432 U.S. 98 (1977)..............................................................................198, 319

*In re Marquez,*
   1 Cal. 4th 584 (1992)..........................................................................157, 265

*Martinez v. Garcia,*
   379 F.3d 1034 (9th Cir. 2004) .....................................................................394

*Martinez v. Ryan,*
   566 U.S. 1 (2012)...........................................................................................21

*Massaro v. United States,*
   538 U.S. 500 (2003)....................................................................................378

*Mayfield v. Woodford,*
   270 F.3d 915 (9th Cir. 2001) ......................................................................266

*McFarland v. Scott,*
   512 U.S. 849 (1994)......................................................................................16

*McMann v. Richardson,*
   397 U.S. 759 (1970).....................................................................................156

*Miller v. Vasquez,*
   868 F.2d 1116 (9th Cir. 1989) ............................................284, 285, 292, 296

*Miller-El v. Cockrell,*
   537 U.S. 322 (2003)......................................................................................15

*Miller-El v. Dretke,*
   545 U.S. 231 (2005).......................................................................................15

*Missouri v. Frye,*
   566 U.S. 134 (2012).....................................................................................156

*Monge v. California,*
   524 U.S. 721 (1998) (dis. opn. of Scalia, J.) .....................................405, 406

*Monroe v. Angelone,*
   323 F.3d 286 (4th Cir. 2003) .......................................................................17

*Moore v. Johnson,*
   194 F.3d 586 (5th Cir. 1999) .....................................................................378

Petition for Writ of Habeas Corpus

*Moore v. United States,*
    464 F.2d 663 (9th Cir. 1972) ........................................................................23

*Morris v. United States,*
    414 F.2d 258 (9th Cir. 1969) ........................................................................53

*Napue v. Illinois,*
    360 U.S. 264 (1959)..............................................................287, 288, 309, 314

*Neil v. Biggers,*
    409 U.S. 188 (1972)....................................................................................197

*Newman v. Harrington,*
    726 F.3d 921 (7th Cir. 2013) ......................................................................153

*Northern Mariana Islands v. Bowie,*
    243 F.3d 1109 (9th Cir. 2001) .............................................................285, 292

*Odle v. Woodford,*
    238 F.3d 1084 (9th Cir. 2001) ...............................................................passim

*Olden v. Kentucky,*
    488 U.S. 227 (1988)....................................................................................343

*United States ex rel. Palmer v. DeRobertis,*
    738 F.2d 168 (7th Cir. 1984) ......................................................................335

*Panetti v. Quarterman,*
    551 U.S. 930 (2007)......................................................................................16

*Parker v. Dugger,*
    498 U.S. 308 (1991)....................................................................................415

*Parker v. Gladden,*
    385 U.S. 363 (1966).............................................................................321, 423

*Parle v. Runnels,*
    505 F.3d 922 (9th Cir. 2007) ...............................................................20, 422

*Pate v. Robinson,*
    383 U.S. 375 (1966)................................................................................25, 53

*People v. Albritton,*
    67 Cal. App. 4th 647 (1998) .......................................................................407

Petition for Writ of Habeas Corpus

*People v. Allen and Johnson,*
No. BA105846 (Los Angeles County Super. Ct. 1997) ......................................301

*People v. Anderson,*
70 Cal. 2d 15 (1968) ..........................................................................................263

*People v. Aparicio,*
38 Cal. 2d 565 (1952) ..........................................................................................53

*People v. Ary,*
51 Cal. 4th 510 (2011) .........................................................................................23

*People v. Ayala,*
23 Cal. 4th 225 (2000) .......................................................................................385

*People v. Balderas,*
41 Cal. 3d 144 (1985) ...............................................................................160, 165

*People v. Bankston,*
No. VA007955 (Los Angeles County Super. Ct. 1995) ....................................300

*People v. Barton,*
12 Cal. 4th 186 (1995) .......................................................................................387

*People v. Barton,*
21 Cal. 3d 513 (1978) ........................................................................................414

*People v. Bishop,*
44 Cal. App. 4th 220 (1996) ..............................................................................298

*People v. Booker,*
51 Cal. 4th 141 (2011) .......................................................................................264

*People v. Bradford,*
14 Cal. 4th 1005 (1997) ...................................................................387, 389, 390

*People v. Bradford,*
15 Cal. 4th 1229 (1997) ............................................................................399, 400

*People v. Breverman,*
19 Cal. 4th 142 (1998) ..............................................................................387, 391

*People v. Bright,*
12 Cal. 4th 652 (1996) .......................................................................................397

Petition for Writ of Habeas Corpus

*People v. Butler*,
  No. NA019605 (Los Angeles County Super. Ct. 1996)....................................300

*People v. Cahill*,
  5 Cal. 4th 478 (1993)................................................................................310

*People v. Carpenter*,
  15 Cal. 4th 312 (1997)..............................................................400, 404, 406

*People v. Coefield*,
  37 Cal. 2d 865 (1951)..............................................................................408

*People v. Collins*,
  17 Cal. 3d 687 (1976)........................................................................363, 406

*People v. Davis*,
  10 Cal. 4th 463 (1995)..............................................................................397

*People v. Dickey*,
  35 Cal. 4th 884 (2005)............................................................287, 288, 310

*People v. Dillon*,
  34 Cal. 3d 441 (1983)........................................................................*passim*

*People v. Finch*,
  213 Cal. App. 2d 752 (1963)......................................................................363

*People v. Gibson*,
  106 Cal. 458 (1895)..................................................................................407

*People v. Granice*,
  50 Cal. 447 (1875)....................................................................................398

*People v. Green*,
  27 Cal. 3d 1 (1980)..................................................................................375

*People v. Guerra*,
  37 Cal. 4th 1067 (2006)............................................................................298

*People v. Guthrie*,
  144 Cal. App. 3d 832 (1983)......................................................................408

*People v. Hansen*,
  9 Cal. 4th 300 (1994)................................................................................397

xiv

*People v. Harris,*
  43 Cal. 4th 1269 (2008) ........................................................................9

*People v. Harris,*
  47 Cal. 3d 1047 (1989) ......................................................................344

*People v. Harris,*
  57 Cal. 4th 804 (2013) .......................................................................264

*People v. Hart,*
  20 Cal. 4th 546 (1999) .......................................397, 400, 406, 409

*People v. Hawthorne,*
  4 Cal. 4th 43 (1992) ...................................................................415, 420

*People v. Hayes,*
  21 Cal. 4th 1211 (1999) ....................................................................183

*People v. Hedgecock,*
  51 Cal. 3d 395 (1990) ........................................................................183

*People v. Henderson,*
  60 Cal. 2d 482 (1963) ...............................................................401, 404

*People v. Hernandez,*
  163 Cal. App. 3d 645 (1985) .....................................................362, 363

*People v. Hernandez,*
  47 Cal. 3d 315 (1988) ........................................................................408

*People v. Hill,*
  17 Cal. 4th 800 (1998) ...............................................................287, 327

*People v. Honig,*
  48 Cal. App. 4th 289 (1996) .............................................................408

*People v. Howard*
  1 Cal. 4th 1132 (1992) .......................................................................415

*People v. Hughes,*
  27 Cal. 4th 287 (2002) ...............................................................398, 399

*People v. Jackson,*
  13 Cal. 4th 1164 (1996) ....................................................................348

*People v. Jones,*
   29 Cal. 4th 1229 (2003) ........................................................407

*People v. Kelly,*
   1 Cal. 4th 495 (1992) ............................................................387

*People v. Kipp,*
   26 Cal. 4th 1100 (2001) ........................................................404

*People v. Kobrin,*
   11 Cal. 4th 416 (1995) ..........................................................402

*People v. Lewis,*
   25 Cal. 4th 610 (2001) ...................................................387, 389

*People v. Marshall,*
   15 Cal. 4th 1 (1997) ..............................................................387

*People v. Mata,*
   133 Cal. App. 2d 18 (1955) ...................................................382

*People v. Mayfield,*
   14 Cal. 4th 668 (1997) ..........................................................264

*People v. McDonald,*
   37 Cal. 3d 351 (1984) .....................................................209, 210

*People v. Mendoza,*
   23 Cal. 4th 896 (2000) ....................................................209, 401

*People v. Mendoza,*
   No. KA032117 (Los Angeles County Super. Ct. 1997)............301

*People v. Mickle,*
   54 Cal. 3d 140 (1991) ...........................................................344

*People v. Millwee,*
   18 Cal. 4th 96 (1998) ............................................................407

*People v. Moore,*
   43 Cal. 2d 517 (1954) .....................................................382, 384

*People v. Murat,*
   45 Cal. 281 (1873) ................................................................398

xvi

*People v. Nakahara,*
   30 Cal. 4th 705 (2003) ................................................................400, 404

*People v. Pennington,*
   66 Cal. 2d 508 (1967) ...............................................................................53

*People v. Pierce,*
   24 Cal. 3d 199 (1979) ............................................................................410

*People v. Pope,*
   23 Cal. 3d 412 (1979) ............................................................................154

*People v. Powell,*
   6 Cal. 5th 136 (2018) .............................................................................323

*People v. Prieto,*
   30 Cal. 4th 226 (2003) ...........................................................................375

*People v. Rain,*
   5 Cal. 3d 839 (1971) ..............................................................................324

*People v. Raley,*
   2 Cal. 4th 870 (1992) .............................................................................375

*People v. Ramkeesoon,*
   39 Cal. 3d 346 (1985) ............................................................................387

*People v. Rice,*
   59 Cal. App. 3d 998 (1976) ....................................................................382

*People v. Rigney,*
   55 Cal. 2d 236 (1961) ............................................................................363

*People v. Robertson,*
   48 Cal. 3d 18 (1989) ..............................................................................348

*People v. Rodrigues,*
   8 Cal. 4th 1060 (1994) .............................................................................25

*People v. Rogers,*
   39 Cal. 4th 826 (2006) .............................................................................23

*People v. Romero,*
   8 Cal. 4th 728 (1994) ...............................................................................16

Petition for Writ of Habeas Corpus

*People v. Ruiz,*
   44 Cal. 3d 589 (1988) ............................................................161, 165

*People v. Sakarias,*
   22 Cal. 4th 596 (2000) ....................................................................406

*People v. Samuel,*
   29 Cal. 3d 489 (1981) .......................................................................24

*People v. Sánchez,*
   No. LA011426 (Los Angeles County Super. Ct. 1994) ....................300

*People v. Sanders,*
   11 Cal. 4th 475 (1995) ....................................................................209

*People v. Seaton,*
   26 Cal. 4th 598 (2001) ....................................................................417

*People v. Silva,*
   25 Cal. 4th 345 (2001) ....................................................................404

*People v. Sloan,*
   592 N.E.2d 784 (1992) ....................................................................365

*People v. Soto,*
   63 Cal. 165 [(1883)]........................................................................399

*People v. Steele,*
   27 Cal. 4th 1230 (2002) ..................................................................385

*People v. Taylor,*
   47 Cal. 4th 850 (2009) ...............................................................23, 25

*People v. Thomas,*
   25 Cal. 2d 880 (1945) ..............................................................264, 407

*People v. Thompson,*
   27 Cal. 3d 303 (1980) .....................................................................375

*People v. Trevino,*
   39 Cal. 3d 667 (1985) .....................................................................410

*People v. Tufunga,*
   21 Cal. 4th 935 (1999) ....................................................................391

Petition for Writ of Habeas Corpus

*People v. Turner,*
   50 Cal. 3d 668 (1990) ................................................................372, 387

*People v. Turner,*
   No. A195172 (Los Angeles County Super. Ct. 1980)............................301

*People v. Visciotti,*
   2 Cal. 4th 1 (1992) ...............................................................................409

*People v. Watson,*
   30 Cal. 3d 290 (1981) ....................................................................397, 401

*People v. Webster,*
   54 Cal. 3d 411 (1991) ...........................................................................387

*People v. Wheeler,*
   4 Cal. 4th 284 (1992) ............................................................................344

*People v. Williams,*
   22 Cal. App. 3d 34 (1971) ....................................................................425

*People v. Williams,*
   71 Cal. 2d 614 (1969) ...........................................................................372

*People v. Williams,*
   No. A194636 (Los Angeles County Super. Ct. 1981)............................301

*People v. Witt,*
   170 Cal. 104 (1915) ........................................................................399, 400

*Perry v. New Hampshire,*
   565 U.S. 228 (2012) (Sotomayor, J., dissenting) ................................185

*Phillips v. Woodford,*
   267 F.3d 966 (9th Cir. 2001) ................................................................423

*Piaskowski v. Bett,*
   256 F.3d 687 (7th Cir. 2001) ................................................................410

*Powell v. Galaza,*
   328 F.3d 558 (9th Cir. 2003) ..........................................................380, 396

*Ramdass v. Angelone,*
   530 U.S. 156 (2000)..................................................................................14

xix

*Reynoso v. Giurbino,*
  462 F.3d 1099 (9th Cir. 2006) .................................................................48

*Rhay v. White,*
  385 F.2d 883 (9th Cir. 1967) ....................................................................53

*Rice v. Wood,*
  44 F.3d 1396 (9th Cir. 1995) ..................................................................363

*In re Richards,*
  55 Cal. 4th 948 (2012) (*Richards II*) ....................................................288

*In re Richards,*
  63 Cal. 4th 291 (2016) (*Richards I*)................................................288, 289

*Richardson v. United States,*
  526 U.S. 813 (1999)........................................................................404, 408

*Richey v. Mitchell,*
  395 F.3d 660 (6th Cir. 2005) .................................................................264

*Ring v. Arizona,*
  536 U.S. 584 (2002)........................................................................380, 409

*Rochin v. California,*
  342 U.S. 165 (1952)........................................................................284, 296

*Rogers v. Superior Court,*
  46 Cal. 2d 3 (1955) ...............................................................................398

*Rompilla v. Beard,*
  545 U.S. 374 (2005)........................................................16, 48, 49, 50

*Ross v. Oklahoma,*
  487 U.S. 81 (1988)..........................................................................181, 183

*Rushen v. Spain,*
  464 U.S. 114 (1983)...............................................................................360

*Sanders v. Ratelle,*
  21 F.3d 1446 (9th Cir. 1994) ...................................................................49

*Sandstrom v. Montana,*
  442 U.S. 510 (1979)........................................................................368, 370

Petition for Writ of Habeas Corpus

*In re Sassounian*,
   9 Cal. 4th 535 (1995) ................................................................ 288

*Sattazahn v. Pennsylvania*,
   537 U.S. 101 (2003) (lead opn. of Scalia, J.) .......................... 405

*Schad v. Arizona*,
   501 U.S. 624 (1991) ................................................................ 407

*Sharon S. v. Superior Court*,
   31 Cal. 4th 417 (2003) ........................................................... 408

*Simmons v. United States*,
   390 U.S. 377 (1968) ............................................ 198, 218, 219

*Smith v. Bennett*,
   365 U.S. 708 (1961) .................................................................. 18

*Snyder v. Massachusetts*,
   291 U.S. 97 (1934) ................................................................. 347

*Spano v. New York*,
   360 U.S. 315 (1959) ............................................................... 327

*In re Steven B.*,
   25 Cal. 3d 1 (1979) ............................................................... 420

*Strickland v. Washington*,
   466 U.S. 668 (1984) ............................................................ *passim*

*Strickler v. Greene*,
   527 U.S. 263 (1999) ............................................................... 286

*Sullivan v. Louisiana*,
   508 U.S. 275 (1993) ............................................................ *passim*

*Taylor v. Kentucky*,
   436 U.S. 478 (1978) ............................................................... 366

*Taylor v. Maddox*,
   366 F.3d 992 (9th Cir. 2004) .................................................... 15

*Teague v. Lane*,
   489 U.S. 288 (1989) .................................................................. 19

Petition for Writ of Habeas Corpus

*Texas v. Cobb,*
  532 U.S. 162 (2001)............................................................405

*Thomas v. Goldsmith,*
  979 F.2d 746 (9th Cir. 1992) .............................................286, 292

*Townsend v. Sain,*
  372 U.S. 293 (1963)..............................................................17

*Trevino v. Thaler,*
  569 U.S. 413 (2013)..............................................................21

*United States v. Agurs,*
  427 U.S. 97 (1976)...............................................288, 309, 314

*United States v. Archibald,*
  734 F.2d 938 (2d Cir. 1984) .............................................318, 319

*United States v. Bagley,*
  473 U.S. 667 (1985)...........................................................285, 286

*United States v. Boigegrain,*
  155 F.3d 1181 (10th Cir. 1998) .............................................153

*United States v. Cronic,*
  466 U.S. 648 (1984)................................................................156

*United States v. Davenport,*
  753 F.2d 1460 (9th Cir. 1985) ...............................................285

*United States v. Dixon,*
  509 U.S. 688 (1993)...........................................................405, 406

*United States v. Downing,*
  753 F.2d 1224 (3rd Cir. 1985)...........................................208, 209

*United States v. Frederick,*
  78 F.3d 1370 (9th Cir. 1996) ...............................................422

*United States v. Free,*
  841 F.2d 321 (9th Cir. 1988) ...............................................263

*United States v. Gagnon,*
  470 US. 522 (1985).................................................................347

Petition for Writ of Habeas Corpus

*United States v. Guerrero,*
  803 F.2d 783 (3d Cir. 1986) ........................................................336

*United States v. Hendrix,*
  549 F.2d 1225 (9th Cir. 1977) ..........................................181, 183

*United States v. Howard,*
  381 F.3d 873 (9th Cir. 2004) ..........................................................52

*United States v. Jackson,*
  726 F.2d 1466 (9th Cir. 1984) ....................................................391

*United States v. Kerr,*
  981 F.2d 1050 (9th Cir. 1992) ....................................................287

*United States v. Lane,*
  474 U.S. 438 (1986)..........................................................161, 165

*United States v. Loyola-Dominguez,*
  125 F.3d 1315 (9th Cir. 1997) ......................................................47

*United States v. Martin Linen Supply Co.,*
  430 U.S. 564 (1977)....................................................................414

*United States v. Martinez-Martinez,*
  369 F.3d 1076 (9th Cir. 2004) ....................................................292

*United States v. Novaton,*
  271 F.3d 968 (11th Cir. 2001) ..........................................361, 362

*United States v. Sanchez,*
  176 F.3d 1214 (9th Cir. 1999) ....................................................327

*United States v. Selva,*
  559 F.2d 1303 (1977)........................................................419, 421

*United States v. Shaffer,*
  789 F.2d 682 (9th Cir. 1986) ......................................................286

*United States v. Sherwood,*
  98 F.3d 402 (9th Cir. 1996) ........................................................361

*United States v. Simtob,*
  901 F.2d 799 (9th Cir. 1990) ......................................................287

*United States v. Smithers,*
   212 F.3d 306 (6th Cir. 2000) ............................................................209

*United States v. Thomas,*
   86 F.3d 647 (7th Cir. 1996) ............................................................336

*United States v. Wade,*
   388 U.S. 218 (1967).................................................................184, 198

*United States v. Wallace,*
   848 F.2d 1464 (9th Cir. 1988) ..................................................422, 423

*United States v. Warf,*
   529 F.2d 1170 (5th Cir. 1976) ........................................318, 319, 321

*United States v. Washington,*
   705 F.2d 489 (D.C. Cir. 1983) .......................................................361

*United States v. Weatherspoon,*
   410 F.3d 1142 (9th Cir. 2005) .......................................................323

*United States v. Williams,*
   436 F.2d 1166 (9th Cir. 1970) .......................................................316

*United States v. Young,*
   470 U.S. 1 (1985)............................................................287, 323, 348

*Vickers v. Ricketts,*
   798 F.2d 369 (9th Cir. 1986) ................................................387, 391

*Victor v. Nebraska,*
   511 U.S. 1 (1994)...........................................................................367

*Vierek v. United States,*
   318 U.S. 236 (1943).......................................................................287

*Vitek v. Jones,*
   445 U.S. 480 (1980).............................................................393, 406

*Vogt v. United States,*
   88 F.3d 587 (8th Cir. 1996) ...........................................................153

*Wardius v. Oregon,*
   412 U.S. 470 (1973)......................................................381, 382, 384

*Watkins v. Sowders,*
   441 U.S. 341 (1981)..............................................................210

*Wiggins v. Smith,*
   539 U.S. 510 (2003)..........................................14, 48, 156, 157

*Williams v. Superior Court,*
   36 Cal. 3d 441 (1984)......................................................161, 401

*Williams v. Taylor,*
   529 U.S. 362 (2000)....................................................14, 157, 262

*Williams v. Woodford,*
   384 F.3d 567 (9th Cir. 2004)..................................................24

*Wilson v. Sirmons,*
   536 F.3d 1064 (10th Cir. 2008) ............................................17

*In re Wilson,*
   3 Cal. 4th 945 (1992)............................................................154

*In re Winship,*
   397 U.S. 358 (1970)........................................................*passim*

*Winters v. New York,*
   333 U.S. 507 (1948)..............................................................408

*Woodson v. North Carolina,*
   428 U.S. 280 (1976)......................................................18, 415

*Ylst v. Nunnemaker,*
   501 U.S. 797 (1991)..............................................................15

*Young v. Ragen,*
   337 U.S. 235 (1949)..............................................................18

*Yun Hseng Liao v. Junious,*
   817 F.3d 678 (9th Cir. 2016) ................................................50

**Constitutional Provisions**

U.S. Const. amend. I. ....................................................11, 284

U.S. Const. amend. V...............................................*passim*

Petition for Writ of Habeas Corpus

U.S. Const. amend. VI. ...................................................................................*passim*

U.S. Const. amend. VIII...............................................................................*passim*

U.S. Const. amend. XIV ..............................................................................*passim*

**Statutes**

28 U.S.C. § 2241 ..................................................................................................3

28 U.S.C. § 2254 .........................................................................................*passim*

Cal. Evid. Code § 954 ......................................................................................160

Cal. Evid. Code § 352 ...............................................................................328, 330

Cal. Evid. Code § 402 ......................................................................................341

Cal. Evid. Code § 787 ......................................................................................340

Cal. Penal Code § 28 .......................................................................................263

Cal. Penal Code § 190.................................................................................402,417

Cal. Penal Code § 745 ................................................................................300, 322

Cal. Penal Code § 977......................................................................................348

Cal. Penal Code § 1118..........................................................................410, 413, 414

Cal. Penal Code § 1367...............................................................................23, 25

Cal. Penal Code § 1368....................................................................................23

Cal. Penal Code § 1376....................................................................................29

Cal. Penal Code § 1473...................................................................................288

Cal. Penal Code § 654 ....................................................................................3, 4

Cal. Penal Code §1163....................................................................................406

Cal. Penal Code § 1164...............................................................................363, 406

Petition for Writ of Habeas Corpus

1

**Other Authorities**

2

American Bar Association, Guidelines for the Appointment and
3    Performance of Counsel in Death Penalty Cases (1989 ed.)............................156

4    Andrea Gibbons, *City of Segregation: One Hundred Years of Struggle*
     *for Housing in Los Angeles* (2018)......................................................................69
5

6    Berkeley Law Death Penalty Clinic, *Whitewashing the Jury Box: How*
     *California Perpetuates the Discriminatory Exclusion of Black and*
7    *Latinx Jurors* (2020) ...............................................................................281

8
     CALJIC No. 1.00 ...............................................................................369
9

10   CALJIC No. 2.01 ...............................................................................367

11   CALJIC No. 2.02 ...............................................................................367

12   CALJIC No. 2.13 ...........................................................381, 382, 383, 384

13   CALJIC No. 2.21.2 ...............................................................................370

14   CALJIC No. 2.22 ...............................................................................370

15   CALJIC No. 2.24 ...................................................................381, 383
16

17   CALJIC No. 2.27 ...................................................................371, 372

18   CALJIC No. 2.51 ...............................................................................369

19   CALJIC No. 2.90 ...............................................................................366

20   CALJIC No. 8.20 ...................................................................396, 403

21   CALJIC No. 8.21 ...................................................................396, 403
22

23   CALJIC No. 8.67 ...................................................................352, 353

24   CALJIC No. 8.81.17 ...............................................................................*passim*

25   CALJIC No. 8.83 ...............................................................................367

26   CALJIC No. 8.83.1 ...............................................................................367

27   CALJIC No. 9.40.2 ...............................................................................387

28

Petition for Writ of Habeas Corpus

CALJIC No. 17.51 .................................................................................................363

Calvin John Smiley and David Fakunle, *From "Brute" to "Thug:"*
*The Demonization and Criminalization of Unarmed Black Male*
*Victims in America*, J. Hum. Behav. Soc. Environ. 2016; 26(3-4):
350-66 ...................................................................................................................322

Cassia Sphon, John Gruhl & Susan Welch, *The Impact of the*
*Ethnicity and Gender of Defendants on the Decision to Reject or*
*Dismiss Felony Charges*, 25 Criminology 175 (1987)............................278, 299

Death Penalty Info. Ctr., *The Death Penalty in 2019: Year End Report*
10 (2019)..............................................................................................................296

Department of Justice, *Unit Guide #53:*
*Identification/Collection/Preservation of Evidence* 53-1 (1986) .............248, 249

Department of Justice, *Crime Scene Investigation: A Guide for Law*
*Enforcement* (2000) ....................................................................................251, 252

Dieter, *Sentencing For Life: Americans Embrace Alternatives to the*
*Death Penalty*, Death Penalty Information Center (Apr. 1993)........................173

E. Woo, & E. Malnic, *Daryl F. Gates Dies at 83; Innovative But*
*Controversial Chief of the LAPD*, Los Angeles Times, (March 8,
2014). ..........................................................................................................108, 114

Elizabeth Loftus, *Eyewitness Testimony* (1996).....................................198, 200, 202

Equal Justice Initiative, *Reconstruction in America. Racial Violence*
*After the Civil War* (2020) ...................................................................................60

Finn, *Given Choice, Va. Juries Vote For Life; Death Sentences Fall*
*Sharply When Parole Is Not An Option*, Washington Post (Feb. 3,
1997) ....................................................................................................................173

Fisher, *Techniques of Crime Scene Investigation* (1993) ...................................*passim*

Glenn Pierce & Michael Radelet, *Impact of Legally Inappropriate*
*Factors on Death Sentencing for California Homicides*, 1990-99,
46 Santa Clara L. Rev. 1 (2005) ........................................................................279

Grosso et. al., *Death by Stereotype: Race, Ethnicity and California's
 Failure to Implement Furman's Narrowing Requirement*, 1433-42,
 66 UCLA L. REV. 1394 (2019) .......................................................................298

Isabel Wilkerson, *The Warmth of Other Suns: The Epic Story of
 America's Great Migration* (2010).......................................................60, 67, 68

Julianne Hing, *Deputy Testimony Confirms Culture of Abuse in L.A.
 County Jails*, Colorlines (June 6, 2014)............................................................313

L. Vogelman, *Big Black Man Syndrome: The Rodney King Trial and
 the Use of Racial Stereotypes in the Courtroom*, Fordham Urb. L.J.
 571-78 (1993).....................................................................................................277

Lynch and Haney, *Death Qualification in Black and White:
 Racialized Decision Making and Death-Qualified Jurors*, 40 Law
 & Pol'y 148 (2018) ............................................................................................281

Marie Nicole Bowman, *Confronting Racist Prosecutorial Rhetoric at
 Trial* 71 Case Western Reserve L. Review (2020)...........................................323

Matcheri Keshavan et. al., *A Dimensional Approach to the Psychosis
 Spectrum Between Bipolar Disorder and Schizophrenia: The
 Schizo-Bipolar Scale*, Schiophr Res, 133 (1-3): 250-54 (Dec. 2011) ...............42

Nettles, B., Nettles, Z.S., Wells, *I Noticed You Paused on Number
 Three*, The Champion 10 (November 1996)......................................................196

Nicholas Petersen, *Cumulative Racial and Ethnic Inequalities in
 Potentially Capital Cases: A Multistate Analysis of Pretrial
 Disparities* Crim. Just. Rev. 225 (2017)..................................................279, 296

Phillip Atiba Goff et al., *Not Yet Human: Implicit Knowledge,
 Historical Dehumanization, and Contemporary Consequences* J.
 Personality & Soc. Psychol. 292 (2008)........................................................300, 323

Praatika Prasad, *Implicit Racial Biases in Prosecutorial Summations:
 Proposing an Integrated Response*, 86 Fordham L. Rev., vol. 86,
 Issue 6, Article 24, 3091 (2018) ......................................................................322

Report of the Independent Commission on the Los Angeles Police
 Department (1991)..............................................................................................290

Petition for Writ of Habeas Corpus

Robert J. Smith & Justin D. Levinson, *The Impact of Implicit Racial Bias on the Exercise of Prosecutorial Discretion*, 35 Seattle U. L. Rev. 795 (2012) ............................................................................ 322

Ryan Patrick Alford, *Appellate Review of Racist Summations: Redeeming the Promise of Searching Analysis,* 11. Mich. J. Race & L 325, 345 (2006) ............................................................................ 323

Steven F. Shatz & Nina Rivkind, *The California Death Penalty Scheme: Requiem for Furman*, 72 N.Y.U. L. Rev. 1283 (1997) ...................... 280

Steven F. Shatz, *The Eighth Amendment, the Death Penalty, and Ordinary Robbery-Burglary Murderers: A California Case Study,* 59 Fla. L. Rev 719 (2007) ............................................................. 280

Susan D. Rozelle, *The Principled Executioner: Capital Juries' Bias and the Benefits of True Bifurcation*, 38 Ariz. St. L. J. 769 (2006) ......... 167, 171

Petition for Writ of Habeas Corpus

1  Lanell Craig Harris
2  # D-03812
3  Mule Creek State Prison
   P.O. Box 409099
4  Ione, CA 95640

5

6

7

8

9              UNITED STATES DISTRICT COURT

10        FOR THE CENTRAL DISTRICT OF CALIFORNIA

11  LANELL CRAIG HARRIS,

12              Petitioner,                **Petition for Writ of Habeas Corpus
                                           by a Prisoner in State Custody**

13         v.
                                           (28 U.S.C. § 2254)
14  PATRICK COVELLO, Warden of
15  California State Prison at San Quentin,

16              Respondent.

17

18         Petitioner Lanell Craig Harris respectfully petitions this Court for a writ of
19  habeas corpus pursuant to Title 28 of the United State Code, sections 2241 and
20  2254 et seq., and by this verified petition alleges the following facts and causes for
21  issuance of the writ:
22

23                   I.    INTRODUCTION
24         Mr. Harris was convicted and sentenced to death for a single homicide based
25  on tainted eyewitness identifications and questionable informant testimony
26  procured only after the Los Angeles Police Department offered a reward for
27  information leading to a conviction.  Despite multiple leads pointing to other
28

                                    1

1    suspects, the police focused solely on Mr. Harris and never apprehended a second
2    suspect. The identification procedures used in Mr. Harris's case were so suggestive
3    that most of the eyewitnesses, whose descriptions of the perpetrator varied widely,
4    initially selected people other than Mr. Harris from numerous photo arrays before
5    settling on Mr. Harris only *after* they saw his photograph in the newspaper and
6    shared it with each other. During a live lineup, one eyewitness blurted out in front
7    of the others that Mr. Harris was the perpetrator, further tainting the identifications
8    of all the eyewitness. Despite the repeat exposure under suggestive circumstances,
9    one of the eyewitnesses was unable to identify Mr. Harris in court even when the
10   prosecutor improperly pointed him out in the courtroom.

11       Mr. Harris's trial was also tainted by racial bias that affected the prosecutor's
12   charging decisions and caused her to refer to Mr. Harris in dehumanizing, racially
13   coded terms, including calling him a "Bengal tiger," "brute," "murderous thug,"
14   "terrorist" and "muscular and big, scary." In addition, several seated jurors
15   acknowledged harboring bias against Black people or made statements indicating
16   such bias. These biases created an excessive risk that the jurors based their verdict
17   on considerations of race and ethnicity rather than the evidence before them.

18       The defense investigation similarly was hampered by racial stereotypes
19   about Black men that prevented the trial team from investigating and discovering
20   that Mr. Harris is intellectually disabled and suffers from psychotic symptoms
21   associated with schizophrenia, including auditory hallucinations, and trauma-based
22   symptoms such as paranoia, hypervigilance and depression, which prevented him
23   from forming the requisite intent for first degree murder. Despite his awareness
24   that Mr. Harris attempted suicide on several occasions and reported experiencing
25   psychotic symptoms to a trial team member, counsel failed to declare a doubt as to
26   Mr. Harris's competency to stand trial, failed to provide readily available
27   information to his mental health expert, and failed to present this information to the
28

1    jury.

2    Although the California Supreme Court granted an order to show cause as to

3    Mr. Harris's claim that he is intellectually disabled and therefore ineligible for the

4    death penalty, and Mr. Harris was ultimately resentenced to life without the

5    possibility of parole, the state courts failed to remedy the constitutional violations

6    that occurred during the guilt phase of Mr. Harris's trial, necessitating this Petition.

7    Mr. Harris respectfully requests that this Court right this wrong and grant a writ of

8    habeas corpus.

9

10                          **II.    JURISDICTION**

11    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 2241

12    and 2254.  Venue in this Court is proper because it is the court for the district

13    containing the state court of conviction (Superior Court of Los Angeles County,

14    California).  28 U.S.C. § 2241(d).

15

16            **III.    PROCEDURAL HISTORY AND BACKGROUND**

17    **A.    Conviction Upon Which the Judgment Is Based**

18    *Nature of Offenses*:        The judgment relates to convictions for the murder

19    of Julian Contreras under California Penal Code section 187;[1] FHP Exh. 1[2]

20    (Amended Abstract of Judgment) at 8-9.  The Court stayed the sentences for all

21    counts other than murder under California Penal Code section 654.  CT 486-99.

22

23    [1]    Throughout this Petition, the Clerk's Transcript will be cited as "CT," the

24    Reporter's Transcript as "RT," and any supplemental volumes of these transcripts

25    as "CT Supp."

26    [2]    Throughout this Petition, exhibits submitted in support of the state habeas

27    petition will be prefaced with "SHP" and exhibits submitted in support of this

28    federal habeas petition will be prefaced with "FHP."

                                    3

1    *Case Number*:        Los Angeles County Superior Court Case No. LA008803

2    Date of Conviction:        June 11, 1993

3    *Date of Sentence*: July 2, 1993 (death penalty); February 16, 2022

4    (resentenced to life without the possibility of parole). FHP Exh. 1 at 8-9.

5    *Date of Judgment*: January 12, 1994 (judgement of death); February 16,

6    2022 (judgement after resentencing to life without the possibility of parole). FHP

7    Exh. 1 at 8-9.

8        *Sentence*:        Life without the possibility of parole (for murder with special

9    circumstance). FHP Exh. 1 at 8-9. Sentencing for all other convictions was stayed

10   pursuant to California Penal Code section 654.

11   **B.    Pretrial and Trial Proceedings**

12       By information filed on March 26, 1992, in Los Angeles County Superior

13   Court, Lanell Craig Harris was charged with two counts of murder under section

14   187, subdivision (a) (Counts 1 and 6), one count of attempted willful, deliberate

15   and premeditated murder, under sections 664/187 (Count 2), and three counts of

16   second-degree robbery under section 211 (Counts 3, 4 and 5).  The offenses

17   charged in Counts 1 through 5 were alleged to have been committed on or about

18   August 7, 1991; the offense charged in Count 6 was alleged to have been

19   committed on or about January 3, 1991. As to Count 1, a special circumstance of

20   murder in the commission of a robbery was alleged within the meaning of section

21   190.2, subdivision (a)(17). It was also alleged that the offenses charged in Counts 1

22   and 6 were a special circumstance (multiple murder) within the meaning of section

23   190.2, subdivision (a)(3). Personal use of a firearm, to wit, a handgun, within the

24   meaning of section 12022.5, subdivision (a), was alleged as to Counts 1 through 5;

25   arming with a firearm, to wit, a handgun, within the meaning of section 12022,

26   subdivision (a)(1), was alleged as to Counts 3 through 5; and personal use of a

27   deadly and dangerous weapon, to wit, a butcher knife, within the meaning of

28

4

section 12022, subdivision (b), was alleged as to Count 6. Each count also contained allegations of a serious felony, pursuant to section 1192.7, subdivision (c), and of a prior felony conviction (violation of section 245, subdivision (a)(l)), on April 24, 1985), within the meaning of section 667.5, subdivision (b). CT 142-49.

An amended information was filed on August 18, 1992, adding another prior felony conviction allegation (one count of residential robbery and two counts of robbery in violation of sections 213.5 and 211, on March 5, 1985), within the meaning of section 667, subdivision (a). The amended information also changed the date of the alleged prior section 245 conviction to March 5, 1985, in the same case number as the alleged prior robbery convictions. CT 150-58.

On March 26, 1992, Mr. Harris was arraigned, entered pleas of not guilty to all counts, and denied the special circumstance and other allegations. CT 183; RT 3.

On April 28, 1993, jury selection commenced before the Honorable Bert Glennon, Jr., in Los Angeles County Superior Court Department Northwest 0, in Van Nuys. CT 213.

On May 19, 1993, the jury was sworn, opening statements were delivered, and testimony in the guilt phase began. CT 225. The jury commenced deliberations at 2:00 p.m. on June 3, 1993. CT 240. On June I 0, 1993, the jury announced that it had reached verdicts on five of six counts, but had reached an "impasse/stalemate," which it believed to be "fixed and unsolvable," on one of the six counts and on a special allegation on one of the six counts. CT 253. The court ordered the verdicts sealed and the matter continued until June 11, 1993. Later the same day, the clerk received a phone call indicating possible juror misconduct and so informed the court. CT 254.

On June 11, 1993, the court and counsel discussed the incident of possible

juror misconduct; the court found that the misconduct had occurred after the verdicts had been sealed and that the verdicts should be taken as sealed. CT 366-68. The jury verdicts were then recorded, finding Mr. Harris guilty in Count 1 of first-degree murder and the robbery special circumstance to be true. The jury also found Mr. Harris guilty of attempted murder (Count 2) and of three counts of second-degree robbery (Counts 3 through 5). The jury further found true all of the firearm use and arming allegations in Counts 1 through 5. The jury was unable to reach a unanimous verdict as to whether the attempted murder alleged in Count 2 was willful, deliberate and premeditated. The jury also could not reach a unanimous verdict as to the charge of murder in Count 6, and the court declared a mistrial as to that count. CT 352-68.

On June 16, 1993, prior to the commencement of the penalty phase, Mr. Harris admitted two prior felony convictions, one within the meaning of section 667, subdivision (a), and the other within the meaning of section 667.5, subdivision (b).[3] The penalty phase commenced on the same date. CT 369-70.

Jury deliberations on penalty began at 2:45 p.m. on June 29, 1993. CT 377. On July 1, 1993, the jury sent a note to the court, asking the court, inter alia, to "define Life without the possibility of parole/Death penalty." CT 379. Following the court's response, the jury resumed deliberations. CT 380. On July 2, 1993, the jury returned its death verdict. CT 414-15.

On December 28, 1993, Mr. Harris filed a motion to modify sentence to life without the possibility of parole (CT 421-26), a motion for new trial (CT 427-33), and a motion to dismiss Count 6 and all remaining allegations (CT 434-36).

On January 12, 1994, Mr. Harris's motions for new trial and for modification of sentence were heard and denied. On the same day, the court imposed an

---

[3]    The prior felony convictions alleged in the information were not tried to the jury at the guilt phase.

6

aggregate sentence of 16 years for Counts 2 through 5, then stayed that sentence as well as the terms for the two priors pending execution of sentence as to Count 1. The court also dismissed Count 6 and any remaining enhancements on motion of the People in furtherance of justice. Finally, the court sentenced Mr. Harris to death on Count 1, first degree murder with the robbery special circumstance. CT 486-99.

C.     Automatic Appeal (California Supreme Court Case No. S037625)

*Appointment of Appellate Counsel.* Following the filing of a Notice of Automatic Appeal, the California Supreme Court appointed the Office of the State Public Defender to represent Mr. Harris in his direct appeal proceedings on July 22, 1998.

*Appellate Briefing.* Mr. Harris's appellate counsel filed Appellant's Opening Brief in the California Supreme Court on October 8, 2004. The following issues related to Mr. Harris's guilt phase were raised:

1.     The Prosecutor Improperly, Unconstitutionally, and Prejudicially Led Prosecution Witness Efren Reyes into an In-Court Identification of Appellant After the Witness Had Been Unable to identify Mr. Harris in the Courtroom.

2.     The Erroneous Admission of Evidence That Prosecution "Snitch" Witness Robert James Was Threatened by Mr. Harris's Sister, Compounded by The Prosecutor's Improper Suggestion in Her Closing Argument that Appellant Was Connected to Such Threats, Violated Mr. Harris's Fundamental Constitutional Rights.

3.     The Trial Court Violated Mr. Harris's Constitutional Rights to Confrontation and to Present a Defense, and Committed Prejudicial Error, by Refusing to Allow Defense Counsel to Impeach Critical Prosecution Witness Robert James with Undisputed Evidence of his Poor Performance on Probation.

4.    The Trial Court Committed Instructional Errors Which Unfairly, Unconstitutionally, and Prejudicially Bolstered the Credibility of the Three Prosecution "Snitch" Witnesses Who Testified Against Mr. Harris.

5.    A Series of Instructions, Exacerbated by Erroneous Closing-Argument Comments by Both the Prosecutor and Defense Counsel, Unconstitutionally Undermined and Diluted the Requirement of Proof Beyond a Reasonable Doubt.

6.    The Trial Court Prejudicially Erred, and Violated Mr. Harris's Constitutional Rights, in Instructing the Jury on First Degree Premeditated Murder and First-Degree Felony-Murder Because the Information Charged Appellant Only with Second Degree Malice-Murder in Violation of Penal Code Section 187.

7.    The Trial Court Committed Reversible Error, and Denied Mr. Harris His Constitutional Rights, in Failing to Require the Jury to Agree Unanimously on Whether Mr. Harris Had Committed a Premeditated Murder or a Felony-Murder Before Returning a Verdict Finding Him Guilty of Murder in the First Degree.

8.    The Trial Court's Erroneous and Unconstitutional Failure to Instruct on Theft as a Lesser Included Offense of Robbery Requires Reversal of the Murder Conviction, the Robbery-Murder Special Circumstance Finding, and the Robbery Convictions in Counts 3 Through 5.

9.    The Trial Court's Erroneous and Unconstitutional Instruction on the Robbery-Murder Special Circumstance Requires Reversal of the Special Circumstance Finding.

10.    Mr. Harris Was Prejudicially Denied Due Process, His State Statutory and Federal Constitutional Rights to be Present, and His Right to a Reliable Determination of His Guilt or Innocence, by the Trial Court's Errors in Conducting Critical Proceedings in His Absence.

11.    Reversal Is Required Based on the Cumulative Effect of Errors That Undermined the Fundamental Fairness of the Trial.

12.    As a Matter of Double Jeopardy, the Trial Court's Erroneous Denial of Mr. Harris's Motion for Acquittal of First-Degree Murder in Count 6 Precludes Any Retrial for That Offense Because There Was Legally Insufficient Evidence of First-Degree Murder Presented on That Count at Mr. Harris's Trial.

13.    The Judgment Must Be Reversed Because Mr. Harris Was Denied a Complete and Accurate Record on Appeal, in Violation of His Constitutional and Statutory Rights.

On April 18, 2005, the Attorney General's Office filed Respondent's Brief. On January 6, 2006, appellate counsel filed Appellant's Reply Brief. The matter was argued and submitted on May 5, 2008.

*Appellate Decision*.    On June 19, 2008, the California Supreme Court affirmed Mr. Harris's conviction and death sentence. *People v. Harris*, 43 Cal. 4th 1269 (2008).    On July 3, 2008, Mr. Harris filed a petition for rehearing of the California Supreme Court's judgment on the automatic appeal, which was denied on July 30, 2008.   Mr. Harris filed a petition for a writ of certiorari in the United States Supreme Court on October 28, 2008.   The United States Supreme Court denied this petition on January 12, 2009.   *Harris v. California*, 555 U.S. 1111 (2009).

**D.    State Habeas Corpus Proceedings (California Supreme Court Case No. S144756)**

*Appointment of Habeas Corpus Counsel*.   On July 22, 1998, the California Supreme Court appointed private counsel Alfons G. Wagner to represent Mr. Harris in state post-conviction proceedings and in clemency proceedings.

*State Habeas Briefing*.   Mr. Harris filed a timely Petition for Writ of Habeas Corpus on July 3, 2006. The issues related to the guilt phase of Mr. Harris's capital proceedings were:

1.    Petitioner Was Deprived of the Effective Assistance of Counsel by His

9

Trial Attorney's Failure to Adequately Voir Dire the Trial Jurors and to Effectively Challenge Juror Misconduct.

2.   Petitioner's Constitutional Rights Were Violated Because His Trial Counsel Provided Ineffective Assistance by Failing to Move to Sever the Rodriguez Homicide from the Contreras Homicide.

3.   Petitioner's Constitutional Rights Were Violated Because His Trial Counsel Provided Ineffective Assistance by Failing to Challenge the Unreliable Eyewitness Identifications of Petitioner.

4.   Petitioner's Constitutional Rights Were Violated Because His Trial Counsel Provided Ineffective Assistance by Failing to Consult with or Present the Testimony of an Eyewitness Identification Expert.

5.   Petitioner Was Deprived of His Constitutional Rights by Prosecutorial Misconduct in Failing to Disclose Material Exculpatory Evidence and Depriving Petitioner of an Accurate, Complete and Reliable Record.

6.   The Presentation of False and Misleading Testimony and False Inferences Irreparably Skewed the Jury's Decision-Making Process.

7.   Trial Counsel Provided Constitutionally Defective Representation When Counsel Failed to Effectively Investigate and Present the Unreliable Physical Evidence Investigation and the Deficient Processing of the Crime Scene.

8.   Petitioner Received Ineffective Assistance of Counsel at the Guilt Phase of His Capital Trial Due to Counsels' Failure to Conduct an Adequate Investigation.

9.   Petitioner's Constitutional Rights Were Violated Because His Trial Counsel Provided Ineffective Assistance by Failing to Investigate and Present Evidence of Third-Party Culpability.

10.   Petitioner's Constitutional Rights Were Violated Because Trial Counsel Provided Ineffective Assistance by Failing to Challenge the Threat Evidence Made

10

Against Prosecution Witness Robert James, Jr.

11.    The Prosecution Engaged in a Pervasive Pattern of Misconduct During the Guilt and Penalty Trials, Rendering the Trial Fund Ament Ally Unfair, and Depriving Petitioner of His Rights Under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

12.    Petitioner Was Denied the Right to Effective Assistance of Counsel at the Guilt and Penalty Phases of His Trial Because His Trial Counsel Unreasonably Failed to Competently Investigate, Prep Are and Present Evidence of Petitioner's Upbringing Including His Multiple Placements in Institutions.

13.    Petitioner Was Deprived of His Right to The Effective Assistance of Counsel and to a Fair and Reliable Determination of Guilt and Penalty by Trial Counsel's Failure to Investigate and Present Evidence of Petitioner's Mental Impairments and to Effectively Use the Mental Health Expert at the Guilt and Penalty Phases of Petitioner's Capital Trial.

14.    Petitioner Was Tried While Incompetent in Violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

15.    Petitioner's Convictions and Death Sentence Must Be Vacated Because of the Cumulative Effect of All the Errors and Constitutional Violations Shown in This Petition and the Automatic Appeal.

The Attorney General's Office filed an Informal Response to the Petition on October 1, 2007, and Mr. Harris filed an Informal Reply to the Informal Response on March 13, 2009.  On July 29, 2015, the California Supreme Court directed respondent to file a supplemental informal response to the petition for writ of habeas corpus "addressing whether, in light of the declaration of Dr. Natasha Khazanov attached as exhibit 2 to petitioner's reply brief, petitioner's Claim XVIII states a prima facie claim that he may not be executed because he is intellectually disabled within the meaning of *Atkins v. Virginia* (2002) 536 U.S. 304 and *In re*

1    *Hawthorne* (2005) 35 Cal. 4th 40." Respondent filed a supplemental informal

2    response on February 9, 2016, and Mr. Harris filed a supplemental informal reply

3    on June 21, 2016.

4    On August 12, 2015, Mr. Wagner withdrew as habeas corpus/executive

5    clemency counsel. The California Appellate Project (CAP) in San Francisco was

6    appointed to represent Mr. Harris for habeas corpus/executive clemency

7    proceedings.

8    ***State Habeas Decision.*** On September 13, 2017, the California Supreme

9    Court ordered respondent to show cause in the Los Angeles County Superior Court

10   as to "why petitioner's death sentence should not be vacated and petitioner

11   sentenced to life imprisonment without possibility of parole on the ground that he

12   is intellectually disabled within the meaning of *Atkins v. Virginia* (2002) 536 U.S.

13   304, as alleged in Claim XVIII of the petition for writ of habeas corpus filed on

14   July 3, 2006. (*See In re Hawthorne* (2005) 35 Cal. 4th 40.)" *In re Lanell Craig*

15   *Harris*, No. S144756. The California Supreme Court denied all other claims

16   related to the guilt phase on the merits and also denied Claim XII (Claim 11 in the

17   list above) as procedurally barred. The Court then transferred the case to Los

18   Angeles County Superior Court for adjudication of the claim as to which the order

19   to show cause was granted.

20   The Habeas Corpus Resource Center was appointed on December 20, 2017

21   to replace CAP as counsel for habeas corpus and executive clemency proceedings.

22   The Los Angeles County District Attorney's Office filed a Return to the

23   Amended Petition on June 28, 2019. On October 29, 2021, the District Attorney

24   filed a Motion to Withdraw the Return and a Request to Impose a Sentence of Life

25   Without the Possibility of Parole. Following a request by the Superior Court for

26   further briefing on November 19, 2021, Mr. Harris filed a Stipulation Following

27   Respondent's Withdrawal of the Return on December 13, 2021. On January 26,

28

12

2022, the Superior Court issued an order discharging the Order to Show Cause and granting the petition for writ of habeas corpus as to Mr. Harris's claim that he is intellectually disabled and therefore ineligible for the death penalty. At a hearing on February 16, 2022, the Superior Court vacated Mr. Harris's death sentence, and resentenced Mr. Harris to life without the possibility of parole. The court issued an amended abstract of judgment on February 18, 2022, reflecting the new sentence.

**E.    Current State Habeas Corpus Proceedings**

All of the claims contained in the instant Petition have been fairly presented to the California Supreme Court.

**F.    Other Petitions**

There are no other petitions currently pending in any court attacking the judgment at issue herein and none has previously been filed except for those set forth above. Mr. Harris has not previously sought relief arising out of the same matter from this Court or any other federal court.

## IV.   AEDPA

**A.    AEDPA Standards**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to this Petition because the Petition is being filed after April 16, 1996. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA, however, does not foreclose relief for the violation of Mr. Harris's constitutional rights. Under AEDPA, this Court may grant habeas relief if it determines that Mr. Harris suffered a violation of his federal constitutional rights and that Mr. Harris has satisfied 28 U.S.C. section 2254(d). See 28 U.S.C. § 2254(a), (d). Section 2254(d) is satisfied if the Court finds that the state court's adjudication of Mr. Harris's claims was either (1) contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or (2) based on an unreasonable

determination of the facts in light of the record that was before the state court. 28 U.S.C. § 2254(d). Mr. Harris is not required to satisfy both sections 2254(d)(1) and 2254(d)(2). *Harrington v. Richter*, 562 U.S. 86 (2011). Section 2254(d) only applies to state court decisions addressing the substantive grounds of a claim. *Lambert v. Blodgett*, 393 F.3d 943, 966-67 (9th Cir. 2004).

Clearly established federal law refers to "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63 (2003). Although the source of clearly established federal law must be the Supreme Court, circuit court decisions remain persuasive authority in determining what law is clearly established. *Duhaime v. Ducharme*, 200 F.3d 597, 600 (9th Cir. 2000).

A state court acts contrary to clearly established federal law if it applies a legal rule that contradicts a prior Supreme Court holding or if it reaches a different result than a Supreme Court case presenting indistinguishable facts. *Ramdass v. Angelone*, 530 U.S. 156, 165-66 (2000). Similarly, "[t]he addition, deletion, or alteration of a factor in a test established by the Supreme Court also constitutes a failure to apply controlling Supreme Court law under the 'contrary to' clause of AEDPA." *Benn v. Lambert*, 283 F.3d 1040, 1051 n.5 (9th Cir. 2002) (citing (Terry) *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).

A state court decision involves an unreasonable application of clearly established federal law if it identifies the correct legal principle but applies it in an unreasonable manner to the particular facts before it. *Terry Williams*, 529 U.S. at 407. A state court decision is also an "unreasonable application" of law if it unreasonably extends a legal principle to a new context or unreasonably refuses to extend a legal principle to a context where it should apply. *Id.* at 397, 407.

Section 2254(d)(2) allows petitioners to challenge the state court's factual findings based upon the evidence before the state court. *Wiggins v. Smith*, 539 U.S.

14

510, 528 (2003).  A § 2254(d)(2) challenge can be premised on any one of numerous theories, including that: (1) the state's factual finding is unsupported by sufficient evidence or is based on a misstatement of the evidence; (2) the state court fact-finding process is defective; (3) no factual finding was made by the state court at all; and (4) the state court makes factual findings under the wrong legal standard. *Taylor v. Maddox*, 366 F.3d 992, 1000-01 (9th Cir. 2004).

Federal court review of a state court decision under section 2254(d) is limited to the record that was before the state court that adjudicated the claim on the merits.  See 28 U.S.C. § 2254(d)(2); *Cullen v. Pinholster*, 563 U.S. 170 (2011). The state-court record "includes both the allegations of [the] habeas corpus petition . . . and . . . any matter of record pertaining to the case." *Pinholster*, 563 U.S. at 188 n.12 (internal quotation marks omitted).  The relevant state court decision is the last reasoned decision regarding a claim.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir. 2013) (explaining that the *Ylst* "look through" doctrine still applies after *Richter*).

The Supreme Court has stated that "in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340, (2003).  To that end, while the standard as articulated in section 2254 is demanding, it is not insatiable; "[d]eference does not by definition preclude relief." *Miller-El v. Dretke*, 545 U.S. 231, 240, (2005) (internal quotation marks omitted).

Section 2254(d) does not preclude relief for the claims stated herein because: (1) the state court's denial of the claims was contrary to or an unreasonable application of clearly established federal law; (2) the state court's denial of the claims was based on an unreasonable factual determination; and/or (3) section 2254(d) does not apply to the claims because they were not adjudicated on the merits in state court.  When section 2254(d) does not apply or is satisfied, the

1   federal habeas court reviews a claim de novo. *See Cone v. Bell*, 556 U.S. 449, 472,

2   (2009); *Panetti v. Quarterman*, 551 U.S. 930, 953-54 (2007); *Rompilla v. Beard*,

3   545 U.S. 374, 390 (2005); *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en

4   banc).

5   **B.   Suspension of the Writ**

6          The denial of federal habeas relief without adequate federal and/or state

7   court process and fact-development procedures is an unconstitutional suspension of

8   the writ of habeas corpus.

9          In *Richter*, the Supreme Court held that a state court summary denial is

10   presumed to be an adjudication on the merits and "the habeas petitioner's burden

11   [under section 2254(d)] still must be met by showing there was no reasonable basis

12   for the state court to deny relief."   562 U.S. at 98.   In *Pinholster*, the Supreme

13   Court held that "review under § 2254(d)(1) is limited to the record that was before

14   the state court that adjudicated the claim on the merits."   563 U.S. at 181-82.

15   These two cases working together impede Mr. Harris's ability to receive federal

16   factual development where he was denied state factual development.

17          In California, a state court summary denial means the state court determined

18   the petition did not state a prima facie case for relief. *People v. Romero*, 8 Cal. 4th

19   728, 737 (1994); *see also Pinholster*, 563 U.S. at 189 n.12.   All but one of Mr.

20   Harris's claims were summarily denied, so he was never given the opportunity for

21   factual development of those claims. *See Romero*, 8 Cal. 4th at 739-40.   Because

22   many habeas claims require factual development to be colorable, *McFarland v.

23   Scott*, 512 U.S. 849, 855 (1994), full and fair factual development at the state court

24   level necessarily is a predicate to the application of section 2254(d) in federal

25   court. *See Boumediene v. Bush*, 553 U.S. 723, 790 (2008) (holding that federal

26   habeas proceedings may be constitutionally circumscribed only to the extent that

27   some court is available to consider the relevant evidence supporting a claim);

28

Petition for Writ of Habeas Corpus

1    *Harris v. Nelson*, 394 U.S. 286, 300 (1969) (holding that "it is the duty of the court

2    to provide the necessary facilities and procedures for an adequate inquiry" into

3    colorable claims); *Townsend v. Sain*, 372 U.S. 293, 313 (1963) (describing the

4    content of a full and fair state court adjudication with emphasis on factual

5    development), overruled on other grounds by *Keeney v. Tamayo-Reyes*, 504 U.S. 1

6    (1992); *Wilson v. Sirmons*, 536 F.3d 1064, 1082 (10th Cir. 2008) ("When a state

7    court has not examined the non-record evidence, it has reached no conclusion 'on

8    the merits.'") (citing *Hoffman v. Arave*, 236 F.3d 523, 536 (9th Cir. 2001)); *Killian*,

9    282 F.3d 1204, 1207-08 (9th Cir. 2002) ("Having refused Killian an evidentiary

10   hearing on the matter, the state cannot argue now that the normal AEDPA

11   deference is owed the factual determinations of the California courts."); *cf. Monroe*

12   *v. Angelone*, 323 F.3d 286, 297 (4th Cir. 2003) (holding that § 2254(d) does not

13   apply when a *Brady* claim is premised on evidence surfacing for the first time in

14   federal proceedings); *but see Blodgett*, 393 F.3d at 965-66 ("We decline to hold

15   that AEDPA's reference to 'adjudicated on the merits' authorizes us to review the

16   form or sufficiency of the proceedings conducted by the state court.").

17        The federal court requirement that Mr. Harris satisfy section 2254(d) based

18   on the record before the state court – a record that is necessarily limited because he

19   was not entitled to fact-development procedures – violates Mr. Harris's

20   constitutional rights. In the absence of a full and fair opportunity to litigate habeas

21   claims in state court, the application of AEDPA to those claims violates Mr.

22   Harris's right to due process and results in a suspension of the writ by leaving Mr.

23   Harris with no effective remedy for federal constitutional violations occurring at

24   his criminal trial. *See Boumediene*, 553 U.S. at 790; *Jefferson v. Upton*, 560 U.S.

25   284, 293-94, (2010); *Ford v. Wainwright*, 477 U.S. 399, 424 (1986)

26   ("[F]undamental fairness is the hallmark of the procedural protections afforded by

27   the Due Process Clause."); *Case v. Nebraska*, 381 U.S. 336, 338 (1965) (Clark, J.,

28

17

concurring) (explaining that the exhaustion doctrine "presupposes that some adequate state remedy exists"); *Young v. Ragen*, 337 U.S. 235, 238-39 (1949). Equally, it violates the equal-protection guarantee as it applies to indigent petitioners, *Smith v. Bennett*, 365 U.S. 708, 714 (1961), and undermines the reliability of capital sentencing under the Eighth Amendment, *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

Accordingly, AEDPA deference should not apply to those claims for which Mr. Harris was denied factual development in state court, and he should be afforded the opportunity to factually develop those claims in this Court.

## V.   INCORPORATION OF EXHIBITS AND REQUEST FOR JUDICIAL NOTICE

1.   While Mr. Harris has made every effort to specifically state all facts and law supporting each claim in this Petition, additional supporting facts and law may have been stated in separate claims. For this reason, Mr. Harris incorporates by reference each and every paragraph of this Petition into each and every claim presented, as if fully set forth. Mr. Harris also incorporates into each claim all exhibits filed concurrently with this Petition and all exhibits which may be subsequently filed in this action.

2.   Mr. Harris requests that this Court take judicial notice of the certified record on appeal and all pleadings, briefs, orders, and exhibits filed with the California Supreme Court in connection with both his appeal (*People v. Harris*, California Supreme Court Case No. S037625) and his state habeas petition (*In re Lanell Craig Harris*, California Supreme Court Case No. S144756).

## VI.  ALLEGATIONS APPLICABLE TO EACH AND EVERY
## CLAIM

In the interest of brevity and to avoid repetition, Mr. Harris makes the following allegations for each enumerated claim below and incorporates these allegations into each claim:

The facts in support of each claim are based on the allegations in this Petition; the declarations and other documents contained in the exhibits to the Petition; the entire record of all the proceedings involving Mr. Harris in the California state courts, including the documents, exhibits, and pleadings in: (1) *People v. Harris*, Los Angeles Superior Court, Case No. LA008803 (trial); (2) *People v. Harris*, California Supreme Court Case No. S037625 (direct appeal); (3) *In re Lanell Craig Harris*, California Supreme Court Case No. S144756 (state habeas proceedings); judicially noticed facts; and all other documents and facts that Mr. Harris may develop and present. The allegations set forth in this Petition generally are incorporated by this reference into each claim below as though set forth in full.

Legal authorities in support of each claim are briefly identified within that claim. Each claim is based on at least one "violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). 28 United States Code section 2254(d) does not bar relief on any of Mr. Harris's claims; nor does the rule of *Teague v. Lane*, 489 U.S. 288 (1989), or any other procedural rule, including state procedural bars. The Court cannot properly deny Mr. Harris relief without first affording him an opportunity for discovery and an evidentiary hearing to further show his entitlement to relief. Despite his requests and his diligence, Mr. Harris was denied meaningful discovery and an evidentiary hearing in state habeas on all claims other than Claim 4 of his state habeas petition. Mr. Harris requests the opportunity to brief his entitlement to court-sponsored fact development and relief.

1    Mr. Harris does not waive any applicable rights or privileges by filing this

2    Petition and the supporting exhibits and, in particular, he does not waive the

3    attorney-client or work-product privileges. Mr. Harris requests that any waiver of

4    a privilege occur only after a hearing with sufficient notice and the right to be

5    heard on whether a waiver has occurred and the scope of any such waiver. Mr.

6    Harris also requests "use immunity" for each and every disclosure he has made and

7    may make in support of this Petition.

8    The violation of Mr. Harris's constitutional rights constitutes structural error

9    and warrants the granting of this Petition without any determination of whether the

10    error was harmless. Even assuming that the harmless error doctrine applies,

11    however, relief is nevertheless required because every constitutional error alleged,

12    individually and cumulatively, "had substantial and injurious effect or influence" in

13    determining Mr. Harris's convictions and sentences. *Brecht v. Abrahamson*, 507

14    U.S. 619, 627, 631, 638 (1993); *Davis v. Ayala*, 576 U.S. 257, 268 (2015). Relief

15    is also required because the error so infected the integrity of the proceeding as to

16    warrant habeas relief, even if it did not substantially influence the jury's verdict.

17    *Brecht*, 507 U.S. at 638 n.9.

18    The constitutional violations set forth in each individual claim alone

19    mandate relief from the convictions and sentences. However, even if these

20    violations do not mandate relief standing on their own, relief is required when each

21    claim is considered together with the additional errors alleged in the other claims in

22    the Petition. Cumulatively, these errors mandate relief from Mr. Harris's

23    convictions and sentences. *Chambers v. Mississippi*, 410 U.S. 284 (1973); *Parle v.*

24    *Runnels*, 505 F.3d 922, 927 & nn.5, 6 (9th Cir. 2007). If respondent contends that

25    any claim should not be considered on the merits because the final state court

26    decision found the claim to be procedurally barred under state law, Mr. Harris

27    contends that the bar does not preclude federal merits review because it is not an

28

20

1    adequate and independent state ground. *Bennett v. Mueller*, 322 F.3d 573, 580 (9th

2    Cir. 2003). If this Court finds any claim to be procedurally defaulted, federal

3    review of the merits of the claim is nevertheless required because Mr. Harris can

4    establish cause and prejudice for the default and that the failure to consider the

5    claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*,

6    501 U.S. 722, 750 (1991); *House v. Bell*, 547 U.S. 518, 522 (2006). Mr. Harris

7    requests notice and an opportunity to be heard on these issues.

8         To the extent that any claim, or part thereof, is deemed to be unexhausted,

9    untimely, or procedurally or otherwise barred, it is a result of the ineffective

10   assistance of prior counsel (state trial, appellate, and/or habeas counsel) and/or

11   inadequate state court funding for post-conviction proceedings, and accordingly

12   this Court should adjudicate the claim on the merits. Prior counsel (state trial,

13   appellate and/or habeas counsel) were ineffective in not raising the claim earlier.

14   *Trevino v. Thaler*, 569 U.S. 413, 417, 429 (2013); *Martinez v. Ryan*, 566 U.S. 1, 17

15   (2012); *Evitts v. Lucey,* 469 U.S. 387, 396 (1985). Mr. Harris requests notice and

16   an opportunity to be heard on these issues before this Court makes any ruling on

17   procedural default.

18

19                    **VII. CLAIMS FOR RELIEF**

20   **A.    Claim One: The State Prosecuted, Convicted, And Sentenced**

21   **Mr. Harris While He Was Mentally Incompetent to Stand Trial**

22       1.   Introduction

23       Mr. Harris was tried and convicted while incompetent to stand trial. As set

24   forth below, Mr. Harris was genetically predisposed to developing mental illness

25   and intellectual disability due to his extraordinary multi-generational family history

26   of cognitive impairment; mental illness, including psychosis; trauma; and

27   substance abuse. He faced additional risks for developing cognitive impairment

28

                              21

and mental illness because of the intractable impact of racism, from its roots in slavery to its culmination during Mr. Harris's capital trial. An assessment of his mental functioning is only complete insofar as it includes the effects of historical and interpersonal trauma and systemic and individualized racism on Mr. Harris and his family.

In accordance with his genetic predisposition and life experiences, Mr. Harris in fact developed intellectual disability and accompanying cognitive impairments, psychosis and other symptoms associated with schizophrenia and mood disorders, as well as developmental trauma symptoms related to his repeated exposure to familial and community violence. Mr. Harris spent a significant period of his late adolescence and into his mid-20s in carceral settings, where, without adequate mental health interventions, he faced an additional set of debilitating trauma. During this time, jail and camp mental health staff identified that Mr. Harris suffered from symptoms of mental illness, including suicide attempts and hallucinations, however he was never appropriately medicated or consistently treated in such settings. At the time of his arrest at age 24 that led to the charges for the capital offenses, Mr. Harris had been free for only a year after having been incarcerated since the age of 19 at Folsom State Prison and other institutions known for their extremely violent environments. Unmoored from the basic, albeit damaging, structure of prison, Mr. Harris decompensated rapidly. He experienced increasing psychotic symptoms and self-medicated with drugs and alcohol. Following his arrest, the adverse conditions of confinement at the Los Angeles County Jail and lack of other consistent outside supports from his trial counsel and family were the final insults that rendered Mr. Harris incompetent to stand trial.

2.    Summary of Applicable Law

The United States Constitution and California's statutes prohibit the state from criminally trying a person while that person is mentally incompetent. *See,*

22

*e.g.*, *Drope v. Missouri*, 420 U.S. 162, 171 (1975); *People v. Taylor*, 47 Cal. 4th 850, 861 (2009) (citing *Pate v. Robinson*, 383 U.S. 375, 378 (1966)); *see also* Cal. Penal Code § 1367(a) (providing that a defendant is mentally incompetent to stand trial if, as a result of mental disorder or developmental disability, he or she is "unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of the defense in a rational manner"). "[C]ompetence to stand trial does not consist merely of passively observing the proceedings. Rather, it requires the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense." *Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001). The criminal trial of an incompetent defendant is per se prejudicial. *See, e.g., Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (citing *Medina v. California*, 505 U.S. 437, 453 (1992)).

Both federal due process and state law require a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence that the defendant may be incompetent. *People v. Rogers*, 39 Cal. 4th 826, 847 (2006) (citing *Drope*, 420 U.S. at 181); *People v. Ary*, 51 Cal. 4th 510, 517 (2011) ("When a trial court is presented with evidence that raises a reasonable doubt about a defendant's mental competence to stand trial, federal due process principles require that trial proceedings be suspended and a hearing be held to determine the defendant's competence."); Cal. Penal Code § 1368. Substantial evidence is evidence that raises a reasonable or a bona fide doubt concerning the defendant's competence to stand trial. *Moore v. United States*, 464 F.2d 663, 666 (9th Cir. 1972). In *Drope v. Missouri*, the United States Supreme Court identified several factors that are relevant to determining whether a hearing on competency is necessary, including "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." 420 U.S. at 180. The *Drope* Court further explained that "even one of

23

these factors standing alone may, in some circumstances, be sufficient" to create a
reasonable doubt regarding the defendant's competence. 420 U.S. at 180; *see also
People v. Samuel*, 29 Cal. 3d 489, 502 (1981) (explaining that factors relevant to a
determination of whether a defendant is capable of both factually and rationally
understanding the nature of the proceedings or assisting counsel in the conduct of
the defense in a rational manner include the defendant's intelligence, ability to
communicate, and emotional and mental stability).

In cases in which the record is insufficient to support a claim of procedural
due process based on competency – for example due to a defendant's psychosis
presenting with negative symptoms or trial counsel's failure to develop evidence
regarding their client's past or current mental health functioning – a claim that a
person was nonetheless incompetent to stand trial is not precluded. A substantive
due process claim – that is, a claim that the petitioner actually was incompetent at
the time of trial – presented in habeas proceedings is not limited to the record at the
time of the trial. *Odle*, 238 F.3d at 1090 (holding that "old and new" evidence may
be reviewed to determine the petitioner's competence at the time of trial). Thus, in
deciding Mr. Harris's claim of incompetence in fact, this Court must consider facts
and evidence that were not available to the trial court. *Williams v. Woodford*, 384
F.3d 567, 608 (9th Cir. 2004); *Deere v. Woodford*, 339 F.3d 1084, 1086 (2003), as
amended on denial of reh'g (9th Cir. 2003) ("'In a habeas proceeding, a petitioner
is entitled to an evidentiary hearing on the issue of competency to stand trial if he
presents sufficient facts to create a real and substantial doubt as to his competency,
even if those facts were not presented to the trial court.'") (quoting *Boag v. Raines*,
769 F.2d 1341, 1343 (9th Cir. 1985)). The case law is clear, furthermore, that the
superior court and trial counsel's failures to raise a doubt as to Mr. Harris's
competency were not dispositive of whether he was incompetent to stand trial.
*See, e.g., Odle*, 238 F.3d at 1088-89 ("[C]ounsel is not a trained mental health

1    professional, and his failure to raise petitioner's competence does not establish that
2    petitioner was competent.  Nor, of course, does it mean that petitioner waived his
3    right to a competency hearing.").    As the Ninth Circuit explained in *Odle*,
4    "personal observations [by the court and defense counsel] cannot overcome the
5    significant doubt about [the defendant's] competence raised by the clinical
6    evidence."  238 F.3d at 1089.

7            California Penal Code section 1367 (a) requires the defendant to establish
8    that his inability to understand the nature of the criminal proceedings and/or to
9    assist counsel is due to a diagnosed mental disorder or developmental disability,
10   and the California Supreme Court's decisions have endorsed that requirement.  Cal.
11   Penal Code § 1367(a) ("A defendant is mentally incompetent . . . if, as a result of
12   mental disorder or developmental disability, the defendant is unable to understand
13   the nature of the criminal proceedings or to assist counsel in the conduct of a
14   defense in a rational manner."); *Taylor*, 47 Cal. 4th at 863-64; *People v. Rodrigues*,
15   8 Cal. 4th 1060, 1110-11 (1994).  This requirement of California law is contrary to
16   established federal law.    *Pate*, 383 U.S. at 378-85 (describing a defendant's
17   peculiar behavior and symptoms throughout his life and at the time of trial that
18   raised a bona fide doubt as to his competence without identifying or requiring a
19   diagnosis); *Dusky v. United States*, 362 U.S. 402 (1960) (noting that on remand the
20   trial court must investigate more than simply whether "the defendant (is) oriented
21   to time and place and (has) some recollection of events," but not requiring a
22   diagnosis to establish incompetence).  Although a defendant who is incompetent to
23   stand trial may suffer from a diagnosed mental illness or developmental disability,
24   federal law does not require that the defendant's incompetence arise from a
25   diagnosed disorder, because symptoms indicative of or consistent with a possible
26   mental or medical condition, without rising to the level of a diagnosis of a specific
27   disorder, equally may interfere with one's "mental acuity to see, hear and digest the

28

evidence, and the ability to communicate with counsel in helping prepare an effective defense." *Odle*, 238 F.3d at 1089. Indeed, were such a requirement to have been placed on Mr. Harris during his capital trial, he may have erroneously been found competent purely on the basis that he had not yet been diagnosed with intellectual disability or a major mental illness despite the fact that symptoms of both conditions had been present throughout his life and operated together during his trial such that he was unable to rationally understand the proceedings against him or assist in his defense. In sum, California has created a standard for proving incompetence in fact that is more burdensome than the federal standard requires, and therefore violates clearly established federal law. 28 U.S.C. 2254(d).

    3.   Mr. Harris Was Incompetent to Stand Trial.

The facts supporting Mr. Harris' allegations, in addition to those to be presented in an evidentiary hearing after he has been afforded a reasonable opportunity for a full factual investigation and access to this Court's processes, including subpoena power and other means of discovery, include but are not limited to the following:

Those facts and allegations set forth in Claim Two, subsection (k) and accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

Mr. Harris' neuropsychological impairments have been present since birth and continued to develop through childhood and adolescence, informed by both organic processes and repeated exposure to trauma, including emotional, physical, and sexual abuse and community violence, neglect, and the deaths of loved ones in immediate succession. Mr. Harris is intellectually disabled and has experienced symptoms of mood disorder and psychosis since childhood, which developed to full blown schizophrenia in late adolescence. These conditions operated synergistically (*i.e.* each fed off the other to make the sum of his impairments

Petition for Writ of Habeas Corpus

greater than if he suffered from any one of these conditions in isolation) to impair his mental functioning at the time of the crimes and throughout his pretrial incarceration and trial, and rendered him incompetent during the legal proceedings that resulted in his death sentence. Due to the delusional nature of his thoughts, including auditory hallucinations and persecutory ideations, as well as his difficulty grasping novel concepts, processing verbal and written information in the moment, and making sense of and appropriately respond to stressful situations, Mr. Harris was unable to comprehend the substance of the proceedings against his, rationally consult with his counsel, and aid in his defense. The allegations contained herein and the exhibits submitted in support of Mr. Harris' claims demonstrate his incompetency as a matter of clinical fact at all stages of his trial.

a. Evidence of Mr. Harris's cognitive impairments and psychiatric disorders

1) Cognitive Impairments/Intellectual Disability

Mr. Harris's mental impairments have been observed since early childhood. He was significantly delayed in language, SHP Exh. 89 at 426; FHP Exh. 43 at ¶ 56, and displayed emotional and cognitive difficulties as early as kindergarten, FHP Exh. 43 at ¶ 178; FHP Exh. 9 at 195. These difficulties continued throughout his schooling and included the repetition of first and eleventh grades, placement in a specialized reading program in elementary school and in special education classes in middle school and throughout his high school tenure. FHP Exh. 43 at ¶¶ 108-18, 122-23; FHP Exh. 9. During middle school, he also was referred to specialized mental health programming at an outpatient facility called Hathaway, which ameliorated some of his struggle for the brief time he remained in that structured environment. FHP Exh. 9 at 196, 200; FHP Exh. 43 at ¶¶ 114-15. While incarcerated in a community camp at the age of 16, Mr. Harris was referred for language and speech development testing. A special education team concluded

Petition for Writ of Habeas Corpus

that Mr. Harris was functioning three to five years below his chronological age in language skills. Following his release, Mr. Harris resumed classes but did not graduate from high school. During an intake assessment at the age of 19, Mr. Harris was found to be operating between a third and sixth grade level in reading, math, and language. FHP Exh. 13 at 505; FHP Exh. 43 at ¶ 152.

In 2008 and 2009, as part of state postconviction proceedings, clinical psychologist Natasha Khazanov evaluated Mr. Harris for intellectual disability. Reply Exh. 2 at ¶ 1, 11. After completing a neuropsychological testing battery that included the administration of the WAIS-III, on which Mr. Harris received a Verbal IQ score of 65, a Performance IQ score of 76 and a Full Scale IQ score of 67, Reply Exh. 2 at ¶ 11, and reviewing educational, psychological, judicial, and correctional records and witness declarations, Reply Exh. 2 at ¶ 12, Dr. Khazanov concluded that Mr. Harris was intellectually disabled. Reply Exh. 2 at ¶ 81. Her findings of adaptive deficits included information obtained during clinical interviews with Mr. Harris: he did not have accurate concepts of temperature or time when it came to cooking, or a menu when it came to ordering food, Reply Exh. 2 at ¶ 31; and that he displayed gross deficits in functional academics related to money and budgeting. Reply Exh. 2 at ¶ 31. Throughout her interview, Mr. Harris responded to Dr. Khazanov with "spontaneous speech [that] was somewhat impoverished and child-like," and she had to repeat questions and explain concepts in the simplest terms. Reply Exh. 2 at ¶ 31. Her clinical observations in conjunction with lay witness accounts of Mr. Harris during the developmental period led her to observe that "Mr. Harris was able to learn to mask and compensate for his deficits. However, his disabilities become very apparent when he is faced with either novel or more complex cognitive and practical tasks." Reply Exh. 2 at ¶ 10.

As part of the same postconviction proceedings, educational psychologist

28

1   Morton Liner reviewed education records, incarceration records, and lay witness
2   declarations and found evidence that Mr. Harris suffered from "significant
3   cognitive deficits, learning disorders, brain damage, a mood disorder and substance
4   abuse, all of which seriously impacted his behavior as well as his perception of
5   reality." SHP Exh. 90 at ¶ 52.

6       In 2018, San Quentin State Prison recognized that Mr. Harris suffers from
7   intellectual disability, FHP Exh. 13 at 571; FHP Exh. 43 at ¶ 187. Consistent with
8   this diagnosis and his longstanding needs, mental health staff and other
9   correctional staff who interface with Mr. Harris regarding important matters such
10  as his institutional classification or medical or mental health, use support strategies
11  called Effective Communication accommodations to help Mr. Harris understand
12  the information being relayed. *See, e.g.*, FHP Exh. 13 at 565-66. These strategies
13  include using simple/basic English, speaking slowly and clearly, and taking
14  additional time to relay the information. FHP Exh. 13 at 565-66, 568-69.

15      In 2022, Mr. Harris's death sentence was vacated and he was resentenced to
16  life without the possibility of parole because he is intellectually disabled and
17  therefore ineligible for the death penalty pursuant to *Atkins v. Virginia*, 536 U.S.
18  304 (2002). *In re Lanell Craig Harris* No. LA008803, Order (1/26/2002); Order
19  (2/16/2022). In the order dated January 26, 2022, in which the court ultimately
20  accepted the joint stipulation of the parties that Mr. Harris is intellectually disabled,
21  the court also and upon its own impetus reviewed the state postconviction
22  materials that supported Mr. Harris's allegations under *Atkins* and "conclude[d]
23  that there is more than enough evidence to support the finding that Petitioner is
24  intellectually disabled within the meaning of *Atkins, In re Hawthorne*, and Penal
25  Code section 1376." (internal citations omitted).

26              2)   Trauma, Mental Illness, and Psychosis

27      Mr. Harris's intellectual disability is best understood as a pre-existing

28

29

1    condition that left him less equipped to handle the traumas of his life, from the
2    death of his loved ones to the interfamilial abuse, community violence, and
3    systemic and individualized racism to which he was subject from birth, as will be
4    described in greater detail below.  FHP Exh. 43 at ¶ 12.  Mr. Harris's myriad
5    impairments worked synergistically – that is, each factor alone was detrimental to
6    his well-being, but their aggregate impact was greater than the sum of each part.
7    The physical and mental traumas he experienced in childhood coupled with
8    intellectual disability and genetic predisposition were foundational risk factors for
9    mood dysregulation, substance abuse, and the psychotic symptoms he began to
10   display in mid-adolescence, which blossomed into full blown psychosis in his late
11   teens and early 20s.  FHP Exh. 43 at ¶ 13.

12        Mr. Harris's early school records contain examples of behaviors that are
13   illustrative of the kind of reactivity typically seen in children who have
14   experienced trauma, including observations that he had difficulty getting along
15   with his peers as early as kindergarten, and engaged in behaviors that repeatedly
16   garnered adult attention and interventions – for good and bad – including needing
17   to be reminded frequently of rules and how to behave in the classroom.  These
18   descriptions also include Mr. Harris's attempts to try and conform both
19   behaviorally and academically across multiple grades, and his inability to do so
20   throughout his elementary school years.  FHP Exh. 43 at ¶ 178; FHP Exh. 9 at 195-
21   96.  Other symptoms that were apparent in childhood and continued through the
22   time of his capital trial included emotional over-reactivity – meaning he responded
23   to situations more intensely or with an inappropriate emotion than objectively
24   merited; his escapism – meaning his unconscious need to distance himself from
25   inner feelings and thoughts, for example through the adrenalin that accompanies
26   intense athletic endeavors, or the numbness that accompanies the use of alcohol
27   and drugs; his sense of hopelessness and his foreshortened sense of future –

28

Petition for Writ of Habeas Corpus

1    meaning his inability to imagine a world much farther than the present moment or
2    to believe that he might be able to change his immediate circumstances for the
3    better over a period of time. Also present were symptoms of hypervigilance, in
4    which one is abnormally alert to potential dangers or threats. FHP Exh. 43 at
5    ¶¶ 76, 177. Consistent with his presentation in early childhood and his cognitive
6    and emotional difficulties and burgeoning mental illness, Mr. Harris was unable to
7    match his behaviors to social and community expectations in early adolescence,
8    and his first contacts with law enforcement and experiences with incarceration
9    began when he was 13 years old. FHP Exh. 43 at ¶ 121. It is through these
10   contacts with law enforcement that the majority of his symptoms of mental illness
11   were documented.

12       Mr. Harris reported experiencing auditory and visual hallucinations for the
13   first time at the age of 14 and was prescribed antipsychotic medication, possibly
14   through a juvenile facility or his contacts at the Hathaway facility. SHP Exh. 14 at
15   64; FHP Exh. 25 at 1207; FHP Exh. 43 at ¶¶ 98, 156, 187. In 1983, after being
16   sentenced to camp community placement at the age of 16, he reported hearing
17   voices that he attributed to Satan telling him to hurt himself. FHP Exh. 43 at ¶ 129.
18   In response, he attempted suicide by wrapping a towel or sheet around his neck and
19   was referred for a mental health evaluation, but it is unclear if such an evaluation
20   took place and what if any treatment he received; apart from the referral itself,
21   there are no accompanying mental health reports or other documentation among
22   the correctional records. FHP Exh. 25 at 1207; FHP Exh. 43 at ¶ 129.

23       In the spring of 1985 at the age of 19, Mr. Harris was again evaluated by
24   psychiatrists in a correctional setting and displayed depressed mood, escapism,
25   anxiety, and compulsivity. FHP Exh. 13 at 505-07; FHP Exh. 43 at ¶¶ 152, 153.
26   He was recommended for psychological counselling but did not receive it. FHP
27   Exh. 13 at 509; FHP Exh. 43 at ¶ 153. In September of that same year, he was
28

31

violently assaulted during a racially motivated riot and hospitalized. FHP Exh. 13 at 511-13; FHP Exh. 43 at ¶ 154. Shortly thereafter, he attempted to kill himself by drinking shampoo and placing a plastic bag over his head. SHP Exh. 14 at 64; FHP Exh. 43 at ¶ 154. In October, Mr. Harris was evaluated for mental health issues again and displayed actively psychotic symptoms including command hallucinations, delusional thinking, and inappropriate affect. The treating doctor recognized that he was acutely psychotic and diagnosed him with "Schizophrenic Reaction" with antisocial trends. SHP Exh. 14 at 65; FHP Exh. 43 at ¶ 156. During a second evaluation one day later, Mr. Harris's Full Scale IQ was measured to be 71, in the range of mild intellectual disability. SHP Exh. 12 at 60; FHP Exh. 43 at ¶ 157. He displayed deviant verbalizations consistent with responding to internal stimuli and depressed mood. The second evaluator recommended Mr. Harris have a psychiatric consultation to explore psychotropic medication. SHP Exh. 12 at 61; FHP Exh. 43 at ¶ 157. Rather than receive appropriate mental health interventions and supports while incarcerated, however, Mr. Harris was transferred to a different prison and there is no documentation of any follow-up to his recommended treatment plan nor were any supports provided for his cognitive impairments. FHP Exh. 13 at 516-18; FHP Exh. 43 at ¶ 158.

Mr. Harris was not evaluated again for mental health issues until his capital trial in 1993. The evaluation was inadequate and incomplete for reasons described below and in Claim Two, subsection (k), nonetheless, the defense evaluator, psychologist Robert White, did observe consistent symptomology with past evaluators. FHP Exh. 43 at ¶¶ 215, 217. He concluded that Mr. Harris suffered from "a very marked depression" that was severe and chronic, RT 3359-60, but that did not rise to the level of "real" mental illness, RT 3403, had a substance abuse problem related to his attempts to self-medicate, RT 3369, and reported hearing at least two different voices that told him to do competing things. RT

1    3558-59.

2         Mr. Harris lived at San Quentin State Prison for almost 24 years prior to

3    being diagnosed with intellectual disability and schizophrenia, perhaps in part

4    because upon his admission in 1994, an evaluator incorrectly noted that Mr. Harris

5    had no documented past mental health history. FHP Exh. 13 at 571; FHP Exh. 43

6    at ¶ 192, and in part because Mr. Harris's psychotic symptoms wax and wane from

7    positive – which are the classic and most recognizable manifestations of psychosis

8    such as hearing voices/responding to internal stimuli, paranoia, hyper-religiosity

9    and grandiosity – to negative – which are characterized by withdrawal and social

10   isolation. FHP Exh. 43 at ¶ 184. He often goes for long periods in which his

11   dominant symptoms are negative, and in his case include isolation and also blunted

12   affect and slow verbal responses, resulting in behavior that is unlikely to draw the

13   attention of other incarcerated people, correctional officers, or mental health staff.

14   FHP Exh. 43 at ¶¶ 184, 189.

15        Mr. Harris was in a period of active psychosis when he was diagnosed with

16   schizophrenia in 2018. In contrast to his typical self-contained presentation and

17   non-confrontational demeanor, Mr. Harris became involved in a conflict with

18   another person on his yard, and eventually had to be forcibly extracted from his

19   cell. FHP Exh. 13 at 572; FHP Exh. 43 at ¶ 186. His symptoms included auditory

20   and visual hallucinations, religious-based delusions, paranoia, blunted affect and a

21   "fixed bright smile." FHP Exh. 13 at 572; FHP Exh. 43 at ¶ 186. He was

22   prescribed the antipsychotic medication Abilify and referred for regular outpatient

23   treatment in the Correctional Clinical Care Management System (CCCMS). FHP

24   Exh. 13 at 573; FHP Exh. 43 at ¶ 186. Eventually, a full medical history was

25   established and treating doctors recognized Mr. Harris had a "documented history

26   of auditory hallucinations and delusions in late teens, remote SAs, intellectual

27   disability, substance use, traumatic brain injury, well controlled hypertension,"

28

33

1    FHP Exh. 13 at 571; FHP Exh. 43 at ¶ 187.

2         Mr. Harris experienced another period of acute psychosis following his
3    resentencing from death to life without the possibility of parole in February 2022.
4    After living on death row for almost thirty years, he was placed in solitary
5    confinement while awaiting transfer to another prison and was observed in his cell
6    pacing and crying.  He was unresponsive when corrections staff attempted to
7    engage with him.  FHP Exh. 13 at 581; FHP Exh. 43 at ¶ 190.  In June 2022, he
8    had to be forcibly removed from his cell.  He was hospitalized and continued to
9    display erratic and delusional behavior.  His condition stabilized after he agreed to
10   resume a regime of antipsychotic medication, which he had discontinued at the
11   time his positive symptoms of schizophrenia reemerged.  FHP Exh. 43 at ¶ 190.

12        b.    Exacerbating Conditions of Confinement at Los Angeles County
13   Jail

14        Prior to his arrest on September 25, 1991, for an unrelated incident that led
15   to the capital charges, FHP Exh. 24 at 1106, Mr. Harris spent just over a year trying
16   to reacclimate himself to his community and family after having been incarcerated
17   since he was 19 years old.  As will be discussed more fully below, the trauma he
18   endured while in prison and lack of treatment exacerbated his mental illness.  Upon
19   release, his psychotic symptoms and his intellectual disability made it more
20   difficult for him to adapt to the changed circumstances in which he found himself.
21   Friends and family noticed his habits towards social withdrawal, and his inept
22   masking.  As his then-wife Lucinda Reeves described, "He went to prison as a kid
23   and came out a man, but inside, he was still a kid."  SHP Exh. 85 at ¶ 9; FHP Exh.
24   43 at ¶¶ 167-68.

25        Mr. Harris's observed behaviors are consistent with being incarcerated on
26   and off during key years of his cognitive and emotional development, and these
27   experiences lead to symptoms associated with institutionalization, also known as

28

prisonization, including hypervigilance, mistrust, alienation from his own emotions and sense of self, social isolation, dependence on structure, and impaired self-worth. The effects of institutionalization are amplified among youthful offenders like Mr. Harris, who are imprisoned when a person's character, habits, and attitudes are still forming. The course of Mr. Harris's development had already been negatively impacted because of the extensive trauma he experienced at home, and the overlapping and interrelated symptoms of trauma and institutionalization were worsened by his intellectual disability and mental illness, which made it more difficult for him to understand and cope with these repeated insults. FHP Exh. 43 at ¶ 166.

Following his arrest, Mr. Harris was vulnerable to further decompensation and an escalation of psychiatric symptoms because he was removed from the few supports he had, including his stepmother Doris and wife Lucinda. He spent the following two years and four months attempting to cope with the stress of a capital trial and the abhorrent living conditions in jail, where he was housed in the newly-built super maximum security facility called the North County Correction Facility located at the Pitchess Detention Center from October 1991 to mid-to-late 1992. FHP Exh. 24 at 979-85; FHP Exh. 46 at 1896, and later, in the notorious Men's Central Jail for the pendency of his trial. FHP Exh. 43 at ¶ 200. Conditions at both facilities were overcrowded and exceptionally violent.

At the Pitchess Detention Center (also called Wayside Honor Ranch), incarcerated people lived under the near daily threat of being attacked or having to participate in assaults against others, which typically occurred along racial lines. The staff were undertrained and inadequate in number to afford security and order for those housed there. Handmade weapons circulated with regularity, and incarcerated people strictly enforced behavioral codes among themselves through violence. Indeed, the violence occurred so frequently, the Pitchess Detention

Petition for Writ of Habeas Corpus

Center was nicknamed the "thunder dorms" due to the booming sounds of the riots that erupted during the time Mr. Harris lived there. Once Mr. Harris was transferred to Men's Central Jail, conditions remained bleak. The aged facility was overrun with rodents and Mr. Harris continued to experience unchecked violence amidst his overcrowded living conditions. The sheer number of people incarcerated made the delivery of adequate mental health services nearly impossible, and despite his need for interventions during this time, it does not appear Mr. Harris received treatment. FHP Exh. 43 at ¶ 200; FHP Exh. 24; FHP Exh. 46.

Mr. Harris's pretrial incarceration was more difficult for him to handle because of the trauma he had experienced during his prior incarcerations. Over the course of multiple meetings with his trial paralegal, Marci Pantiliat, he described how miserable he was at the North County Correction Facility. He repeatedly recalled the violence he had witnessed at Folsom State Prison and described in detail the deaths he had seen. Mr. Harris suggested that the people he presently was incarcerated with exaggerated their charges, a breach of a behavioral code that would have gotten them killed at Folsom. FHP Exh. 53 at 3003. He also described how loud it was at night, and that the guards forced him and others he was housed with to strip and shower together. FHP Exh. 53 at 3006. He re-told of past violence and emphasized his own toughness in a manner that suggests, consistent with his history, he was feeling profoundly unsafe leading up to his capital trial and was unable to process his experiences and manage his responses. FHP Exh. 43 at ¶ 201; FHP Exh. 53 at 3002-03, 3006. The conditions at the North County Correction Facility were also far more restrictive than those he had experienced at Folsom. Whereas Mr. Harris preferred a strict routine of waking, eating and exercise, in part to help control his psychotic symptoms, a tactic he still employs while incarcerated to this day, he was only permitted limited time for physical

36

1    movement, which both affected his mood and his ability to navigate the psychotic

2    symptoms he was experiencing.  FHP Exh. 43 at ¶ 201; FHP Exh. 53 at 3006.

3            Mr. Harris was transferred from Wayside to the Los Angeles County Jail in

4    late 1992 because he required medical treatment for bleeding ulcers.  FHP Exh. 53

5    at 3021. Trial counsel learned of the reason for Mr. Harris's transfer through his

6    stepmother, Doris.  Bleeding ulcers are a recurrent condition related to stress, and

7    although at the time of trial Mr. Harris had a documented history of stress-related

8    ulcers and gastrointestinal distress, SHP Exh. 19 at 91-115, his legal team did not

9    appear to follow up, explore how his condition resolved, or how it might affect him

10   at trial. FHP Exh. 43 at ¶ 205.

11           c.    Opinion of Psychiatrist Richard G. Dudley, M.D. Regarding Mr.

12   Harris's Competency to Stand Trial

13           Dr. Richard G. Dudley, M.D. is an expert in adolescent and adult male

14   psychiatric assessments who began his private practice in 1976 and forensic

15   practice in 1984.  Currently licensed to practice medicine in New York, Dr. Dudley

16   is board certified in psychiatry by the American Board of Psychiatry and

17   Neurology; a Distinguished Fellow of the American Psychiatric Association

18   (APA); a Fellow of the American College of Psychiatrists; a member of the Black

19   Psychiatrists of America; and a Fellow of the New York Academy of Medicine

20   who has qualified and testified as an expert in legal proceedings in state and

21   federal courts throughout the United States, including California.  He conducted a

22   comprehensive forensic mental health assessment of Mr. Harris in conjunction with

23   the state postconviction proceedings that resulted in Mr. Harris' resentencing to life

24   without the possibility of parole.  FHP Exh. 43 ¶¶ 1-7.  In order to complete his

25   assessment, Dr. Dudley reviewed extensive records of Mr. Harris and his family

26   members, including medical, educational, institutional, military, and other relevant

27   documents; primary and secondary source materials pertinent to the geographical

28

                                   37

1  areas where Mr. Harris and his family lived and the institutions with which they

2  interacted; and declarations, trial testimony, and expert opinions generated during

3  the course of this capital litigation.  Dr. Dudley conducted in-person clinical

4  interviews with Mr. Harris at San Quentin State Prison for approximately eight

5  hours across two days in April 2022.  FHP Exh. 43 at ¶¶ 8-9.

6              1)   General Conclusions Regarding Mr. Harris's Mental Health

7  and Functioning

8        Dr. Dudley reached key conclusions critical to the determination of Mr.

9  Harris's competency at the time of his trial, which spanned from his arrest in

10  September 1991 to his sentencing in January 1994.  To begin, he opined that Mr.

11  Harris's functioning and behaviors are most accurately understood in the context of

12  his myriad mental impairments.  Due to repeated institutional failures, he was

13  misdiagnosed for most of his life and received inappropriate treatment and

14  interventions, or most often, no treatment at all.  FHP Exh. 43 at ¶ 171.

15  **Intellectual Functioning**

16        Mr. Harris's history indicates the presence of multiple factors that

17  placed him at greater risk of developing intellectual disability. These risk factors

18  were biomedical, social, behavioral and educational and occurred during the

19  prenatal, perinatal and postnatal periods of his life.  FHP Exh. 43 at ¶ 172.  Dr.

20  Dudley reviewed the educational and institutional records of Mr. Harris, the

21  declaration of Natasha Khazanov, Ph.D., and the materials she relied upon, and

22  concurred that Mr. Harris meets the diagnostic criteria for intellectual disability,

23  defined as significantly subaverage intellectual functioning accompanied by

24  deficits in adaptive behavior that manifested during the developmental period.

25  FHP Exh. 43 at ¶ 173.

26  **Trauma, Mental Illness, and Psychosis**

27        Mr. Harris experienced trauma beginning in infancy, which altered his brain

28

development and left him with very few coping mechanisms when he faced new and adverse situations. Children, like adults, have a neurophysiological response to a violent, frightening situation, which is commonly known as the "fight, flight or freeze response."  Children who feel protected and experience consistent and appropriate caregiving eventually learn how to manage this neurophysiologic stress response as part of regular development.  When children such as Mr. Harris are *repeatedly* stimulated by exposure to abusive, threatening, and dangerous violence, in the absence of adequate parenting, however, the development of the brain is negatively affected.  More specifically, the amygdala, which is the area of the brain known to activate the physiological stress response, overdevelops.  This increases the fear and anxiety these children experience and causes them to be hyper-responsive to frightening situations.  The development of the hippocampus, which is the area of the brain known to turn off the stress response, simultaneously is inhibited, thereby decreasing its capacity to control the stress response.  As a result of these structural and functional alterations of the brain, these children are hypersensitive to perceived threats of harm; they are also over-reactive to such perceived threats; and it is extremely difficult for them to calm or suppress the stress response.  Furthermore, these brain alterations exacerbate psychological trauma-related symptoms, especially those psychological symptoms of increased arousal, such as hypervigilance, the startle response, sleep disturbances, and attentiveness.  FHP Exh. 43 at ¶ 174.

As a young child, Mr. Harris developed attachment issues, including fears of abandonment coupled with an intense desire to be loved.  He also evidenced an unstable sense of self and difficulties developing self-esteem.  In addition, it was difficult for him to learn to regulate his mood, an expected outcome given his exposure to trauma and the history of mood instability and other mental illness throughout his family history.  Coping with these risk factors resulted in a lifelong,

39

frantic effort to find some sort of external affirmation to compensate for his absent sense of self and to disguise his inability to fully understand and meaningfully participate in the world around him.  FHP Exh. 43 at ¶ 175.

One of the key synergies in Mr. Harris's early childhood is between trauma and the absence of parental support.  Individually, each risk factor can be devastating, and when they occur in tandem, the consequences on development are more severe than in isolation.  Mr. Harris experienced horrific physical and emotional trauma largely at the hands of his caregivers, making them both the source of the trauma and the reason for the void of support.  Mr. Harris was left to manage his responses to his painful experiences without role modeling or guidance, let alone the possibility of finding relief or comfort.  It is also worth noting that because Mr. Harris lacked adequate parental/caregiver supports, he was at increased risk of experiencing additional trauma, for example in his community and in the penal institutions where he was incarcerated.  FHP Exh. 43 at ¶ 176.

Mr. Harris's trauma related difficulties manifested behaviorally as emotional over-reactivity; escapism; the sense of hopelessness and his foreshortened sense of future.  These maladaptive coping mechanisms further isolated Mr. Harris by feeding into his difficulties connecting emotionally with his peers, family members, and girlfriends. Another early manifestation of his trauma response was that he began to hear the friendly voices of the people in his life who had died, most prominently his father and Robert James.  Eventually these voices were subsumed by his psychosis, but they likely began as a way for Mr. Harris to self-soothe and process old and new traumas.  FHP Exh. 43 at ¶ 177.

Mr. Harris moved from a traumatic home environment to a traumatic institutional environment, such that over the course of his development, he did not live in a single place where he knew he was safe.  His experiences while incarcerated, including being a victim of violence and witnessing the deaths and

40

beatings of people he was housed with, further contributed to his maladaptive trauma responses. FHP Exh. 43 at ¶ 179.

Mr. Harris presents with clinically significant mood disturbance (depression) and psychotic symptoms that have been documented since 1983, when he was sixteen years old. Both Mr. Harris's sister, Geraldine Harris and his uncle, Tracy Legett were diagnosed with psychotic disorders – bipolar disorder and schizophrenia, respectively – suggesting that Mr. Harris is genetically predisposed to psychotic thought processes. Certain mental illnesses, including depression and psychotic disorders, have hereditary components, making it more likely that a person with a specific set of genes will become mentally ill. Furthermore, environmental and experiential factors including trauma and caregiver attachment issues, both of which occurred during Mr. Harris's childhood, also contribute to the likelihood a person will experience major mental illness. FHP Exh. 43 at ¶ 182.

Psychosis typically reaches its full phase of symptoms at age 17 or 18, and Mr. Harris was affected by the illness in what is known as the "prodromal" phase sometime prior to his first reported suicide attempt and treatment with medication in 1983, when he was 16. The prodromal phase of schizophreniform spectrum disorders, including schizophrenia, is an insidious period when a psychotic disorder settles into the brain. This phase may include hearing voices and would have affected Mr. Harris's ability to cope with trauma (in addition to the voices likely being a product of trauma and the grief process). Mr. Harris's use of drugs and alcohol during the prodromal phase likely exacerbated the development of psychotic symptoms during this early phase of his illness, given that the substances he was using were either neuro-physiologically associated with the development of psychotic symptoms or compromised his ability to sort out and identify psychotic symptoms. FHP Exh. 43 at ¶ 183.

Mr. Harris displayed symptoms consistent with the early stages of

41

schizophrenia, as well as symptoms consistent with depression and trauma-related disorders. The cooccurrence of these symptoms is not surprising given that schizophrenia and mood disorders exist along the same spectrum of mental illnesses, and themselves overlap.[4] For example, hallucinations may be present in both severe depression and schizophrenia, and it is the nature of the delusional beliefs that determines the appropriateness of various diagnoses. In Mr. Harris's case, the content of his earliest delusions focused on important people he had lost; he reported seeing and speaking to his dead relatives in a way that was comforting. This type of report is consistent with mood disorder, and the totality of information indicate that Mr. Harris was extremely depressed following the losses of so many important people in his life. Over time, Mr. Harris's delusions changed in character to command-type hallucinations, and were infused with religious tropes, including Satan taking the place of, or interacting with, his dead relatives. This type of hallucination is consistent with schizophrenia, in that the hallucinations are more bizarre and unrelated to any realistic occurrence. However, as Mr. Harris began to evidence the signs and symptoms of schizophrenia, all of the symptoms of his mood disorder were not simply subsumed by the psychosis. Depressive symptoms such as lethargy, hopelessness, and a foreshortened sense of future existed alongside the positive and negative manifestations of psychosis. FHP Exh. 43 at ¶ 185.

Based on the clinical interviews with Mr. Harris, the testimony of Dr. White, his interview notes, and the notes of Ms. Pantiliat's visits with Mr. Harris upon which Dr. White relied when forming his clinical opinions; and the complete psychosocial history Dr. Dudley compiled, he concluded, to a reasonable degree of

---

[4]    See, e.g., Matcheri Keshavan et. al., A dimensional approach to the psychosis spectrum between bipolar disorder and schizophrenia: The Schizo-Bipolar Scale, Schiophr Res, 2011 Dec., 133 (1-3): 250-54.

Petition for Writ of Habeas Corpus

1   medical certainty, that "[Mr. Harris] lacked the capacity to participate in his own

2   defense or cooperate with counsel" and that "he lacked a rational understanding of

3   the proceedings against him." FHP Exh. 43 at ¶ 207.

4                    2)   Practical Implications of Symptoms at Trial That Establish

5   Incompetency in Fact

6           During pretrial and trial, Mr. Harris met regularly with the paralegal

7   assigned to his case, Marci Pantiliat, whose notes describe behaviors and self-

8   reported symptoms that were consistent with Mr. Harris's longstanding mental

9   illness and active psychosis, though she did not recognize them as such. FHP Exh.

10  43 at ¶¶ 201, 202. Mr. Harris reported to both Ms. Pantiliat and trial expert Dr.

11  White contemporaneously, and Dr. Dudley during clinical interviews, that he was

12  suffering from auditory hallucinations. FHP Exh. 43 at ¶ 202; FHP Exh. 53 at

13  3019; 25 RT 3558-59. During the trial itself, he often did not know what was

14  happening. FHP Exh. 43 at ¶ 202.

15          Consistent with his current presentation of psychosis, Mr. Harris cycled

16  through periods of relative calm to periods of deep agitation and paranoia. FHP

17  Exh. 53 at 3002-03. Mr. Harris told Ms. Pantiliat that he had "crazy" thoughts,

18  including to kill himself, FHP Exh. 53 at 3002, and repeatedly expressed

19  persecutory ideation – the false belief that evil forces were out to get him. In this

20  case, Mr. Harris believed that "White people" generally and the prosecutor

21  specifically were engaged in elaborate conspiracies to see that he was convicted.

22  FHP Exh. 53 at 3002-03, 3019. Often, delusions have some basis in reality, and

23  while Mr. Harris was correct that the state was prosecuting him and that the actors

24  were predominately White, that reality was elaborated to delusional proportions

25  wherein he erroneously believed that the world was out to get him. For instance,

26  he believed that one of the arresting investigating detectives was "mad" at him and

27  that all of the law enforcement officers in North Hollywood and the Foothill

28

43

1    Divisions were "against him," that his current prosecution was in retaliation for a

2    past case, and that they, meaning law enforcement, read his mail. FHP Exh. 53 at

3    3003. He perseverated on the idea of "White people" coming after him in the

4    conversation, looping back to the topic seemingly at random, and interspersed with

5    what Ms. Pantiliat characterized as bizarre tangents, including that "Farakhan [sic]

6    should be president," and that his defense team made "crumbs" (financially

7    speaking). FHP Exh. 43 at ¶ 202; FHP Exh. 53 at 3003.

8        His legal team observed and misinterpreted negative symptoms of psychosis.

9    For example, when Mr. Harris presented with a large smile that did not change,

10   Ms. Pantiliat attributed his facial expression as a sign that he was "keeping

11   something" from her. FHP Exh. 43 at ¶ 202; FHP Exh. 53 at 3007. During another

12   instance when he was unable to provide further descriptions about his prior suicide

13   attempts and thoughts he himself described as crazy, she characterized Mr. Harris

14   as being evasive. FHP Exh. 43 at ¶ 202; FHP Exh. 53 at 3002. However, due to

15   his myriad impairments, Mr. Harris is not able to give full, accurate accounts of his

16   experiences or history. FHP Exh. 43 at ¶ 203.

17       Mr. Harris attempted to make himself out to be more successful in life and in

18   control of his current circumstances in the jail than he actually was. He told Ms.

19   Pantiliat that his grade point average in school was a "3.0" and stated that he

20   almost went to college for physics. FHP Exh. 53 at 3002, 3016. Rather than

21   interpreting Mr. Harris's descriptions as masking behaviors and/or maladaptive

22   attempts to be liked and considered worthy of being listened to, she simplistically

23   understood him to be bragging and lying to her. Similarly, Ms. Pantiliat described

24   Mr. Harris at one point as "swaggering" into a visit, and noted he "exuded

25   confidence" as though he was showing off, when the most likely interpretation of

26   his behavior based on his extensive trauma history was that he was relying on his

27   size to try to keep himself safe in the incredibly fraught environment in which he

28

1    found himself. FHP Exh. 43 at ¶ 203; FHP Exh. 53 at 3018.

2        Mr. Harris was extremely reluctant to waive speedy trial rights and allow

3    his attorneys more time to investigate his case and saw himself in an oppositional

4    position to his public defender Michael Gottlieb. FHP Exh. 53 at 3014. His legal

5    team characterized his difficulties in cooperating as "acting out." FHP Exh. 53 at

6    3028. Mr. Harris, on the other hand, described Mr. Gottlieb to Ms. Pantiliat as a

7    person who yelled at him, did not listen, was friends with the district attorney, and

8    would have done more on the case had Mr. Harris been able to pay him, which

9    echoes the paranoia and persecutory ideation he expressed regarding the

10   prosecution and White people generally. FHP Exh. 53 at 3005.

11       Rather than "acting out," the interactions between Mr. Gottlieb and Mr.

12   Harris are far more indicative of Mr. Harris's psychiatric and neuropsychiatric

13   difficulties, lack of understanding of the consequences of failing to waive time and

14   normal courtroom decorum, and also ultimately suggest his inability to cooperate

15   with his legal team. Ms. Pantiliat, deemed the member of the defense team with

16   the closest relationship to Mr. Harris, often had difficulty making sense of what Mr.

17   Harris tried to communicate; she frequently asked him to repeat or explain what he

18   was talking about, and described instances where she could not comprehend his

19   meaning so she simply gave up trying. FHP Exh. 53 at 3015. At one point, she

20   became so frustrated with Mr. Harris that she engaged in shouting and yelling at

21   Mr. Harris to try and get her points across. FHP Exh. 53 at 3003. She did not

22   explore or appear to consider that his cognitive impairments might be the cause of

23   their communication difficulties, and Mr. Harris lacked the self-awareness and

24   ability to express himself in a way that might have altered her perception of him.

25   These interactions indicate that Mr. Harris was unable to rationally consult and

26   cooperate with his defense team or aid in his defense. FHP Exh. 43 at ¶ 204.

27       By the time the presentation of evidence had begun, there are indications

28

45

that Mr. Harris's relationship with his counsel had deteriorated below the meager foundation that had been established. On at least two occasions, Mr. Harris refused to meet with the defense psychologist Robert White, who was attempting to gather information relevant to the presentation of Mr. Harris's developmental history for the penalty phase. Throughout their meetings that did occur, in the early part of 1993, Mr. Harris was viewed as uncooperative to the point that Dr. White was unable to establish meaningful clinical rapport with him. 24 RT 3377, 3385. As. Dr. White described it, Mr. Harris "had a very apathetic attitude, and he expressed to me that he really didn't care what happened to him, and it was within this general sense of apathy that he did not seek to open up to me and develop a rapport that I was trying to establish." 24 RT 3378. In considering the totality of Mr. Harris's background, however, the apathy observed by Dr. White is most reasonably understood as a response of an intellectually impaired man to the retraumatizing environment of the Los Angeles County Jail, superimposed upon his other, long-standing major psychiatric difficulties. FHP Exh. 43 at ¶ 206.

In recounting what happened at trial presently, Mr. Harris is not able to articulate what the defense strategy at his trial was, or what the goals of the trial were. He believes that his lawyer tried to show that people were lying, but ultimately, that the district attorney got all the witnesses to lie and his entire trial was corrupt. Mr. Harris also said that his lawyer and paralegal did not speak with him about what was happening during the trial and that he believes he was excluded from sidebar conferences because people would have looked at him suspiciously. These descriptions are consistent with his documented indications of paranoia and delusional thinking at the time of trial. FHP Exh. 43 at ¶ 206.

While intellectual disability or mental illness do not render a person facing criminal charges *per se* incompetent, the evidence in Mr. Harris's case "revealed an extensive history of mental impairment, and expert testimony and jail records

46

suggested that [the defendant's] mental problems lay not just in the past, but continued to the time of trial." *Odle*, 238 F.3d at 1089; *see also United States v. Loyola-Dominguez*, 125 F.3d 1315, 1318-19 (9th Cir. 1997) (finding that a competency hearing was required where defendant attempted suicide on the eve of trial and the trial court failed to elicit adequate information to dispel concerns). Mr. Harris's mental illness and intellectual disability combined with the acute stress of a capital trial made it impossible for him to formulate a rational understanding of the proceedings against him or to cooperate with counsel and aid in his defense. FHP Exh. 43 at ¶ 207. According to Dr. Dudley,

> [Mr. Harris] did not know what information he could tell his legal team that would be helpful at his capital trial, and he would not have been able to assist counsel in developing guilt-phase defenses based on his mental state or complex facts as they might relate to alibis or innocence; an accurate social history; or accurate descriptions of his mental health problems due to his intellectual disability, depression, psychosis, trauma-related difficulties, and overall lack of insight. It is also my belief, held with the same degree of medical certainty, that [Mr. Harris] experienced pervasive delusional and paranoid beliefs that there was a conspiracy against him being played out during his trial. These false beliefs were evidenced in the contemporaneous interview notes of Ms. Pantiliat, and interfered with his ability to cooperate with his legal team and rationally understand the legal proceedings. My own interviews with [Mr. Harris] about his understanding of his capital trial and the voluminous evidence of the wide-ranging impact of his intellectual disability, developmental disabilities, and mental illness on his overall functioning further demonstrate that he lacked a rational understanding of the proceedings against him.

FHP Exh. 43 at ¶ 207.

The deprivation of Mr. Harris's fundamental constitutional right to be competent at all proceedings was prejudicial per se, had a substantial and injurious

47

1   effect or influence on the jury's determination at the guilt phase, and compels

2   reversal of the judgment of conviction and sentence.

3         4.   Trial Counsel Rendered Ineffective Assistance of Counsel Because He

4   Failed to Investigate Mr. Harris's Mental Functioning and to Prepare, Consult with,

5   and Present the Testimony of Mental Health Experts.

6         Trial counsel unreasonably and prejudicially failed to safeguard Mr. Harris's

7   right to be competent during all proceedings by failing to investigate his cognitive

8   functioning and psychosocial history, hire mental health experts, and ultimately to

9   declare to the court a doubt as to his competence and to invoke the constitutionally

10  and statutorily mandated procedures to determine his competence. *See* FHP Exh. 2

11  at ¶ 14 (standard of care expert explaining that counsel was responsible for

12  carefully monitoring a client's competency to stand trial and to raise a doubt with

13  the court when appropriate); *Wiggins v. Smith*, 539 U.S. 510, 521 (2003);

14  *Strickland v. Washington*, 466 U.S. 668, 669 (1984).

15        a.   Legal Standard

16        One of the most fundamental duties of trial counsel is the obligation to

17  thoroughly investigate a case. *Rompilla v. Beard*, 545 U.S. 374, 387 (2005). At a

18  minimum, trial counsel "has a duty to make reasonable investigations or to make a

19  reasonable decision that makes particular investigations unnecessary." *Kimmelman*

20  *v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland*, 466 U.S. at 691). "In

21  assessing the reasonableness of an attorney's investigation . . . a court must

22  consider not only the quantum of evidence already known to counsel, but also

23  whether the known evidence would lead a reasonable attorney to investigate

24  further." *Wiggins*, 539 U.S. at 527; *see also Correll v. Ryan*, 539 F.3d 938, 949

25  (9th Cir. 2008) ("An uninformed strategy is not a reasonable strategy."); *Reynoso v.*

26  *Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006) (holding that a strategic decision

27  made on the basis of inadequate investigation is not a reasonable decision);

28

48

1    *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) (holding that defense

2    counsel's tactical decisions are only appropriate where counsel has conducted "a

3    reasonable investigation enabling him to make informed decisions about how best

4    to represent his client").

5        At the time of Mr. Harris's trial in 1993, it was well-established that trial

6    counsel had a duty to "conduct a prompt investigation of the circumstances of the

7    case and to explore all avenues leading to facts relevant to the merits of the case

8    and the penalty in event of conviction." *Rompilla*, 545 U.S. at 387 (quoting

9    American Bar Association, *Standards for Criminal Justice Providing Defense*

10   *Services*, Standard 4-4.1 (2d ed. 1982 Supp.) (1982 ABA Standards for Criminal

11   Justice)); FHP Exh. 3 at ¶ 21; Exh. 2 at ¶¶ 8-12. As courts continue to recognize,

12   "The commentary to the [ABA] standards made clear that 'information concerning

13   the defendant's background, education, employment record, mental and emotional

14   stability, family relationships, and the like, will be relevant . . . . '" *Doe v. Ayers*,

15   782 F.3d 425, 435 (9th Cir. 2015) (quoting *Bobby v. Van Hook*, 558 U.S. 4, 7-8

16   (2009)). Because this case was a capital case, trial counsel had a duty to

17   investigate Mr. Harris's social history and mental functioning and to adopt a timely,

18   coherent, and unified approach to developing evidence for the presentation at both

19   phases of a capital trial. *See, e.g.*, *Florida v. Nixon*, 543 U.S. 175, 192 (2004) ("To

20   summarize, in a capital case, counsel must consider in conjunction both the guilt

21   and penalty phases in determining how best to proceed."). Had trial counsel

22   conducted the investigation in accordance with the standard of care at the time, the

23   social history investigation would have yielded evidence relevant to both stages of

24   the proceedings, inter alia, Mr. Harris's incompetence to stand trial and his

25   impaired mental state at the time of the alleged crimes.

26       Following a reasonable investigation, capital defense attorneys had a well-

27   established duty to consult with and present the testimony of qualified and

28

adequately prepared expert witnesses to assist the jury in understanding the significance and context of facts they could not reasonably be expected to know without expert testimony. *See Duncan*, 528 F.3d at 1235 (citing *Dugas v. Coplan*, 428 F.3d 317, 331 (1st Cir. 2005)); *Daniels v. Woodford*, 428 F.3d 1181, 1204-05 (9th Cir. 2005) (1983 California trial); *see also Caro v. Woodford*, 280 F.3d 1247, 1254-56 (9th Cir. 2002) (holding that in 1981, trial counsel preformed deficiently by failing to consult with and present testimony of an expert to explain the effects of toxic chemical exposure on the defendant's brain); *Bean v. Calderon*, 163 F.3d 1073, 1079-80 (9th Cir. 1998); *Caro*, 280 F.3d at 1254-55 (describing the duty to provide to mental health experts with pertinent information about the defendant where counsel is on notice that their client may be mentally impaired).

Equally essential, counsel had the duty to adequately prepare the experts they did retain. *Yun Hseng Liao v. Junious*, 817 F.3d 678 (9th Cir. 2016) (trial counsel's failure to secure evidence to support expert's opinion prejudiced petitioner); *Rompilla*, 545 U.S. at 387. To be effective, trial counsel had a duty to provide the mental health experts with the fruits of a reasonable investigation. *Bloom v. Calderon*, 132 F.3d 1267, 1277 (9th Cir. 1997); *Clabourne v. Lewis*, 64 F.3d 1373, 1385 (1995) (trial counsel prejudicially ineffective for failing "to adequately prepare his [mental state] expert and then present him as a trial witness"); *Jennings v. Wood*, 290 F.3d 1006, 1010, 1014-16 (9th Cir. 2002).

b. Trial Counsel knew or reasonably should have known that Mr. Harris's multiple mental impairments prevented him from cooperating with counsel and rationally understanding the proceedings against him.

Trial counsel was aware based on his meetings with Mr. Harris and his family members and consultations with Dr. White, as well as the school records and jail and prison records in their possession, of the following triggering facts:

Mr. Harris's behavior during initial meetings alerted Mr. Gottlieb and Ms.

Pantiliat that an "extensive psychological evaluation" was necessary for penalty phase preparations and that based on the preliminary information they provided, psychologist Robert White agreed such an evaluation was "mandatory." FHP Exh. 60 at 3082-83.

Trial counsel was advised that preparing Mr. Harris's case required additional expert assistance, including neuropsychological testing and screening for learning and attention disorders, FHP Exh. 60 at 3083; FHP Exh. 53 at 3031, as well as fetal alcohol syndrome, FHP Exh. 61 at 3085.

Trial counsel were advised that they misunderstood that Mr. Harris was from an unremarkable middle class background, when in fact interviews with Mr. Harris's siblings indicated that he experienced significant and "terrifying" physical and psychological abuse and displayed symptoms of depression, withdrawal and anger in adolescence. FHP Exh. 53 at 2964-65.

Mr. Harris reported to Ms. Pantiliat paranoid delusions about his trial including a White conspiracy against him and that he was hearing voices he characterized as "crazy" that told him to do things including to kill himself. FHP Exh. 53 at 3002-03, 3006.

Mr. Harris's prison records documented his history of prior mental health issues, including paranoid delusions and a diagnosis of Schizophrenic Reaction, and that he was previously treated with antipsychotic medications. SHP Exh. 14 at 65.

Mr. Harris's Full Scale IQ was documented to be 71, within the range of Mild Intellectual Disability. SHP Exh. 12 at 60; FHP Exh. 43 at ¶ 148.

Trial counsel engaged in screaming matches with Mr. Harris and often could not understand what he was saying during visits in the county jail. FHP Exh. 53 at 3003, 3005.

As his capital trial approached, Mr. Harris's stress levels and accompanying

1  uncooperative behavior increased, including "acting out" in court. In August 1992,
2  he unreasonably refused to waive time based on his paranoid beliefs that his trial
3  was a sham and part of a conspiracy. FHP Exh. 53 at 3014, 3028.

4      Dr. White informed counsel that Mr. Harris was not cooperative in that he
5  refused visits beginning in March 1993 on the eve of trial. 24 RT 3359, 3377,
6  3384. Dr. White reported that during assessments, Mr. Harris "had a very apathetic
7  attitude, and he expressed to me that he really didn't care what happened to him,
8  and it was within this general sense of apathy that he did not seek to open up to me
9  and develop a rapport that I was trying to establish." 24 RT 3378. Dr. White
10 believed his evaluation to be incomplete due to the lack of rapport he established
11 with Mr. Harris. 24 RT 3394.

12     Trial counsel, on notice that Mr. Harris was cognitively impaired and
13 displayed bizarre behavior at the Los Angeles County Jail while awaiting trial,
14 unreasonably failed to investigate his mental health and procure expert assistance
15 to assess Mr. Harris's competency. Where trial counsel should reasonably suspect
16 that their client is incompetent, they have a duty to investigate their suspicion.
17 Failure to do so constitutes deficient performance. *See United States v. Howard*,
18 381 F.3d 873, 881 (9th Cir. 2004) ("When counsel has reason to question his
19 client's competence . . . failure to investigate further may constitute ineffective
20 assistance of counsel."); *see also Douglas v. Woodford*, 316 F.3d 1079, 1085 (9th
21 Cir. 2003) ("Trial counsel has a duty to investigate a defendant's mental state if
22 there is evidence to suggest that the defendant is impaired.").

23     While "there are . . . no fixed or immutable signs which invariably indicate
24 the need for" counsel to investigate a client's competency, *see Drope v. Missouri*,
25 420 U.S. 162, 180 (1975), the symptoms Mr. Harris exhibited, as well as other
26 evidence of his incompetency of which trial counsel was aware, have typically
27 been held to require at least a hearing on the question, and thus some investigation

28

52

Petition for Writ of Habeas Corpus

by trial counsel. *See, e.g., Pate v. Robinson*, 383 U.S. 375, 378-82 (1966) (finding due process required competency hearing for defendant where four lay witnesses testified to history of head injury and erratic behavior, and psychiatric records indicated possible schizophrenia); *People v. Pennington*, 66 Cal. 2d 508, 518 (1967) (holding that an expert opinion that defendant was incompetent, psychotic symptoms, prior diagnosis of schizophrenia, inappropriate behavior, and observations of defendant weeping in his cell required competency hearing despite opinions of four court appointed experts that defendant was competent); *People v. Aparicio*, 38 Cal. 2d 565, 569-70 (1952) (finding expert testimony during the sanity phase that, although legally sane, defendant was psychotic, suffering from delusions of persecution and hallucinations; and lay witness testimony describing his auditory hallucinations and paranoid fears raised a reasonable doubt as to competency); *Blazak v. Ricketts*, 1 F.3d 891, 898 (9th Cir. 1993) (finding failure to hold competency hearing violated due process in light of presentence report documenting psychiatric history; prior findings of incompetence; and prior diagnosis of schizophrenia that was in remission, but raised "continuing concern about the reoccurrence of schizophrenia"); *Morris v. United States*, 414 F.2d 258 (9th Cir. 1969) (holding competency hearing was required by history of mental illness and treatment; prior finding that appellant had been insane even though he was later found to have recovered his sanity; and prior findings of a psychotic condition); *Rhay v. White*, 385 F.2d 883, 884-85 (9th Cir. 1967) (finding competency hearing was compelled by trial testimony describing defendant's chronic mental disturbances, paranoid traits, violent behavioral explosions, and previous institutional diagnoses.

   c. Trial counsel unreasonably failed to follow up on red flags and triggering facts that required him to investigate Mr. Harris's competence.

   Instead of following up on these triggering facts, trial counsel unreasonably

1    failed to investigate Mr. Harris's functioning throughout his life and during the

2    time of trial or present evidence through a qualified and adequately prepared

3    expert.

4    The case paralegal Ms. Pantiliat conducted the entirety of the investigation

5    into Mr. Harris's background, including collecting and reviewing documents and

6    interviewing and preparing social history witnesses to testify. *See* SHP Exh. 101 at

7    530, 534; FHP Exh. 52 at ¶¶ 3-4. Despite such a massive task, she was also

8    charged with assisting in coordinating all police and investigative reports, acting as

9    Mr. Gottlieb's liaison with defense witnesses, as well as being the go-between for

10    Mr. Gottlieb and Mr. Harris, and assisting in jury questionnaire creation and

11    analysis.    SHP Exh. 101 at 530.    Given her competing responsibilities, the

12    compilation of a complete psychosocial history was impossible, and was, in any

13    event, a task that required expert assistance. Indeed, her notes reflect gross

14    misunderstandings of Mr. Harris's mental illness and impaired cognitive

15    functioning that would have been apparent to an appropriately qualified mitigation

16    specialist or mental health expert. FHP Exh. 43 at ¶¶ 192-96. She was also

17    misappraised of facts, including that Mr. Harris came from a typical middle class

18    background. FHP Exh. 52 at ¶ 4.

19    The only expert assistance secured by trial counsel was the appointment of

20    Dr. Robert White in November 1992, only a few months before the trial began in

21    April 1993, CT 194 (Order appointing Dr. White, 11/17/1992); CT 213 (Minute

22    Order, 4/28/1993).    His assistance was specifically limited to penalty phase

23    defenses rather than an assessment of Mr. Harris's competency and mental state at

24    the time of the charged offenses. Dr. White testified that he was referred by trial

25    counsel to address the factors involved in Mr. Harris's developmental history that

26    led to his current personality and emotional functioning.    25 RT 3597.    Thus,

27    despite the robust evidence before them, trial counsel failed to consult with an

28

1    expert regarding Mr. Harris's competency or any mental state defenses.

2          Dr. White was provided only limited materials from trial counsel. The sum

3    of the documentary evidence he received was: the preliminary hearing testimony,

4    police reports, and charging documents. He was also given memoranda created by

5    Ms. Pantiliat that documented interactions she had with Mr. Harris leading up to

6    trial, and telephone calls she had with his stepmother, Doris Harris. Dr. White met

7    with Mr. Harris on multiple occasions and administered the Minnesota Multiphasic

8    Personality Inventory (MMPI), the results of which were clinically invalid. He

9    also conducted a telephone interview with Doris, 24 RT 3386, and several other

10   family members. Significantly, he was not provided any materials from Mr.

11   Harris's prior incarcerations or school records that documented longstanding

12   symptoms of mental illness despite the fact they were in trial counsels' possession.

13   25 RT 3570, 3597-98.

14          Because of his unreasonable preparation, Dr. White's conclusions were

15   misleading, unreliable, and incomplete. Dr. White concluded that Mr. Harris

16   suffered from "a very marked depression," 24 RT 3359, a term he used to describe

17   "a condition that dominates one's mood, including one's thoughts" and that "very

18   much affects the feelings of self-esteem, self-image, marked sadness, self-respect,

19   loss of appetite," and can cause the person to "have little interest or investment in

20   their life." 24 RT 3360. On cross examination he agreed that his assessment did

21   not include findings of a "real" mental illness. 24 RT 3403. He also testified that

22   Mr. Harris had a substance abuse problem, that he used alcohol as a means of self-

23   medication while on the streets, but that he would likely adjust well to the structure

24   of prison and that his behavior would not be an issue because he would not have

25   access to alcohol. 24 RT 3382, 3373.

26          In terms of his social history, Dr. White testified that Mr. Harris was in

27   special education in elementary school, but that he later received his GED (which

28

is incorrect), 24 RT 3409, and that he suffered psychological abuse, mainly due to the "degree of strictness" of his father's parenting, 24 RT 3366, as well as some physical abuse, 24 RT 3370.[5]

Dr. White was aware, because Mr. Harris reported it to him, that he was hearing voices that told him to do various things, but because of the lack of confirmatory information and background information, he was unable to determine whether the voices were auditory hallucinations. 25 RT 3559-60. He also believed he had established insufficient rapport with Mr. Harris to explore the subject further. 25 RT 3596.

Dr. White administered the MMPI to Mr. Harris despite his awareness that Mr. Harris might lack the reading ability to complete the test in a way that would yield reliable results. Dr. White opined that one reason the test scoring could have been invalid was because of random responding, meaning that Mr. Harris was simply picking answers at random rather than being able to understand the questions and answer them. If a test requires reading comprehension, and a person does not have the reading level necessary to complete the test, generally it makes little sense to administer the test only to have to invalidate the results (which implies the test-taker did something wrong). FHP Exh. 43 at ¶ 216.

Dr. White's opinions were unreliable and incomplete, even within the narrow developmental scope he was asked to evaluate, because they failed to include information contained in school, medical, and incarceration records as well as accounts from peers and family members with firsthand information about Mr. Harris's behaviors and functioning. Such information would have been essential to Dr. White accurately presenting the key developmental factors in Mr. Harris's life

---

[5]    It is unclear why he testified in a manner inconsistent with the findings of abhorrent abuse he memorialized to trial counsel, and which were robustly corroborated during state postconviction investigations.

1    and explaining to the jury how they affected his behaviors at the time of his trial.

2    This is especially true given Mr. Harris's limitations resulting from his multiple

3    psychiatric and neuropsychiatric difficulties, and the difficulty that Dr. White had

4    working around those limitations.  FHP Exh. 43 at ¶ 217.

5               d.   Reasonable counsel would have conducted a thorough psychosocial

6    history investigation of readily available documentary evidence and lay witness

7    accounts, and provided that information to a mental health expert or experts, and

8    then declared a doubt as to Mr. Harris's competence.

9         Had trial counsel conducted a reasonable investigation into Mr. Harris's

10   mental functioning throughout his life and during this capital trial and given that

11   information to a qualified expert, they would have learned the following:

12                                    *

13        In order to accurately describe Lanell[6] Harris's intellectual and emotional

14   capacities and accompanying behaviors, it is important to discuss the specific ways

15   that his mental impairments and illnesses interacted throughout his life.  FHP Exh.

16   43 at ¶ 14.

17        Lanell came into the world with limited intellectual potential that placed a

18   concrete cap on his development.  As he grew older, the outside circumstances he

19   encountered became increasingly challenging, however the expected increase in

20   intellectual, emotional and practical capacities that come with normal development

21   did not occur for Lanell.  This means that as he progressed from childhood and into

22   his teenage years, Lanell dealt with the events of life – including profound loss,

23   and severe and complex trauma – with a much younger brain capacity than his

24   chronological age suggested, and such a deficit was particularly damaging because

25

26   _____

27   [6]   For the purpose of narrative cohesion and to prevent confusion with other
     family members, during this portion of the Petition, Mr. Harris will be referred to

28   by his first name.

1    of his lack of protective factors: neither a parental figure nor institutional support

2    system was helping him to manage the incredible adversity of his home life.  FHP

3    Exh. 43 at ¶ 15.

4    Without substantial supports, Lanell was unable to cope effectively with his

5    circumstances.  His reactions, often described as immature, were those of a small

6    child who incorrectly perceives himself to be the center of the world, and therefore

7    understands the terrible events in his life to be his fault.  By the time Lanell

8    reached late adolescence, he was unable to regulate his mood, *i.e.*, appropriately

9    match his behavioral and emotional responses to external stimuli, and he began

10   experiencing psychotic symptoms including hallucinations. He did not accurately

11   understand what was happening to him internally and he evidenced little insight

12   into his mental health issues or comprehension that treatment might be helpful –

13   both of which are minimally required to engage and comply with therapy.  FHP

14   Exh. 43 at ¶ 16.

15   Lanell's life story is also enmeshed with the failure of social and political

16   institutions – community, educational, and family support systems; and ultimately,

17   the legal and penal systems – to identify his well-documented behaviors as the

18   products of cognitive and mental impairments and illnesses.  There appears to be a

19   grave misperception of Lanell due to his physical characteristics, notably his race

20   and his size as he is a large, athletically inclined Black man.  During the most

21   vulnerable moments his needs went unseen and undiagnosed in part because he

22   presented as a muscular, dark-skinned adolescent who tried to mask his difficulties

23   with alternating degrees of withdrawal and bluster.  What should have been

24   understood as an exceptionally mitigating personal and psychosocial history was

25   obscured by the assumptions and explicit and implicit racial biases of his

26   evaluators, and later his legal team who failed to recognize and appreciate the

27   severity of Lanell's multiple impairments, and when they interviewed Lanell,

28

1   essentially saw nothing to mitigate.  FHP Exh. 43 at ¶ 17.

2       **Relevant Multi-Generational Family History**

3       *Roots*

4          Lanell's life history has been forged amongst social, environmental, and

5   genetic risk factors that have combined to disastrous effect.  Prior to his birth, both

6   the paternal and maternal lineages of his ancestry emerged from the brutalities of

7   the Jim Crow South to the more veiled but no less insidious patterns of

8   discrimination that had developed in the West, with the Great Migration.  From the

9   beginning of the first World War through the 1970s, over 6 million Black

10  Americans migrated from the repressive regimes of the southern states and

11  dispersed across the country, seeking opportunities and equality, all of which were

12  elusive.[7]  Compounding the historical trauma was the rollercoaster of promises and

13  possibilities that Lanell's ancestors saw enough of to hope for but were just out of

14  reach – such as the vibrant Black community that was beginning to flourish in

15  Marlin, Texas, where some of Lanell's ancestors lived, before being dismantled by

16  institutions of White supremacy stewarded into being during Jim Crow, or the

17  (relative) equality witnessed abroad during military service that were denied to

18  Black veterans upon return to the United States.  In many ways, for Lanell's

19  ancestors the opportunities they witnessed and then saw dashed were more difficult

20  to navigate psychologically than had they never been able to imagine those

21  opportunities in the first place.  FHP Exh. 43 at ¶ 18.

22      The lives of Lanell's great grandparents along both sides were

23      ... controlled by the meticulous laws of Jim Crow, a nineteenth-
24      century minstrel figure that would become shorthand for the violently
25      enforced codes of the southern caste system.  The Jim Crow regime
26      persisted from the 1880s to the 1960s, some eighty years, the average

27     [7]   See generally, Isabel Wilkerson, The Warmth of Other Suns (2010).

28

lifespan of a fairly healthy man. It affected the lives of at least four generations and would not die without bloodshed, as the people who left the South foresaw. [8]

Jim Crow encompassed rigidly enforced economic, social and political norms that were the foundation of White supremacy as the nation transitioned away from slavery and genocide and into new mechanisms of subjugation of Black and Brown people. The hopelessness that accompanied the racialized violence; the denial of rights and basic needs – from food to education to employment opportunities; and the assault on the autonomy and value of Black lives played out across Lanell's multigenerational history. The sequelae of racism and thwarted attempts to attain a positive sense of self among Lanell's caregivers included substance abuse, violence and risk taking, which directly impacted Lanell's cognitive, emotional, and psychological development. FHP Exh. 43 at ¶ 19.

In the South, rigid enforcement of the social and economic norms of slavery took hold immediately following the Civil War. Black people were violently attacked and murdered for trying to leave the plantations where they were formerly enslaved. During Reconstruction, so-called "race riots," which are more appropriately understood as massacres perpetrated on Black communities, were meant to stymie economic and political equality with constant threats of terror.[9] Systems such as segregation, inadequate schools and hospitals, sharecropping, and Jim Crow laws prevented Black families and Black communities from attaining independence from the former slave-holding economy. By the 1930s, disparities in earnings between Blacks and Whites were so entrenched that economic freedom was nothing more than an ephemeral hope. As summarized by historian Isabel

---

[8]    Wilkerson, *The Warmth of Other Suns* 34.

[9]    Equal Justice Initiative, *Reconstruction in America. Racial Violence after the Civil War*, 1865-76, 63-64, 73 (2020).

Petition for Writ of Habeas Corpus

Wilkerson,

> The disparity in pay, reported without apology in the local papers for
> all to see, would have far-reaching effects. It would mean that even
> the most promising of colored people, having received next to nothing
> in material assets from their slave foreparents, had to labor with the
> knowledge that they were now being underpaid by more than half,
> that they were so behind it would be all but impossible to accumulate
> the assets that their white counterparts could, and that they would, by
> definition, have less to leave succeeding generations than similar
> white families. Multiplied over the generations, it would mean a
> wealth deficit between the races that would require a miracle windfall
> or near asceticism on the part of colored families if they were to have
> any chance of catching up or amassing anything of value. Otherwise,
> the chasm would continue, as it did for blacks as a group even into the
> succeeding century. The layers of accumulated assets built up by the
> better-paid dominant caste, generation after generation, would factor
> into a wealth disparity of white Americans having an average net
> worth ten times that of black Americans by the turn of the twenty-first
> century, dampening the economic prospects of the children and
> grandchildren of both Jim Crow and the Great Migration before they
> were even born.

FHP Exh. 43 at ¶ 20.

The paternal line of Lanell's family has roots in the town of Marlin in Falls
County, Texas. Oral histories depict a society sowed on the seeds of racial
violence, both between the Indigenous people that occupied the land prior to the
arrival of the settlers, and later, between the freed Black and White populations,
with the culture of White Supremacy being viciously enforced through
extrajudicial killings – lynching – in a grove of trees just outside the town. FHP
Exh. 48 at 2087-106. The Black community nonetheless established two schools
in churches before the town voted to erect a separate school building for Black
students in 1916, as well as produced its own newspaper, The Falls County
Freeman. FHP Exh. 48 at 2084-86. The history of the town, including business

61

development and lack thereof, is premised on deep mistrust among people of different races, socio-economic statuses, and newcomers and long-time residents. FHP Exh. 48 at 2107-15; FHP Exh. 43 at ¶ 21.

The 1920 Federal Census documents that Lanell's great grandfather, 26-year-old Ross Harris, lived in Marlin. He worked as a farmer and was married to Willie Richardson, who was eighteen and worked as a laborer. Both could read and write. They had an infant daughter named Inez. FHP Exh. 8 at 179. Lanell's grandfather, Ross Barnett Harris, was born to the couple on May 22, 1920, sometime after the census was taken. Thereafter, Ross Sr. continued to work as a farmer while Willie transitioned to raising the children full time, at least for a period. FHP Exh. 7 at 139. Ross Sr. died just before Ross B.'s fifth birthday, on March 25, 1925. His death certificate indicates that he had been ill with tuberculosis, which he contracted six to seven years prior in New Mexico. The condition was complicated by exposure (usually to extreme weather, though this is not stated explicitly) and he passed after being under the care of a physician for five days. FHP Exh. 7 at 168; FHP Exh. 43 at ¶ 22.

It is significant that the man who would father and then abandon Lanell's father was himself without a steady male role model. Given that the pattern of absent male caregivers spanned three generations by the time that Lanell was born, there had been no opportunity to develop and learn to transmit from father to son the knowledge base, insights and skills a Black man requires to navigate the racism and other life difficulties he will endure. This not only complicated the development of Lanell's self-esteem/self-worth, but also significantly increased the risk that his efforts to cope would consume the valuable limited resources he did possess and needed to maximize his ability to function; and also increased the risk that his efforts to cope would be self-destructive. FHP Exh. 43 at ¶ 23.

In 1930, Willie had taken over as the head of the household and worked as a

farm laborer as did her daughter, 11-year-old Inez. Presumably Ross B. Harris was still too young to work or at least, to have an occupation listed on the census. The family had also taken in a boarder, Willie Johnson, FHP Exh. 8 at 180, who was a 34-year-old blind musician with whom Willie would have her third child, a daughter named Sam Faye Johnson, on June 23, 1931. FHP Exh. 7 at 167. It does not appear Willie Richardson remarried, though she may have had a fourth child, a daughter named Dorothy Jean Dancy with a man named Joe Dancy, who was born on September 12, 1933. FHP Exh. 43 at ¶ 24.

The family upheavals evidenced by the census and vital records coupled with historical accounts of Marlin, Texas, support the inference that Ross B. Harris faced a significant amount of adversity during his formative years, from parental loss to poverty, domestic instability, and racism. The paper trail on Ross B. Harris runs dry until he registered for the U.S. Army draft when he was 21 years old. At that time, Ross B. was working as a porter for the Fox Drug Company in Clovis, New Mexico, though he still listed his residence with his mother in Marlin, Texas. FHP Exh. 39 at 1747. Two years prior, he had fathered a son, James Edward Harris ("Franky")[10] – the boy who would grow up to become Lanell's father. Franky's birth certificate reveals that his given name was Collie Junos Harris, born at full-term to H.B. (Ross B.) Harris and Sylvester Sexton, ages 20 and 19 respectively, on November 23, 1939. Because his parents never married and it appears Sylvester moved to Oklahoma shortly after his birth, Franky may not have been aware of his first given name; indeed, as an adult he requested a later-issued birth certificate that recorded his true name as James Edward Harris, his birthdate as November 23, 1939, and his parents as Ross B. Harris and Sylvester Sexton. FHP Exh. 7 at 134, 173; FHP Exh. 43 at ¶ 25.

---

[10]  Lanell's father was most often called "Franky" and will be referred to by that name when he is discussed in this declaration.

Sylvester moved to Okmulgee, Oklahoma with Franky shortly after his birth. As a teenager, he attended and reportedly graduated from high school and upon completion, immediately joined the army. His avocations were basketball and football and on his enlistment form, he reported that he did not hold any civilian occupations prior to his service. FHP Exh. 34 at 1580. Lanell's own memory of his single visit to his father's childhood home in Oklahoma includes that his grandmother, who he considers "country" and who he called "Syl," had him dig in the mud to catch catfish, which she cooked along with frogs and rabbits. FHP Exh. 43 at ¶ 26.

At the age of eighteen, Franky had a son named Lance Harris with Argretta Nelson. FHP Exh. 7 at 136. As Ross B. had done before him, Franky did not participate in his son's early years or upbringing. He began his military service shortly after the child's birth and it was not until Lance himself was in his late teens that Franky became an active part of his life. The pattern of single caregivers and fathers who are not present in their children's lives that is seen among the men of Lanell's paternal line is reflective of a larger endemic among Black families that has been observed since slavery: Black children lived with one parent, or no parent at all in dramatically higher percentages than White children. Due to economic, political and social factors, this was not a trend that ended with the abolition of slavery, but rather one that perpetuated and increased into the 1980s and beyond. FHP Exh. 47 at 2054-69. The lens of historical trauma offers insight into why this was the case. Although the patriarchal nuclear family structure has long been prized and normalized in the United States, it has not been achievable among different communities of color. FHP Exh. 47 at 2046-53. "African American marriages and relationships have strived to model the white patriarchal nuclear family model, but the experiences of slavery, legal segregations (which lasted roughly one-hundred years, from 1865-965), and contemporary structural racism

64

have prevented the attainment of this model." FHP Exh. 47 at 2046-53. For example, the inability of many Black men in Ross B. and Franky's generations to achieve solitary breadwinner status due to economic oppression, social inequality, and the rise of mass incarceration led to substituting behaviors that also demonstrated masculinity – and therefore value and worth – including displaying physical ability and sexual prowess, (and in turn, fathering a number of children) which are direct derivatives of the values and stereotypes imposed on Black men during slavery. FHP Exh. 47 at 2050. Additional consequences of these behaviors include conflict among partners in Black households. FHP Exh. 47 at 2050-51; FHP Exh. 43 at ¶ 27.

Franky served in the army for two years, from 1958 to 1960, without deployment or participating in armed conflict. An Armed Forces Qualification Test (AFQT) reveals that Franky scored in the 18th percentile, FHP Exh. 34 at 1566, which is within the lowest range of scores accepted for service, and consistent with compromised intellectual functioning, likely hindering his abilities to meet expectations and function, cognitively and emotionally, at the same level as his peer group. Given that his military records also reveal that he suffered from insomnia and then also contracted syphilis that was seemingly undiagnosed for between five to ten months, his ability to function may have been further compromised by other psychiatric and/or neuropsychiatric difficulties. FHP Exh. 43 at ¶ 28.

Franky's cognitive limitations predisposed Lanell to cognitive issues as well, from both genetic and environmental standpoints. In other words, in addition to the fact that Lanell was genetically predisposed to the development of the same cognitive difficulties that his father exhibited, Lanell's father did not have the capacity to recognize Lanell's need for specialized attention and then offer and/or obtain the specialized attention that Lanell required. FHP Exh. 43 at ¶ 29.

Petition for Writ of Habeas Corpus

1   When Franky's term of military service ended, he migrated to California to

2   the home of his father, Ross B. Harris on Montford Street, in the unincorporated

3   city of Pacoima, in the greater Los Angeles Area, where shortly thereafter, he

4   would meet Lanell's future mother Rosemary Leggett. FHP Exh. 34 at 1558, 1576;

5   FHP Exh. 43 at ¶ 30.

6   Lanell's maternal line has its beginnings in the United States in Mississippi

7   and Alabama. His great grandmother, Susie Walker was born in the town of

8   Meridian, in Lauderdale County, Mississippi in 1897. Meridian was a hotbed of

9   Ku Klux Klan activity where White supremacy was enforced by physical violence

10  as well as structural barriers to equality.[11] According to the 1900 Federal Census,

11  Susie was one of six children in a household supported solely by her father's small

12  income as a farm laborer. FHP Exh. 8 at 175. In 1910, Susie and her siblings lived

13  with their mother and her new husband in the town of Hurricane Creek. It appears

14  two more children were born of this marriage and all but the youngest three (ages

15  8, 4, and 2) were working as farm laborers along with their mother on a family

16  farm, while their stepfather was a general farm laborer. FHP Exh. 8 at 177. Like

17  Lanell's paternal ancestors, those along the maternal line faced significant poverty,

18  familial instability, and structural racism. By the 1920 Federal Census, Susie was a

19  widow herself, having married John Leggett and given birth to their son, Prestley

20  Tracy Leggett on June 11, 1916. FHP Exh. 39 at 1746; FHP Exh. 8 at 178. She

21  moved back to Meridian and worked as a cook for a private family, a position she

22  held for most of her life. FHP Exh. 8 at 178, 184. Her son, Prestley, who

23

24  [11] One particularly brutal example of this history is the so-called Meridian
    Race Riot, which took place over three days in March 1871 and resulted in the

25  killing of almost thirty Black citizens of Meridian and the departure of hundreds

26  more in the aftermath of the violence. See "The Meridian Race Riot (1871),"
    available at https://www.blackpast.org/african-american-history/meridian-race-riot-

27  1871/#:~:text=The%20Meridian%20Race%20Riot%20occurred,history%

28  20since%20the%20Civil%20War (last visited on 11/29/2022).

Petition for Writ of Habeas Corpus

eventually became known as Tracy, left home and migrated west to California.[12] FHP Exh. 43 at ¶ 31.

The Patton line of Lanell's maternal heritage hails from the small town of Georgina, in Butler County Alabama, where his great-grandfather, Comer, worked as a laborer at a sawmill. Comer was born in 1886, FHP Exh. 39 at 1745, and in 1910, he resided with his parents, who both were farmers. FHP Exh. 8 at 176. He married Minnie Gandy, Lanell's great grandmother, in 1925 in Alabama, FHP Exh. 7 at 172, and migrated west to California a short time later. Their daughter, Hermalee,[13] was born in Alabama in 1920 prior to their marriage. FHP Exh. 8 at 181. By 1930, the family along with Minnie's sister, Millie, all lived in Pacoima. FHP Exh. 43 at ¶ 32.

The Great Migration, the phenomenon of Black people fleeing oppressive regimes of the south to live in the western or northern parts of the country, resulted in over six million people migrating between 1915 and 1970.[14] As described by Wilkerson,

> Yet the hardened and peculiar institution of Jim Crow made the Great Migration different from ordinary migrations .... Southern blacks [ . . . ] traveled deep into far-flung regions of their own country and in some cases, clear across the continent. Thus the Great Migration had more in common with the vast movement of refugees from famine, war, and genocide in other parts of the world, where oppressed people, whether fleeing twenty-first century Darfur or nineteenth-century Ireland, go great distances, journey across rivers, deserts, and oceans

---

[12]  At some point, it appears his mother joined him there as her death, on May 31, 1961, occurred in Los Angeles, California.

[13]  Records alternately list the spelling of her name as Herma Lee and Hermalee. She will be referred to as "Hermalee" throughout this declaration to remain consistent with references to her in these legal proceedings.

[14]  Wilkerson, *The Warmth of Other Suns*, 26.

or as far as it takes to reach safety with the hope that life will be better wherever they land.[15]

The journeys themselves were treacherous, with many basic travel necessities out of reach because facilities like gas stations, motels, and restaurants refused to serve customers of color. Although Black travelers published "Green Books" – listings of amenities open to people of color bound in green paperback books – much of the information was out of date by the time a family set out across the country, and the consequence of a misstep or a business that had changed ownership was not simply inconvenience or discomfort, it could mean exposing an entire family to grave, racist violence.[16]  FHP Exh. 43 at ¶ 33.

In the 1930s, the Pattons and Leggetts were among the early Black families to settle in Pacoima, FHP Exh. 48 at 2189, a small town situated in the northeastern San Fernando Valley. Although it was first settled in the 1880s, opportunities for employment and housing were scarce and the population remained small – approximately 4,200 in 1930 and less than 10,000 in the early 1940s. FHP Exh. 48 at 2229-30. Pacoima was inhabited mostly by migrant laborers and railroad workers who sought to live in closer proximity to employment opportunities than was available to them in central Los Angeles.  FHP Exh. 48 at 2229.  During this time, less than ten percent of the roads were paved and there was very little infrastructure to support the community.  FHP Exh. 48 at 2230; FHP Exh. 43 at ¶ 34.

Pacoima was isolated and under resourced largely due to legislation and other officially sanctioned policies and practices that had the effect of relegating people of color to segregated areas of Los Angeles, while infrastructure and other supports were diverted to areas inhabited predominately by White residents.  For

---

[15]  *Id.* at 162-63.

[16]  *Id.* at 178-82.

Petition for Writ of Habeas Corpus

example, racial criteria were institutionalized in the appraisal of properties for federal government subsidies and mortgage finance.[17]   Racial covenants were written into property deeds used widely in Los Angeles and cities nationally from 1900 to 1948.  This allowed the majority White property owners, who through discriminatory policies controlled most of California's real estate, to not sell or rent homes to "any person other than one of the white or Caucasian race." FHP Exh. 48 at 2193.  At the same time, the Joe Louis Housing Tract, named after the revered black heavyweight champion, was specifically named to steer Black buyers to homes in Pacoima.  "Joe Louis was just the most popular guy, and it attracted people to this community," said Ed Kussman, former head of the San Fernando Valley chapter of the National Association for the Advancement of Colored People and a longtime advocate for fair housing.  "It was just another way of isolating us . . . when no one else wanted to rent or sell to you, they'd send you here."  FHP Exh. 48 at 2255.  By 1960, 90% of the nearly 10,000 African Americans in the San Fernando Valley lived in Pacoima. Although the demographics of the town itself were diverse, with a mix of Black, White, and Asian people living within the town limits, they were separated geographically from one another on the basis of race and ethnicity.  FHP Exh. 48 at 2230-31, solidifying the structures of systemic racism and inequality that reached an apex during Lanell's childhood and continue to plague the communities of the San Fernando Valley to this day.  FHP Exh. 43 at ¶ 35.

Comer was the only employed member of the Patton household, and he worked as a laborer on a fruit farm.  FHP Exh. 8 at 181.  Hermalee attended San Fernando High School.  FHP Exh. 40; FHP Exh. 8 at 182.  Sometime prior to 1940, she met and began a relationship with Tracy Leggett though it is unclear whether

---

[17]   Andrea Gibbons, *City of Segregation: One Hundred Years of Struggle for Housing in Los Angeles* (2018).

69

the two formally married.  FHP Exh. 7 at 158.  By the 1940 Federal Census, Tracy and Hermalee resided together along with her parents and grandfather.  Although Tracy Leggett was listed as the head of the household, he had been unemployed for 10 months; his typical occupation was driving trucks and he had obtained a fourth-grade education.  Comer continued to work as a laborer in support of the family. FHP Exh. 8 at 182.  Tracy and Hermalee had their first child together, Rosemary Leggett (Lanell's mother), on August 25, 1940.    Rosemary's birth was a complicated one.  Hermalee suffered from toxemia (the medical term today is preeclampsia) at least at the onset of her labor if not before and hemorrhaged during labor.  Surgical interventions during labor included low forceps and an episiotomy.  Although no birth injuries were noted to Rosemary at the time, FHP Exh. 7 at 138, it is impossible to rule out the possibility that oxygen deprivation during her birth contributed to the neuropsychiatric difficulties that she exhibited as she developed (as described below).  FHP Exh. 43 at ¶ 36.

Sometime after Rosemary's birth, it appears the entire family moved to Hoyt Street in Pacoima.  Tracy was employed by the Works Progress Administration, a New Deal federal agency that offered unemployed Americans jobs in construction and public works.  Comer continued to work as a laborer at a hardware store.  FHP Exh. 39 at 1745-46.  Tracy and Hermalee had their second child, Tracy Jr., on September 24, 1941, FHP Exh. 7 at 140, and their third child, Jerry, on February 22, 1947.  FHP Exh. 7 at 135.  By 1947, the family had moved from Hoyt Street to Pinney Street, also in Pacoima.  Tracy and Hermalee separated and on October 1, 1949, Hermalee married a man named Booker Harris.  FHP Exh. 7 at 146.  The children's home situation following their mother's marriage was erratic and unstable, and they were frequently shuffled among the homes of Hermalee, Tracy, and their grandparents.  FHP Exh. 42 at 1756.  Rosemary and her two brothers faced significant adversity throughout their lives, including a genetic

70

1  predisposition to mental illness, as court records indicate a family history of
2  "insanity" and epilepsy. FHP Exh. 22 at 952; FHP Exh. 43 at ¶ 37.

3      Mental illness has genetic, environmental, and experiential components that
4  inform an individual's risk and influence the severity of the illness, and also an
5  individual's chance for recovery or symptom management.  In the case of the
6  Leggett family, it appears that mental illness was present in family members across
7  several generations.  This multigenerational pattern indicates that Lanell had a
8  genetic predisposition to mental illness because certain mental illnesses, notably
9  schizophrenia and mood disorders, are more likely to occur based on the presence
10  of one or more genetic variants that are passed from parents to their children.
11  Genetic susceptibility to mental illness, when coupled with familial instability,
12  structural racism (including limited opportunities for treatment), and trauma, all
13  combined to place Lanell, his grandmother, Hermalee and mother, Rosemary, at
14  risk of developing severe mental illness as well as decreasing the likelihood for
15  effective symptom management and recovery because of lack of access to
16  treatment and systemic as well as functional obstacles to comply with any
17  treatment that might have been available. FHP Exh. 43 at ¶ 38.

18      As school records demonstrate, Rosemary's difficult birth gave way to
19  continued struggles in her early elementary years and beyond.  Although she
20  consistently was described by teachers as cheerful and well-liked, she was just as
21  consistently observed to be immature with clear deficits in her cognitive abilities.
22  FHP Exh. 18 at 682, 689-90.  At Pacoima Elementary School, Rosemary's Full
23  Scale IQ was measured at 65 on an administration of the Stanford-Binet
24  Intelligence Scale and she was referred to special educational classes, known as
25  Special Training Classes (S.T.C.) for "Educable Mentally Retarded" students.  FHP
26  Exh. 18 at 679, 689; FHP Exh. 49 at 2545-62. While attending San Fernando High
27  School, a Wechsler Intelligence Scale measured her Full Scale IQ at 59.  FHP Exh.
28

1    18 at 679. She continued in Special Training Classes throughout her school tenure.
2    FHP Exh. 18 at 677-78; FHP Exh. 43 at ¶ 39.

3        The impact of Rosemary's cognitive difficulties was not limited to her
4    academic struggles. Her medical records reveal serious problems with obesity and
5    oral hygiene, indicating that she struggled with self-care and relatedly, that she
6    likely lacked support to help her develop such a capacity or otherwise ensure that
7    she was being taken care of. FHP Exh. 43 at ¶ 40.

8        On a high school personal survey included with Rosemary's school records,
9    she indicated that her biggest wishes were to get married and to become a dancer.
10   FHP Exh. 18 at 687. Rosemary's unsuccessful attempts to follow her dreams led
11   her down a path riddled with disappointment and significant loss. Rosemary likely
12   had her first child, Ronald Earl, known as "Ronnie" shortly after she turned fifteen
13   years old, on October 13, 1955. FHP Exh. 7 at 137. Although his birth certificate
14   indicates he was born outside of a hospital (no address is listed) to Rosemary's
15   father Tracy and his new wife, Annabelle, Rosemary's other children acknowledge
16   that in fact, Ronald was their oldest sibling. FHP Exh. 7 at 137; FHP Exh. 43 at
17   ¶ 41; SHP Exh. 78 at ¶¶ 1, 8; SHP Exh. 89 at 425, SHP Exh. 89 at 425, 428; *See
18   also* SHP Exh. 83 at 408.

19       A short time later, Rosemary became pregnant by Roger Bell, a man six
20   years her senior, while she was still in high school. FHP Exh. 18 at 686; FHP Exh.
21   7 at 128. Roger worked as a gas station attendant but eventually obtained a job as
22   a truck driver for General Motors. Their first son, Roger Jr., who was known as
23   Dennis, was born at Hermalee and Booker's home on Pinney Street, on July 5,
24   1957, when Rosemary was sixteen. FHP Exh. 7 at 131. Rosemary appears to have
25   stopped attending classes at San Fernando High School in 1958, when she was in
26   the 11th grade. FHP Exh. 18 at 678, 692. She and Roger had a daughter, Arlene,
27   on April 23, 1959. FHP Exh. 7 at 128; FHP Exh. 43 at ¶ 42.

28

Petition for Writ of Habeas Corpus

1    Shortly after Arlene's birth, Rosemary and Roger separated and she began

2    dating another man, with whom she had a son named Kenneth "Kenny" Johnson.

3    The relationship ended and Kenny never knew his biological father.  SHP Exh. 89

4    at 425, 428.  Next, Rosemary began dating Ross B. Harris, but upon meeting Ross

5    B.'s son, Franky, who had transferred to the Army Reserves on July 29, 1960, and

6    moved to his father's house in Pacoima, FHP Exh. 34 at 1558, she took up with

7    him and so began the relationship of Lanell Harris's parents.  FHP Exh. 43 at ¶ 43.

8    Rosemary's experience with motherhood while she was still an adolescence,

9    coupled with her intellectual disability and other psychological and emotional

10    difficulties, were risk factors for negative developmental outcomes in her children.

11    This is because when children whose brains are still developing become parents

12    themselves, they lack the maturity and certain skills to effectively raise babies –

13    from meeting basic health and material needs to providing appropriate emotional

14    guidance and support.  By the age of 19, Rosemary had three children under the

15    age of three and no stable partner to help her manage the demands of motherhood.

16    Not only was her own development still underway, her developmental capacity was

17    limited by her intellectual disability, meaning she had fewer tools than an average

18    young mother to navigate the extreme challenges she faced.  Her underdeveloped

19    and/or absent emotional and cognitive resources coupled with the instability of her

20    support system negatively impacted her children's health, physical and emotional

21    safety, and opportunities as well as abilities to learn and grow in step with their

22    peers, as will be described in more detail below.  FHP Exh. 43 at ¶ 44.

23        *Lanell's Birth and Early Childhood*

24    Franky and Rosemary's relationship began in tumult and ended in tragedy.

25    The couple moved in together along with Rosemary's three young children,

26    Dennis, Arlene and Kenny.  On September 19, 1961, the couple's first child,

27    Geraldine Sylvester, was born.  FHP Exh. 7 at 145.  On September 6, 1963, their

28

73

second child, Darlene was born.   The family resided on Desmond Street in Pacoima and Franky had obtained work on the assembly line at General Motors. FHP Exh. 7 at 130.    Franky self-reported on his records for Veterans' Administration (VA) benefits that he and Rosemary married in Tijuana, Mexico in 1963 and divorced in the late summer of 1966, FHP Exh. 35 at 1603, however these events are not corroborated by corresponding vital records.   Both parents brought genetic profiles to the relationship that predisposed their children to mental illness and cognitive issues, as well as multigenerational histories of racial, and individual traumas that further interfered with their abilities to nurture and provide care for their children, thereby exacerbating these genetic vulnerabilities.   FHP Exh. 43 at ¶ 45.

Franky abused alcohol and drugs, and his drinking was often accompanied by unpredictable violence.   Rosemary's son Dennis recalls living with his mother and Franky when he was young, witnessing Franky's drinking, and experiencing beatings at his hands.   SHP Exh. 78 at ¶¶ 1, 3, 5. Darlene reports that Franky tried to run Rosemary over with a car.   SHP Exh. 82 at 403.   By all accounts, Franky's behaviors rendered his households and all who resided within them subject to extreme instability and repeated exposure to traumatic events.   In addition to the pattern of substance abuse and violence, Frankie also engaged in relationships with multiple women simultaneously, a pattern which, as previously noted, likely has its roots in seeking validation of masculinity and power through avenues other than income generation and financial success. FHP Exh. 43 at ¶ 46.

Before Lanell was born or shortly thereafter, Franky and Rosemary's relationship crumbled.   They lived apart and Franky had already begun a serious relationship with a woman named Doris, whom he would later marry and who would become the most stable adult caregiver in Lanell's life. SHP Exh. 78 at ¶ 3; SHP Exh. 89 at 425.   The relationship between Doris and Franky, however, was

hallmarked by his abuse of her and the children in his care; erratic and unpredictable behaviors and constantly shifting professional goals; his continuing battle with alcohol addiction; and numerous extra-marital affairs. SHP Exh. 83 at 410-12; SHP Exh. 82 at 405; SHP Exh. 78 at ¶¶ 3, 6, 7; SHP Exh. 84 at ¶¶ 3, 4, 6, 8, 9, 11. The repetition of these behavioral patterns reflect Franky's maladaptive attempts to achieve a positive sense of self, which seems to be the failed quest of his life. In its pursuit, he was unable to meet the accompanying responsibilities to provide emotionally and financially for his children. FHP Exh. 43 at ¶ 47.

Rosemary's ability to support her children independently of Franky was compromised by her limited cognitive abilities. She obtained janitorial and maintenance work – simple, repetitive, task-oriented employment that typically required little complex planning; she worked as a janitor at Valley Community Hospital from 1965 to 1967. FHP Exh. 7 at 151. The type of work that Rosemary was able to obtain also relegated her to low potential earnings, and her multiple pregnancies likely restricted the amount of time she was physically able to work. Her relationship history suggests Rosemary's deficits kept her hewn in patterns of dependency, typically with older male partners, whom she relied on for material support. Furthermore, the caregiving responsibilities she faced at the time of Lanell's birth were enormous – raising five small children ages 9, 7, 6, 4, 2 and a newborn would have proven overwhelming for a parent functioning within normal cognitive ranges, but her significant impairments would have rendered the task nearly impossible. The confluence of Rosemary's impaired intellectual functioning and the erratic and pathological behaviors exhibited by Franky, which are consistent with mental illness and compromised intellectual abilities as well, rendered the pair woefully ill-equipped to care for one small child, let alone the six for which they ultimately became responsible. FHP Exh. 43 at ¶ 48.

The lack of access that Lanell's parents had – to employment opportunities

75

that would have allowed for economic advancement and public transportation to make such employment possible; to quality education; to adequate community resources to address mental health problems and family services – further compromised their already limited abilities to provide care and supports to their children.  In the years leading up to Lanell's birth and well into his childhood, Pacoima is documented to have had grave deficits in infrastructure, services, and resources.  FHP Exh. 48 at 2223-53; FHP Exh. 43 at ¶ 49.

Lanell Craig Harris was born on August 10, 1966 at Sun Valley Hospital in Pacoima.  At the time of his birth, Rosemary resided on De Haven Street.  Franky, who worked as a spot-welder for General Motors, lived apart from her.  SHP Exh. 1 at 1.  Due in part to their separation, Franky questioned whether Lanell was fathered by another man, a belief that encapsulated the distance and rejection that were the hallmarks of his relationship to his youngest child.  SHP Exh. 83 at 408; FHP Exh. 43 at ¶ 50.

During the first eight months of Lanell's life, Franky moved in with his girlfriend, Doris, who describes a happy and calm beginning of their relationship. Doris's only biological son, Robert James, also lived with them.  Rosemary kept all six of her children in her care.  SHP Exh. 83 at 408; FHP Exh. 35 at 1603.  Medical records show that she underwent a cholecystectomy (surgery to remove the gallbladder) on March 16, 1967, and a dilation and curettage (D&C) procedure five days later.  In the weeks that followed, she began to experience nausea, vomiting and lethargy.  She collapsed while she was taking care of Lanell, SHP Exh. 89 at 425, and she was admitted to the hospital on April 6 with continuing symptoms of lethargy and confusion.  By the time she was transferred to an appropriate intensive care unit later in the day, she was in a coma and jaundiced.  SHP Exh. 46 at 322. She died at 9:45pm that same evening of massive hepatic necrosis with halothane anesthesia listed as a probable cause.  Rosemary also suffered from a

76

gastrointestinal hemorrhage and acute tubular necrosis preceding her death.
Although hepatic necrosis due to halothane anesthesia is a rare surgical
complication, by 1963, the use of this particular anesthetic was contraindicated for
cholecystectomies.    Rosemary's records, in documenting the medically
contraindicated anesthesia and the time that elapsed between her hospital
admission and receipt of responsive treatment, are indicative of inadequate medical
care, a risk factor for poor health and premature death faced by many people of
color in the United States historically and continuing to this day.[18]  FHP Exh. 43 at
¶ 51.

Accessible, quality medical care was largely unavailable in Pacoima during
Lanell's childhood and teenage years.  Poor and immigrant families had little
access to private health care systems, forcing them to attend public clinics that
were understaffed and under-resourced.  FHP Exh. 48 at 2259-68.  The postwar
population surge and accompanying "White flight" to increasingly segregated
communities with high concentrations of resources left a vacuum of need for
medical care among the communities of color that remained.  FHP Exh. 48 at
2259-68.  Though public hospitals began to expand medical services to these
communities in the Los Angeles area, by 1972, further efforts to consolidate county
services, which promised a more equitable system of health planning, were
completely derailed by "the increasingly political nature of the county health care
system."  FHP Exh. 48 at 2259-68.  The failure to meet the needs of the
communities led to devastating backlash. An "independent commission's report on
the causes of the Watts riots [of 1965] identified the lack of health care in south-
central Los Angeles" as a factor, FHP Exh. 48 at 2259-68, while a report by the

---

[18]    Austin Frakt, *Bad Medicine: The Harm that Comes from Racism*, New York
Times, January 13, 2020, updated July 8, 2020.  Available at https://www.nytimes.
com/2020/01/13/upshot/bad-medicine-the-harm-that-comes-from-racism.html (last
visited January 29, 2023).

Petition for Writ of Habeas Corpus

Governor's Commission investigating the same found that "health conditions of the residents of South-Central Los Angeles are relatively poor and facilities to provide medical care are insufficient." FHP Exh. 48 at 2269-324; FHP Exh. 43 at ¶ 52.

Following Rosemary's death, Roger, Kenny, Arlene, Geraldine, Darlene and not-yet-eight-month-old Lanell temporarily were taken in by their grandmother, Hermalee.    Hermalee was both materially impoverished and emotionally exhausted, and unable to nurture the six young children left in her care. In addition to having just lost her eldest daughter, her son Tracy Leggett Jr. was also intermittently residing with her and faced grave problems of his own. FHP Exh. 22 at 913; FHP Exh. 22 at 916. Reports from probation officers and court appointed doctors reveal that in 1964 and 1965, Tracy was held for months at a time at Agnews State Hospital and Camarillo State Hospital to be treated for symptoms of mental illness, including command hallucinations.    FHP Exh. 22 at 914.    His condition was referred to on at least one occasion as schizophrenic in nature. FHP Exh. 22 at 915. Tracy also suffered substantial injuries in a car accident, which treating doctors suspected exacerbated his already significantly impaired cognitive functioning.    FHP Exh. 22 at 911.    Intelligence Quotient measurements administered during the course of his treatment found that his IQ was between 57 and 69,[19] a range generally recognized as within the diagnostic criteria for intellectual disability. The near uniform recommendation of evaluating clinicians as well as probation officers was that he was unable to function in the world without constant assistance, and most notably, that his lack of understanding and inability to control his impulses posed serious dangers to others. FHP Exh. 22 at 894-95, 898, 911, 923-24, 950. In January 1965, his caseworker concluded,

---

[19]    The higher IQ score was obtained on a Beta test; the lower score on a WAIS test, and at least one examiner attributed the scoring difference to the variance between the instruments used.

78

> This young man needs a well-structured setting where he can be constantly supervised and cared for. His gross inadequacy should be noted but the concept of punishment would have little meaning or benefit to affect change. A hospital setting where he would not be unique and where considerable care could be afforded him is recommended.

FHP Exh. 42 at 1757.

Nonetheless, he was released from the criminal justice system without mental health or social support plans or opportunities for continued treatment and professional assistance, and sent to reside with Hermalee and the children. Following subsequent arrests after his release from the state hospitals, he was sent to jail rather than being given the mental health care he required. FHP Exh. 43 at ¶ 53.

When the children first came to stay with her, Hermalee lived in a small house on Pinney Street in Pacoima. There was not a separate sleeping area for them, so the children all slept in the living room. In addition to the overcrowded living conditions, Lanell's brother Kenny recalls that Hermalee was "really old, mean and in poor health," and because she was unavailable to care for Lanell, his siblings were tasked with feeding him and changing his diapers. SHP Exh. 89 at 425. Hermalee disfavored Lanell and his brother, Kenny, and treated them differently because they were the darkest of her grandchildren. SHP Exh. 83 at 409; SHP Exh. 89 at 429. She also did not like Lanell's father Franky because he was dark skinned. SHP Exh. 83 at 410. Such preferences are indicative of the racism Hermalee experienced herself, including the higher value that was placed on lighter complexions within families and larger communities – both Black and White. Hermalee's negative perception of Lanell from infancy due to his dark skin tone is an early example of a stereotype that would pose a challenge to him for his entire life. FHP Exh. 43 at ¶ 54.

1    Hermalee, with her resources completely taxed, was unable to continue
2    living with all six children.  Franky asked his mother in Oklahoma to take over
3    caring for the children he shared with Rosemary, but she refused.  SHP Exh. 83 at
4    408.  The siblings instead were divided: Darlene, Geraldine, and Lanell were sent
5    to live with their father, Doris and her son Robert James, and Roger, Kenny, and
6    Arlene remained with Hermalee.  SHP Exh. 83 at 408; SHP Exh. 89 at 425.  The
7    separation was devastating for the children old enough to remember it, who had
8    come to rely and depend on one another amidst the instability their mother's death
9    caused.  SHP Exh. 89 at 425-26; SHP Exh. 78 at ¶ 8.  Kenny remembers that at one
10   point, his mom Rosemary asked her mother to make sure the children always
11   stayed together, but her desire was impossible for the remaining family members to
12   honor.  SHP Exh. 89 at 426; FHP Exh. 43 at ¶ 55.

13        By the time Geraldine, Darlene, and Lanell moved in with Doris and Franky,
14   they had already experienced substantial risk factors associated with negative
15   developmental outcomes including: genetic predisposition; exposure to physical
16   and emotional trauma; overcrowding; poverty; neglect; and loss of a primary care
17   taker which caused maternal attachment issues.  Around the time of the move,
18   Geraldine was described as very shy in school records.  FHP Exh. 17 at 671.  She
19   repeated second grade and was placed in special education classrooms.  Darlene,
20   who was between four and five, had not been potty-trained and wore diapers.  SHP
21   Exh. 83 at 408.  Lanell was also described as very quiet – even as a baby – and he
22   did not begin speaking until after he was three years old.  SHP Exh. 89 at 426; FHP
23   Exh. 43 at ¶ 56.

24        The Harris children, already showing signs of emotional and cognitive
25   impairments, were thrust into a chaotic, unpredictable, emotionally and physically
26   damaging environment controlled by two caregivers who themselves were
27   significantly compromised.  Franky was working only sporadically and Doris's

28

Petition for Writ of Habeas Corpus

income as a medical care administrator was often the family's sole source of financial support. FHP Exh. 33 at 1522; SHP Exh. 89 at 425; SHP Exh. 83 at 410; SHP Exh. 93 at 446. In 1970, Doris's net income of $428 per month was insufficient to meet the basic expenses of the household of six. FHP Exh. 33 at 1522-23. Adding to the instability, the family moved at least five times between 1968 and 1974 – or almost once a year. FHP Exh. 16 at 646; FHP Exh. 17 at 667. According to Doris, the stress of the additional children in the household correlated with Franky's increased use of alcohol and displays of violence. SHP Exh. 83 at 408; FHP Exh. 43 at ¶ 57.

In the face of the increased financial demands of providing for his children, Franky struggled to find regular employment. He was granted a full honorable discharge from the Army Reserves on June 30, 1964. FHP Exh. 34 at 1601. From 1967 until 1975, Franky applied for educational benefits to attend a variety of trade schools and technical colleges with the hopes of alternately becoming a radio-television repair person, a musician, a computer operator, a respiratory therapy technician in dentistry, and eventually resuming study as a musician. FHP Exh. 35 at 1606, 1611, 1613, 1618-19, 1660; FHP Exh. 45. He did not complete any of the programs in which he was enrolled, and attended sporadically, usually in two-to-three month increments. In January 1974, in the midst of his efforts to obtain a degree and accompanying stable income, Franky was severely injured when he was hit by a car. FHP Exh. 35 at 1642; SHP Exh. 83 at 409; SHP Exh. 84 at ¶ 13. He was in the hospital for months, and when he returned home, he was dependent on Doris for his physical care and basic needs, like bathing, which often happened in front of the children and left him feeling humiliated and angry, even after the physical injuries had healed. SHP Exh. 83 at 409-10; SHP Exh. 84 at ¶ 13; FHP Exh. 43 at ¶ 58.

Franky's physical limitations resulting from the accident and lack of

economic and employment achievements further undercut the positive sense of self he sought to create. He was in the traditional role of "head" of his family by virtue of historical gender norms but was completely unable to materially, let alone emotionally, provide for the members of his household. These difficulties pushed him towards areas in which he was able to attain more immediate positive reinforcement – the attentions of other women; drinking and the club scene; and exerting rigid control over his children and Doris. FHP Exh. 43 at ¶ 59.

### Childhood Home Life and Risk Factors

*Physical, Emotional, and Sexual Abuse*

Lanell's childhood years, a time during development wherein his unique cognitive vulnerabilities required support and nurturance, were filled with violence – both witnessed and experienced. His caregivers modeled and encouraged addictive behaviors, and the lack of predictability, stability, and affection exacerbated his serious cognitive and psychological impairments. FHP Exh. 43 at ¶ 60.

Franky and Doris targeted the children for mental and physical abuse, while simultaneously being enmeshed in their own cycle of extreme abuse and conflict that often occurred in front of the children. SHP Exh. 82 at 403-05; SHP Exh. 84 at ¶¶ 3, 4, 9,13; SHP Exh. 78 at ¶¶ 3, 6, 7; SHP Exh. 89 at 425-28; SHP Exh. 83 at 410-12; SHP Exh. 93 at 445-47. The harms that Franky visited on Doris also included the pain and humiliation associated with his numerous extra-marital affairs. SHP Exh. 91 at 440; SHP Exh. 83 at 411; SHP Exh. 89 at 425. Franky's reputation for having affairs with many different women at a time was known not just within the family, but also throughout the community. FHP Exh. 43 at ¶ 61. His infidelities were witnessed, both directly and indirectly, by his children, which modeled a maladaptive coping mechanism and fraught path towards a positive sense of self as they forged their own adolescent identities. Lanell's older brother

witnessed Franky having sex on the counter of a record store with a woman other than Doris. SHP Exh. 89 at 425. Lanell told his father he intended to date one of the girls he went to school with, but Franky forbade it, explaining to his young son that he had slept with the girl's mother and that Lanell's love interest might actually be his half-sister. SHP Exh. 91 at 440. Franky also attempted to have sex with one of Lanell's high school girlfriends when she was fifteen years old. SHP Exh. 95 at 497; FHP Exh. 43 at ¶ 61.

With respect to Doris, Franky engaged in direct emotional and verbal abuse, ranging from making degrading comments about her abilities in front of their friends at parties, to telling her she was a bad cook and couldn't do anything right in front of the children. SHP Exh. 93 at 445. He attempted to exert complete control over the household by making demands that he was the first person to be served at mealtimes, and the only one to discipline the children. SHP Exh. 93 at 445. Part of his power came from the unpredictability of his rules and his enforcement of them. As Doris recalls, "Some nights he came home late and demanded that I cook for him. Even if I had to work early the next morning, Franky pushed me into the kitchen and shoved me around until I cooked what he wanted." SHP Exh. 83 at 411. These demands and the physical violence that often accompanied them did not occur in a manner she could anticipate. In another instance, Doris had unwittingly pulled Franky's marijuana plants from their garden as she was weeding, and although Franky "had his hands out in front of him like he wanted to strangle [her]" he ultimately did not harm her. SHP Exh. 83 at 411; FHP Exh. 43 at ¶ 62.

In addition to the emotional abuse he perpetrated, Franky physically assaulted Doris. He hit her regularly, often so hard she would fall to the ground. SHP Exh. 93 at 445; SHP Exh. 84 at ¶ 3. He threw Doris through a bathroom mirror, SHP Exh. 82 at 405, and on one occasion beat her with a gun before

jamming the barrel deep in her throat; in that instance, Doris believed he was going to kill her.  SHP Exh. 83 at 410; SHP Exh. 93 at 445.  He beat her in front of the children and she would often beg for them to intervene on her behalf.  According to Doris, "The kids saw many of these fights.  They saw way too much violence and fighting and yelling."  SHP Exh. 83 at 411; FHP Exh. 43 at ¶ 63.

Doris, rather than shielding the children from the violence, was so desperate that she embroiled them in the cycles of abuse.  Franky's oldest son, Lance, recalls an incident soon after coming to California: "I remember one time seeing my Dad hit Doris so hard, he knocked her down.  He then turned around and hit me too.  I wasn't too proud of my dad after that."  SHP Exh. 84 at ¶ 3.  After living with them for almost a year, Lance found a home of his own down the block, but even then, he recalls "Doris would come stay with me after she and my dad would fight.  She just needed to get away from him."  SHP Exh. 84 at ¶ 6.  Doris called on Lanell to protect her most often.  As his sister Darlene recalls, "Doris made it very difficult for Lanell because she often put him between her and my dad.  Even though he wasn't very old, Lanell was big and Doris used him by telling him he had to protect her from our dad."  SHP Exh. 82 at 405.  Still, it took until he was a teenager before he outgrew his father, and Lanell suffered each time he intervened on Doris' behalf.  According to his brother Kenny, "[Franky] was a lot bigger than Lanell, and [Franky] knocked Lanell down and out of the way when he tried to help Doris."  SHP Exh. 89 at 427.  During the above-mentioned gun incident, Doris observed:

> The kids were watching, and Lanell, who was not even a teenager yet tried to stand up for me.  Franky was drunk and tossed Lanell across the room; Lanell hit his head really hard.  The next morning, when he was sober, Franky continued the problem.  He went into Lanell's room, and made his own son fight him.  Lanell tried to leave the room, but Franky pulled him back into the room.  It was so sad.

Lanell didn't want to fight his own father, but Franky kept saying:
"You think you're a man now? Fight me like a man!

SHP Exh. 83 at 410-11.

According to Lanell's high school girlfriend, Donna, "Being unable to protect Doris from Franky's violent rages made Lanell feel like a failure." SHP Exh. 91 at 440; FHP Exh. 43 at ¶ 64.

Both witnessing the abuse and shouldering the responsibility to protect Doris placed Lanell in situations far beyond his physical, mental, and emotional capabilities. Lanell expressed feelings of confusion when he recalled hearing Doris scream from another room; although he comprehended that something was wrong, he was not able to make sense of the beatings. In retrospect, Lanell linked the behavior to Franky's drinking but otherwise characterized Franky and Doris's relationship as one in which they generally got along. Lanell also believed that his father felt remorseful when he woke, sober, and saw the bruises he inflicted the night before. Lanell's awareness of the physical violence between his caregivers began when he was five or six years old, an age where even without cognitive impairments, the exposure was damaging to his sense of safety and profoundly altered his sense of self. FHP Exh. 43 at ¶ 65.

Upon further exploration of the relationship between his father and stepmother, Lanell noted that he thought Doris was his biological mother until he was in about the 7th grade. She was the most consistently positive figure in his early life, and he perceived their relationship as being extremely close. He described himself as her "protector"; he indicated that there were many times when he feared for her life at the hands of his father; and it was clear that the role of protector became an integral part of how he viewed himself. On the other hand, Lanell also loved and wanted to feel connected to his father, despite his full awareness of Franky's violent and adulterous behavior. So, as noted above, he

offered various explanations for his father's behavior that minimized his father's culpability and allowed him to maintain a sense of connection to his father. Although such perceptions and responses as Lanell expressed are often seen in children raised in homes where there is domestic violence, Lanell's intellectual deficits and other psychological and emotional difficulties made it all the more likely that he would view and respond to the situation as he did. FHP Exh. 43 at ¶ 66.

Doris was unable to regulate her emotions and the violence and chaos of her relationship permeated nearly every aspect of her life. SHP Exh. 93 at 447. At least one friend of hers, Mary Reeve, observed that Doris was completely subsumed by Franky, such that she could not talk about other subjects, let alone nurture the four children in her household. As Mary Reeve experienced it, "Doris was depressed. She called me and told me about everything that happened. She was so depressed that she could only talk about her own problems. When I responded to her or shared similar experiences, she wouldn't hear what I was saying." SHP Exh. 93 at 447. The effect of the stress was so extreme that Doris developed a tic, which subsided after Franky died. SHP Exh. 93 at 449. This, of course, indicates that although Doris was likely depressed, she was also clearly extremely anxious while living with Franky, and the repeated exposure to violence and threats of violence that she endured were traumatic. FHP Exh. 43 at ¶ 67.

Doris was also a perpetrator of direct emotional and physical abuse on Franky's children, which likely stemmed not only from cycles of abuse she was experiencing from Franky, but also her own family history. Doris immigrated from England, the daughter of an interracial couple. The challenges and experiences of her childhood, migration and prior marriage colored her behaviors towards Franky and his children. Her prior divorce, and the death of one of her children when the baby was thirteen months old undoubtedly impacted her capacity to rear Franky's

children and simultaneously confront the physical and emotional abuse being
perpetrated on her.  FHP Exh. 11 at 306; FHP Exh. 43 at ¶ 68.

Doris disavowed any of Rosemary's children from speaking about their
mother in her presence.  SHP Exh. 82 at 403; SHP Exh. 89 at 426.  The older
children hid the pictures they had of their mother, and secretly showed them to
Lanell to remind him of her, but, as noted above, it took time for him to understand
that Doris was not his birth mother.  Doris's disparagement of Rosemary –
including telling the children about the abusive relationship that existed between
Franky and Rosemary; calling Rosemary a "whore"; and becoming enraged when
the children talked about their mother – was an erasure of their history and a
trauma of its own, SHP Exh. 82 at 403; SHP Exh. 89 at 426, which only made
worse the grief and accompanying attachment issues they experienced after the
sudden death of their parent.  FHP Exh. 43 at ¶ 69.

Attachment during infancy and into late childhood to a primary caregiver, or
caregivers, is a normal part of human development that fosters a sense of security,
encourages personal autonomy, helps to regulate stress, and is foundational for the
formation of a positive sense of self and later interpersonal relationships.  Basic
attachment needs can be fulfilled by simply holding, soothing, keeping clean, and
feeding an infant.  Whatever offerings of love and nurturing Rosemary gave
Lanell, they all but evaporated after her death.  Certainly, his brothers and sisters
loved Lanell, but they were young children who had just lost their mother and
placing them in the role of primary caregivers to an infant was itself a traumatic
developmental experience for each of them.  When the children resided together
with Hermalee, they lacked the emotional and intellectual tools necessary to rear a
baby, let alone process unassisted the death of their mother and navigate the
uncertainty that followed.  When Lanell was transferred to the care of his father
and Doris, he did not receive physical affection from either adult, which is part of

developing appropriate childhood attachments.  SHP Exh. 89 at 429.  Lanell
considers Doris his mother, a fact not psychiatrically significant on its own.
However, Lanell's specific inability to accept that he had indeed had a biological
mother who died until he was an adolescent, is indicative of his maladaptive
coping skills, *i.e.*, using avoidance and denial to move through the reality of her
death, and also is reflective of his concrete and rigid thinking from a very young
age. FHP Exh. 43 at ¶ 70.

Doris perpetrated other abuses on Lanell and his siblings that often involved
humiliation and emotional battery.  She competed with the children for Franky's
limited attention when he was home, and was resentful of his absences when he
was playing music or going to clubs. SHP Exh. 82 at 403.  She told Franky – often
falsely – that the children misbehaved when he was out, which she knew would
result in them being beaten by their father.  SHP Exh. 82 at 404; SHP Exh. 89 at
426. And she also harmed them in her own right. As Darlene recalls,

> The worst abuse was the verbal and mental abuse.  She called us sluts
> and whores, and she called Lanell a bastard.   We never relaxed,
> because we didn't know where the next slap or scream would come
> from.  When Doris's friends came over to the house, if she didn't like
> what we were wearing right in front of her friends she would rip our
> clothes right off of us.

SHP Exh. 82 at 404.

Doris also perpetrated cruel psychological punishments, including locking
the children out of the house all day and then inviting them in and pretending
nothing had happened moments before their father was set to arrive home, SHP
Exh. 89 at 426, and leaving the children in the outdoor dog kennel with the
Doberman Pinchers after dark – even though the dogs were so vicious as to have
sent Franky to the hospital. SHP Exh. 82 at 404; FHP Exh. 31 at 1371.  She
threatened to burn their tongues when she suspected them of lying. SHP Exh. 82 at

88

403.   Doris also whipped the children and hit them with household objects like spoons, ceramic bowls, and shoes.  SHP Exh. 82 at 403-04; SHP Exh. 89 at 427. The physical abuse often carried additional psychological components. According to Darlene, "Doris often whipped all three of us when only one of us did something wrong.  She said she whipped all of us to make sure she got the right one."  SHP Exh. 82 at 404; FHP Exh. 43 at ¶ 71.

Lanell was particularly vulnerable to Doris.  As the youngest child, he was the least mature but, because he was a boy, he was expected to be able to handle an overwhelming amount of household responsibilities, from sharing the housework with his sisters, to cleaning and mowing the yard, taking care of the dogs, emptying the trash and other large, physical tasks on his own.  SHP Exh. 89 at 426. Doris demanded that the children complete heavy loads of chores, which were beyond their maturity levels and capabilities, and forbade them from leaving the house until they were accomplished to her satisfaction.  SHP Exh. 89 at 426. Lanell's cognitive and developmental difficulties rendered him unable to complete the tasks he was assigned, though he tried.  SHP Exh. 82 at 406.  His failures often led Doris to target him, and the erratic and unpredictable nature of her negative attention was particularly hard for Lanell to process. According to Darlene, "Doris was sneaky to Lanell.  She would love him and treat him right one day, and then treat him like dirt the next day."  SHP Exh. 82 at 406.  Given his limited cognitive abilities, Lanell's sister Darlene also recognized that "[i]t was probably harder for Lanell to understand why Doris was so mean, since he thought of her as his real mom."  SHP Exh. 82 at 403; FHP Exh. 43 at ¶ 72.

Franky was also physically abusive to the children, alternating between bestowing positive attention and then physically harming them in a manner similar to Doris, though Franky's physical assaults were far more extreme.  He took the children into his garage where he beat them with extension cords, belts, and tree

89

branches.  SHP Exh. 82 at 404; SHP Exh. 89 at 427; *see also* SHP Exh. 78 ¶¶ 3, 6.
Franky's violence was marked with a particular gendered brutality against Lanell.
When Lanell was about six years old, Franky tied him to a tree outside and left him
there for misbehaving.  SHP Exh. 95 at 496.  On another occasion, he heard Lanell
singing the feminist anthem "I Am Woman" with his step-grandmother, Mary
Patton.  Franky grabbed Lanell from the couch, causing Mary, who was unwell, to
fall on the floor.  Franky dragged Lanell to the garage where he beat him "for being
a sissy."  SHP Exh. 83 at 410.  He demeaned and talked down to Lanell, hurling
insults that diminished his son's sense of self-worth.  He called Lanell names like
"good-for-nothing," "son-of-a-bitch," SHP Exh. 89 at 427, or "stupid" and "a piece
of shit," while also saying Lanell would never grow up to be any kind of man.
SHP Exh. 91 at 441; FHP Exh. 43 at ¶ 73.

     Franky's abuse also included ritualized depravations.  When the children
misbehaved, they were often placed in "solitary" for a week or more.  SHP Exh. 89
at 427.  Lanell's older brother Kenny witnessed this happen to Lanell: " . . .
everything was taken out of his room, and all he had to do to fill time was to sit
and stare at the wall.  Lanell was not allowed to come out of the room to eat with
the family or play outside."  SHP Exh. 89 at 427.  His only respite from
confinement was attending school.  SHP Exh. 89 at 427; FHP Exh. 43 at ¶ 74.

     When children are repeatedly exposed to violent traumatic experiences, such
exposures impact their development in several ways.  When the violence is
prolonged, unpredictable, and/or difficult to understand (due to the nature of the
violence or the limited capacity of the child to understand what is going on), and
when the child is not provided with the type of parental support that might help
mitigate the impact of such repeated exposure to trauma, it makes matters even
worse.  Such was the case for Lanell and his siblings, but especially for Lanell,
given that he was particularly targeted and lacked the intellectual and emotional

1    resources required to make sense of and cope with his situation on his own.  FHP
2    Exh. 43 at ¶ 75.

3         First among the impacts of exposure to the patterns of violence and absence
4    of the supports described above, these children display well-known, psychological
5    signs and symptoms associated with trauma-related psychiatric disorders, including
6    hypervigilance and over-reactivity.  Second, it is now clear that such repeated
7    exposure to violence, in the absence of parental nurturing and supports, impacts the
8    development of their brains.  More specifically, the part of the brain that generates
9    the normal neurochemical response to danger (known as the 'fight or flight'
10    response) becomes overdeveloped, while the part of the brain that calms that
11    response becomes underdeveloped.  As a result, such children are biologically
12    hyper-stimulated, and it takes them much longer periods of time to calm down
13    once they are triggered.  Finally, repeated exposure to violent, traumatic
14    experiences, in the absence of parental nurturing and support, impacts
15    psychological development.  These children evidence instability with regard to
16    attachment to caregivers and their sense of self; difficulty regulating their mood;
17    and impulsivity.  This combination of psychiatric and neuropsychiatric responses
18    to trauma results in a more complexed and difficult to manage clinical picture.
19    FHP Exh. 43 at ¶ 76.

20         From early childhood, Lanell was on a rollercoaster of explosive encounters
21    with his caregivers that were the foundation of how he learned to attach in
22    relationships and respond to the world around him.  His early childhood
23    experiences, which he was unable to fully comprehend or integrate, laid the
24    foundation for mood dysregulation and behaviors linked to exposure to trauma,
25    like hypervigilance, that Lanell began to display in adolescence and into his
26    teenage years. FHP Exh. 43 at ¶ 77.

27         Despite Franky's abuse, Lanell adored and idolized his father.  Lanell's
28

1   neighborhood friend Ysidro Heredia recalls, "On Friday nights Franky always have
2   [sic] his band over to their house and they would play in his garage and drink beer
3   and smoke pot. We weren't allowed in but we would hang around outside. Lanell
4   always wanted to be near his dad." SHP Exh. 88 at 421. Even now, Lanell tends
5   to minimize the confusing, traumatizing abuse he suffered and instead focuses on
6   positive moments with his father, including that his father bought him a drum set
7   and taught him to play. By the time he was twelve, he performed alongside his
8   father in various night clubs. Lanell also describes, in gross generalities, idyllic
9   father-son activities such as fishing, delivering newspapers, and playing basketball
10  with Franky. All of this is Lanell's attempt to rewrite his history; and in this re-
11  written version, his father adores him as well and he is valued and supported; but
12  his imaginings cannot overcome the impact of violence and lack of supports he
13  actually faced. FHP Exh. 43 at ¶ 78.

14          Lanell responded passively to Franky's violence, at times ducking away but
15  mostly allowing himself to be beaten without challenge. SHP Exh. 95 at 496.
16  According to his long-time girlfriend Donna, "Lanell didn't fight back when his
17  father was beating him because, even though he was being hurt by Franky, Lanell
18  believed Franky was still his father no matter what and he had to respect him."
19  SHP Exh. 91 at 440. The persistence of Lanell's attempts to connect with his
20  father and acceptance of his abuse indicate a painful processing mechanism: Lanell
21  continued to look for the promise of finding love and affection from his father,
22  though he had no reason to believe he would ever receive these positive attentions.
23  Here too, it should be noted that although such an unrelenting search for
24  acceptance from a parental figure who is unable to provide it is often seen in
25  similarly placed children and adults, Lanell's intellectual deficits and other
26  psychological and emotional difficulties made it all the more likely that he would
27  view and respond to the situation as he did. FHP Exh. 43 at ¶ 79.

28

92

1    More than anything, Lanell sought to connect with Franky as a source of
2    support and a role model. Again, as Donna observed, "Even though Franky was
3    really mean and hurt Lanell, he was the only father Lanell had and Lanell wanted
4    to do anything to please him." SHP Exh. 91 at 441. One of the few areas in his
5    life Lanell could receive attention from his father was by participating in his band
6    activities. As mentioned above, Franky taught Lanell to play the drums when he
7    was very young and Lanell's older brother Lance played the bass trumpet. This
8    point of connection with his father, however, brought Lanell in close contact with a
9    world of drugs, alcohol, and violence he was unequipped to navigate without adult
10    protection or guidance. SHP Exh. 83 at 411; SHP Exh. 84 at ¶ 12. Kenny recalls
11    of Franky, "He took Lanell with him to clubs in the 1970's [sic] when Lanell
12    wasn't even a teenager yet. Often, while James [Franky] played the clubs, Lanell
13    slept in the car. Outside the clubs Lanell saw a lot of crazy stuff. In the alley
14    behind the clubs, people shot up drugs and he had to walk pass [sic] these people to
15    get to the car where he slept." SHP Exh. 89 at 427. Doris echoes that "when they
16    went to these gigs, Franky let Lanell drink. Lanell wasn't even a teenager when
17    this started." SHP Exh. 83 at 411. Even during the instances when Lanell received
18    the parental attention he so desperately wanted, it came with risk to his physical
19    safety and his father's encouragement of behaviors that further compromised his
20    development. FHP Exh. 43 at ¶ 80.

21    In some ways, Lanell was primed – meaning he had come to expect based on
22    past experiences – to interact with adults in age-inappropriate circumstances.
23    From the time he was about five years old, Lanell recalls being privy to
24    conversations among his grandmother, Mary, Doris, and other women who
25    discussed their experiences in a manner they likened to "war stories" that a child
26    Lanell's age could not make sense of. When Lanell spent time with his paternal
27    grandfather, Ross B., also as a young child, he was taken to an alley behind a

28

93

liquor store, where he would hang out with his grandfather, father, and other men while they sat on crates and drank. The men gave Lanell money, and he was instructed to go to the store and buy what they asked for. Often, the men were so intoxicated they did not ask for their change back and Lanell returned home with a pocket of money after these outings. Ross B. began teaching Lanell to drive when he was nine years old, and as mentioned above, Lanell regularly accompanied his father to the club scene beginning when he was eleven or twelve. The fact that Lanell was purposely exposed to alcohol, drugs, sexual activity, and other adult activities and given no help to understand or cope with them at such an early age is yet another form of child abuse and neglect that he endured. Although this type of abuse and neglect would complicate the development of any child, the impact was even greater for Lanell, due to his underlying intellectual deficits and other psychiatric and neuropsychiatric difficulties. FHP Exh. 43 at ¶ 81.

The ability of a child to form strong, healthy bonds with caregivers is dependent on two key feedback loops: the child must feel safe, and the child must feel valued and cared for. This foundation allows a child to engage with the other work of cognitive, psychological, emotional, and social development. When early attachments fail and are accompanied by prolonged disruption (through abuse, instability, and neglect, for example) as was the case in Lanell's childhood, the above-described developmental difficulties and the resultant inability to respond appropriately on the basis of external stimuli, often follows. Furthermore, it is not simply that a child might fail to form stable bonds with others, but that a child may form unhealthy, overly dependent bonds that continue to harm them. In Lanell's case, these difficulties, paired with cognitive difficulties, led to disastrous behavioral consequences, including the manner in which he clung to and sought approval from an idealized vision of his father, which he never received. Furthermore, given all of the difficulties noted above, and his genetic

94

predisposition to the development of major psychiatric difficulties including psychosis, it is not surprising that Lanell began to experience psychotic or at least psychotic-like symptoms during his adolescent years. FHP Exh. 43 at ¶ 82.

Lanell and his siblings were also the subjects of repeated molestation by their uncle Tracy. Doris, who was working full time, sent Lanell, Darlene and Geraldine to be cared for by Mrs. Patton, their great-grandmother who resided with their grandmother, Hermalee. Doris paid Mrs. Patton for her services. SHP Exh. 83 at 408. This arrangement placed the children in close, near-constant contact with their severely impaired and mentally ill uncle. Darlene recounts,

> When I was little, my Uncle Tracy sexually molested me. He also
> sexually molested my sister Geraldine and my brother Kenny. Tracy
> started raping us when we were in elementary school, but our great-
> grandma [Mrs. Patton] had no idea. Although Lanell doesn't talk
> about it, I'm pretty sure Tracy did the same to him. If he did it to
> Kenny, I can't see why he wouldn't do it [sic] Lanell as well. Tracy
> was around Lanell just as much.

SHP Exh. 82 at 405.

Dennis Bell, who lived in Hermalee's house, witnessed the abuse of his sisters. He recounts, "Buddy [Uncle Tracy] drank a lot, and molested Geraldine, Darlene, and Arlene. I walked in on him molesting Arlene. At the time I was about 11, so I couldn't do anything. I just ran to my grandma and told her that Uncle Buddy was on top of Arlene in the bed. Grandma took care of it." SHP Exh. 78 at ¶ 9; FHP Exh. 43 at ¶ 83.

Compounding the trauma of the assaults themselves, the two primary caregivers, Hermalee and Doris, were aware the children were being molested but they did nothing to stop the abuse. SHP Exh. 83 at 409; *see also* SHP Exh. 78 at ¶ 9, FHP Exh. 22. Immediately prior to the children being sent to Hermalee's house after Rosemary's death, Tracy's probation records indicated that law enforcement officers believed his mother was aware that her son posed a danger to

Petition for Writ of Habeas Corpus

others because she pleaded with them to return him to a residential treatment facility for mental illness. FHP Exh. 22 at 894, 898. In 1969, Tracy was arrested for assault and kidnapping in connection with an attempted rape of his 15-year-old neighbor, FHP Exh. 22 at 922, and Dennis had told Hermalee directly that he saw his uncle raping his sister. SHP Exh. 78 at ¶ 9. Doris, too, knew the harm the children were suffering in Hermalee's care, but still continued to send them there day after day. She recalls, "At that time, the kids' Uncle Tracy was living with Mrs. Patton and Hermalee. He molested all the girls, and I think he molested Lanell too. Lanell was too young to tell anyone about it, but Tracy was very sick and had access to all the kids." SHP Exh. 83 at 409. The staggering permissiveness of Doris and Hermalee and their failures to intervene reflect the severity of their own trauma. In a cost-benefit type of analysis, Lanell's caregivers concluded that they had no other option but to keep the children in Tracy's vicinity, or they were too damaged to make such an assessment. Inherent in their inactions is a devaluation or inability to comprehend the pain that Lanell and his siblings experienced. Further, the children were aware that their caregivers were unable or unwilling to protect them, an egregious form of caregiver abandonment. FHP Exh. 43 at ¶ 84.

By the time Lanell was in high school, he not only expected but thought he was deserving of abuse from the world around him. To enforce discipline on the football team, coaches paddled students for infractions such as tardiness. Lanell, who was frequently late to practices and to games, would say to his coach, "I've got it coming. I'm late and there's no excuse." FHP Exh. 11 at 303-04. Whereas most players "were only late once, because the paddling took place in front of the team and it was very embarrassing," SHP Exh. 87 at ¶ 5, Lanell's tardiness was a consistent issue and he was resigned to the ritualistic, humiliating punishment as his teammates looked on and laughed. SHP Exh. 87 at ¶ 5; FHP Exh. 43 at ¶ 85.

Lanell's most observable responses to trauma were acceptance and withdrawal. The circumstances of his home life became so dire that his sisters Geraldine and Darlene ran away from home. Years later, Darlene recalls Lanell confronting her about what he perceived as abandonment: "Lanell asked me once why we left him in that house alone. I feel so bad about that. I feel like I should have stuck around and taken care of him." SHP Exh. 82 at 405. His friends who were aware of the extreme abuse he faced observed, "Lanell never expressed his emotions. He would tell us that his dad hit him or that his mom had yelled at him, but he wouldn't say how he was feeling or cry." SHP Exh. 88 at 422. Linda Shipley, a high school girlfriend and neighbor recalls,

> Lanell didn't like being at his house so most of the time we hung out at my house. Once, while [sic] were walking home from school Lanell's mood just got sadder and sadder and then when he got to our street he turned to me and said: 'I really don't want to go home, you just don't know what goes on behind closed doors.' At school, Lanell was so happy-go-lucky but at home, he was miserable.

SHP Exh. 95 at 496.

The constant, yet unpredictable violence, changed the course of Lanell's development and his understanding of the world around him. His sister Geraldine characterizes the household as follows: "It seemed like every day our house was filled with anger and abuse whether it was against us kids or between my dad and Doris." SHP Exh. 82 at 405. Lanell's cognitive impairments precluded him from understanding or making sense of the violence he experienced, and also combined to place him at risk for the development of substance use disorder, and mental illness. FHP Exh. 43 at ¶ 86.

*Substance Abuse*

Alcohol and drugs were ever-present in Lanell's childhood environment. Observations of both his father and Doris suggest that they drank and used drugs

97

with high levels of dependency that interfered with meeting the responsibilities of daily life. According to Lanell's brother Dennis, "James [Franky] drank a lot and used marijuana. He also took pills, and I saw him shooting up drugs several times. James had a garage where he played music, and he would go out there to shoot up." SHP Exh. at 78 ¶ 5. Dennis also observed of Doris, "[t]here was a lot of partying going on in that house. It seemed like every time I was over there, [Doris] was high or had some liquor in her." SHP Exh. 78 at ¶ 7. Among the neighborhood, Lanell's household was also known for the drinking that went on there. SHP Exh. 88 at 421. Significantly, Lanell and his siblings were exposed to the drinking and drug use of their caregivers, but were left to make sense of it on their own. As a high school girlfriend of Lanell's describes, "One time, Lanell and I went out to the garage right after Franky had been there. We found a glass pipe, and Lanell told me his dad smoked dope. I am not sure if he meant heroin or crack." SHP Exh. 95 at 496; FHP Exh. 43 at ¶ 87.

Lanell's abuse of drugs and alcohol began in childhood as part of the modeled behavior he saw normalized by his caregivers. Lanell began using alcohol in adolescence with his father, and drugs including PCP, methamphetamine, and marijuana during his early teenage years. FHP Exh. 53 at 2969-70; FHP Exh. 11 (noting that drinking and/or drugs were involved in juvenile offenses). By his eighth-grade year, Lanell reports drinking alcohol and/or smoking marijuana daily. Substance abuse caused additional insults to his developing brain, and worked synergistically with his already compromised intellectual functioning, genetic risk factors, and his early childhood experiences to further hamper his intellectual development as well as placed him at risk for developing even more severe mental illness. FHP Exh. 43 at ¶ 88.

Lanell's use of substances was in large part self-medication, or a coping mechanism to compensate for the absence of other regulatory tools necessary for

98

processing his life experiences, his compromised intellectual functioning, and, in
adolescence, his burgeoning mental illness. However, the substances he used
likely worsened at least some of the symptoms he was attempting to alleviate. For
example, crack cocaine interferes with behaviors commonly seen in people with
trauma histories such as scanning the environment and other hypervigilant
behaviors; as a result, they ultimately feel less able to protect themselves from
perceived harm; and in turn, their trauma-related symptoms become even more
severe. Lanell's underlying mental illness also made him more vulnerable to the
negative effects of methamphetamine. Not only do people who suffer from
psychosis metabolize and respond to the drug differently than people who have no
underlying psychosis, but methamphetamine can trigger psychotic episodes with
greater frequency and severity in these individuals. Then more generally,
substances compromise intellectual functioning levels. For an adolescent who is
intellectually disabled, any further impairment of his intellectual functioning, even
if temporary, would have created additional risks and made it more difficult to
accurately interpret social cues, think abstractly, draw on past experiences, and
anticipate consequences. FHP Exh. 43 at ¶ 89.

Lanell's substance abuse began with his father's direct knowledge and tacit
approval, which distorted appropriate boundaries in their parent-child relationship
and skewed Lanell's already limited ability to anticipate and respond to the
negative consequences of his behaviors. It was during many substance-laden
interactions with his father at the music clubs that Lanell received the attention he
craved, attention even his later successes in sports did not garner. The positive
reinforcement Lanell received during these interactions with Franky offered the
false sense of a solution: that drugs or alcohol could replace or somehow foster the
love, affection, and developmentally appropriate attentions he needed to feel
whole. As one of his high school girlfriends observed, "Lanell started drinking to

1   hide the pain his father caused him. Drinking let him hide from his feelings of
2   being inadequate in his father's eyes and feeling like he never got a chance to
3   please his father." SHP Exh. 91 at 441. Given Lanell's intellectual disability and
4   other cognitive impairments, which rendered his comprehension and understanding
5   even less than his young chronological age, he likely attached unguided,
6   misinformed memories and positive associations with drinking and his father, and
7   was ill-equipped to appreciate or understand the consequences of drinking and
8   drug use on his immediate behavior, let alone his development. FHP Exh. 43 at
9   ¶ 90.

10      *Familial Loss*

11      Lanell did have a few protective factors in his personal life, but each time a
12   protection eroded or vanished, it overtaxed Lanell's limited cognitive and
13   emotional resources. The foremost protective factor was the presence of a small
14   number of family members who offered Lanell affection and safety and reinforced
15   positive feelings of self-worth. The first of these people was Lanell's mother,
16   Rosemary. Despite her own cognitive limitations and possible struggles with
17   substance abuse, the sparse information available about her life suggests she did
18   her best to care for her children and tried to keep them together throughout her
19   tumultuous relationships with their different fathers. Lanell's relationship with his
20   mother existed only in his infancy, and therefore, what constituted adequate
21   caregiving at this time was a set of simple behaviors including holding him,
22   feeding him, and soothing him. What is strikingly clear is that after her death, he
23   received none of these basic goods required for normal, healthy development. By
24   all accounts, his siblings cared for him during their stay with his grandmother,
25   Hermalee, and neither Doris Harris nor his father offered physical affection or
26   emotional support, which as described above are critical for normal psychological
27   and neuropsychological development. FHP Exh. 43 at ¶ 91.

28

After his mother's death, Lanell drifted through most of his childhood reliant on his siblings for affection and the modelling of appropriate behaviors. While it is developmentally inappropriate to expect children to have the resources to nurture other children in the absence of able adults, Lanell's older siblings were particularly ill-equipped to take on caregiving. After the trauma of losing their mother, being divided into two separate households, their young ages, and each of their individual impairments and maladaptive coping mechanisms, they were unable – nor should they have been expected – to offer the kinds of consistent support and stability Lanell so desperately needed. FHP Exh. 43 at ¶ 92.

When Lanell was twelve years old, Doris's mother, Mary Walker came from England to live with the family. FHP Exh. 7 at 156. She offered him softness and comfort in a household that was universally described by all who experienced it as devoid of normal physical affection and expressions of love. SHP Exh. 84 at ¶¶ 9, 15. Unsurprisingly, Lanell quickly grew close with her. However, even the supportive aspects of this relationship for Lanell were undercut by its accompanying difficulties. By the time she arrived to live with Doris, Mary Walker was a very ill woman. She could not walk on her own and had difficulties using her hands. SHP Exh. 84 at ¶ 14. Doris demanded that Lanell and his sisters act as nurses for her, with responsibilities ranging from feeding and bathing her to changing her diapers. SHP Exh. 84 at ¶ 14; *see also,* SHP Exh. 89 at 427; FHP Exh. 43 at ¶ 93.

His step-grandmother's love offered Lanell a critical emotional support, and her death on June 18, 1979, FHP Exh. 7 at 156, was devastating to him. Without the appropriate tools to help him process her fatal illness and cope with his grief, Lanell came to believe her death was his fault. According to his brother Kenny, "Lanell was taking care of her when she died. He was really upset and shook-up about that; he felt really guilty." SHP Exh. 89 at 427. His sister Darlene echoes,

"Lanell was there when Doris's mom died. It really freaked him out, and made him depressed." SHP Exh. 82 at 406. Doris also witnessed Mary die, and explains, "Eventually, she died, right in front of Lanell. He had been eating his breakfast . . . After my mother was gone, Lanell missed her. He would sit on the couch and say: 'This is where Grandma used to sit. This was her spot.' It was hard for him that she was gone." SHP Exh. 83 at 410. The behavioral changes observed by the people closest to him speak to Lanell's vulnerability. After Mary's death, Lanell reports hearing voices for the first time. FHP Exh. 43 at ¶ 94.

Fifteen months later, on September 25, 1980, Lanell lost another key support, his stepbrother, Robert James. Whereas Lanell's older biological brothers, all of whom resided outside the home, appeared intermittently throughout Lanell's life and were already struggling with their own traumas and addictions, his stepbrother Robert was consistently in a supportive, caregiving role. Although Robert, who was thirteen years older than Lanell, could not intervene to stop the abuse his stepsiblings experienced at the hands of Doris and Franky, he offered protection and comfort within the violent home environment in accordance with his abilities. SHP Exh. 82 at 405. According to Lanell's older brother Dennis, "The only brother Lanell had who was a good influence was Robert . . . When we were kids, Robert looked out for us. Lanell loved him a lot, and had a really close connection with him." SHP Exh. 78 at ¶ 12. Given their age difference, Robert's relationship with Lanell had paternal undertones. Lanell "would go to Robert with his problems, not Franky, because he was afraid of Franky." SHP Exh. 93 at 446. As Lanell's high school girlfriend recalls, "Robert provided an escape for Lanell. Lanell saw Robert as his protector from Franky. Lanell did father-son things with Robert, because Franky was too busy with his band, women and drinking." SHP Exh. 91 at 441. It was Robert who encouraged Lanell to play sports and who took him to games and practices. RT 3334; FHP Exh. 43 at ¶ 95.

102

1          Although Robert was a strong support for Lanell, his positive influence was
2    limited. To begin, Robert was twelve when his mother and Franky began dating
3    and he met Lanell; he was still developing and maturing himself, which made it
4    impossible for him to offer the full range of guidance and supports Lanell so
5    desperately needed. For example, Robert was unable to help Lanell through his
6    struggles with school due to his own serious academic difficulties. Robert's school
7    records indicate that he performed below grade level throughout elementary
8    school, FHP Exh. 44 at 1863-65, 1867, and by the time he reached middle school,
9    Robert was failing or receiving Ds in many of his academic classes. He was able
10   to attend high school because of annual promotion as opposed to academic
11   readiness, due to a "parental decision" not to retain him in junior high school. FHP
12   Exh. 44 at 1860. Robert stopped regularly attending school in 10th grade, after
13   four semesters at that grade level with limited-to-no attendance and assignment to
14   low index classes, which refers to classes for students performing at the low-end or
15   "index" of certain academic aptitude tests. FHP Exh. 49 at 2550. At age 16, it
16   appears he was no longer actively enrolled in school. FHP Exh. 44 at 1860-61.
17   Lanell recalls learning things from Robert like how to dress, tie a tie, and be
18   attractive to girls. He thinks of him as a best friend, who took him out for drives
19   and bought him food and candy. FHP Exh. 43 at ¶ 96.

20         Robert James was twenty-six years old when he was shot in the chest and
21   died as a result of his wounds. The death was ruled a homicide but was never
22   solved by the police. FHP Exh. 7 at 150. According to family members, he was
23   killed by his wife's brothers during a domestic dispute. Lanell, however, blamed
24   himself for Robert's death, as he had done with his grandmother Mary. According
25   to Doris, Lanell was waiting for Robert to pick him up and take him to practice or
26   a game.[20] At first, Lanell was upset because he thought Robert had forgotten him.

27

28       [20]  Lanell's recollection before trial was that Robert James was on his way to

When he learned of his death, he was extremely quiet, "just like he went into a world of his own. [He] didn't speak to anybody." RT 3337-38. He did not cry or show emotion. RT 3338. Later, Lanell revealed to the mental health defense expert at trial, Dr. White, that he felt "that somehow he was responsible for this, or blamed himself unduly because Robert was going to pick him up . . . . And [Lanell] seemed to feel, that, you know, had he not made those arrangements with Robert, that perhaps Robert would not have been killed." RT 3364. Lanell conflated the two events: Robert's death and his agreement to transport Lanell. His inaccurate belief that they were causally related amplified the devastation of Robert's death. To this day, Lanell describes Robert's murder as though he was in the room, watching it happen. He credits knowing the brutal details, including that Robert's face was smashed by a clothing iron, to Doris. Lanell was completely adrift without him. SHP Exh. 82 at 405. Shortly thereafter, at the age of 13, Lanell began drinking more heavily and attending school less. RT 3338. At night, he heard voices that told him to hurt or kill himself. FHP Exh. 43 at ¶ 97.

The final, and perhaps most devastating familial loss was the death of Lanell's father. Lanell was uniquely vulnerable in the years immediately preceding his father's terminal lung cancer diagnosis. When he was 14 years old, after the near back-to-back deaths of his grandmother and stepbrother, Lanell was referred to a psychiatrist. He reported having visual and auditory hallucinations and was treated with the anti-psychotic medications Thorazine and Mellaril. SHP Exh. 12 at 59; SHP Exh. 14 at 64. He began to act out in ways that brought him to the attention of legal authorities and was eventually incarcerated. On March 26, 1983, Franky died while Lanell was serving time at the juvenile facility Camp Gonzales.

---

pick him up and take him to a Dodger's game; indeed, the Dodgers played the Giants at home and lost 2-3 on September 25, 1980.

Petition for Writ of Habeas Corpus

1     FHP Exh. 43 at ¶ 98.

2        The physical distance between Lanell, then 15, and his father deprived him

3 of the closure that could have assisted with processing the traumatic loss. Instead,

4 "he was always bothered and very sad because he never got to say goodbye to his

5 father." SHP Exh. 91 at 441. By the time his father died, Lanell was old enough to

6 understand he also did not get to say goodbye to his mother before she passed, a

7 parallel circumstance that amplified his feelings of regret. Lanell discussed with

8 his girlfriend Donna the devastating effect his father's death had on him: "When

9 Franky died Lanell was really upset because he felt he was never able to measure

10 up in his father's eyes, like his father died before Lanell could ever prove to him

11 that he was a man." SHP Exh. 91 at 441. His sister Darlene confirms, "After our

12 dad died, Lanell was torn up and very emotional. I think partly he was upset

13 because he never got to have a relationship with him. It was also a scary time for

14 us, because we didn't know what was going to happen to us. Doris never treated

15 us well and she wasn't our mom and she didn't have to keep us." SHP Exh. 82 at

16 406; FHP Exh. 43 at ¶ 99.

17        Family reports indicate that the death of his father was the cognitive and

18 emotional insult that catalyzed Lanell into full blown mental illness, and Lanell

19 became somewhat more vocal about his psychic wounds. Again, according to

20 Donna, "While Franky was alive, Lanell kept all of the pain inside. He wouldn't

21 open up, but after Franky died Lanell shared with me the emotional and physical

22 pain Franky had caused him. He was really hurting." SHP Exh. 91 at 441.

23 Shortly after his father's death, upon being released from juvenile camp, Lanell

24 returned home to find that Doris invited her new boyfriend, Tyrone Bowers, and

25 his son to live with her and Franky's children. Lanell felt betrayed and pushed to

26 the margins. He started sleeping in the garage where his father used to hold band

27 practices, and though many of his possessions had been taken by his siblings and

28

others by the time he returned from camp, Lanell found a few instruments that belonged to his father and hid them. Given that Lanell had very limited abilities to process and make sense of the world around him, "He became kind of a daredevil, and didn't really care what happened to him. As he got older, Lanell slept a lot more. It was like the only way he could deal with his messed up family life was to be drunk, high or asleep." SHP Exh. 89 at 427; FHP Exh. 43 at ¶ 100.

Upon further exploration of this period of time in Lanell's life, he seemed to confirm the observations of family members and added some thoughts of his own. Lanell noted that the death of his step-grandmother, then the death of his stepbrother, and then the death of his father felt like the loss of everyone who cared about him, one right after the other. He noted that at the same time, instead of proving to his father that he was going to become a good man, he had started getting into trouble. Lanell didn't seem to blame himself for his father's death, unlike with the death of his step-grandmother and stepbrother, but consistent with his history of wishing for things from his father that he never received, he felt certain that if his father had not died, his father would have figured out a way to help him get his life back in order. He talked about moving into the garage and trying to gather anything he could find that had belonged to his father, seemingly as a way of remaining connected to his father; but ultimately, without his father, he was overwhelmed by hopelessness and wanted only to give up. FHP Exh. 43 at ¶ 101.

### Institutional Failure and Environmental and Community Danger

Against the backdrop of long-standing brain impairments, trauma, substance abuse, and burgeoning mental illness, Lanell, unmoored and largely unprotected, navigated through school, his community of Pacoima, juvenile facilities, and prison. These environments, plagued by racism and systemic inequality, threatened Lanell's well-being, and further hampered his development rather than

106

1    provided the structures, treatment, and supports he needed. FHP Exh. 43 at ¶ 102.

2        At the time of Lanell's birth, Los Angeles County was a racially charged

3 powder keg. A severe lack of resources and basic goods in communities of color

4 (housing, basic services, healthcare, adequate education, *e.g.*) combined with state-

5 sanctioned discrimination in housing and employment, and police brutality fueled

6 by racist police administrations, and led to several significant instances of civil

7 unrest. The Watts Rebellion (1965), the assassinations of Martin Luther King Jr.

8 and Bobby Kennedy (1968), the East Los Angeles High School Walkouts (1968),

9 and the Chicano Moratorium (1970) among other key national and local events

10 were harbingers of the struggles Lanell would personally endure in his life by

11 virtue of geography and race. FHP Exh. 43 at ¶ 103.

12      *Policing*

13        The racist political environment from the 1950s to the 1970s in Los Angeles

14 was chiefly curated by three powerful people: Sam Yorty, the mayor of Los

15 Angeles, James Francis McIntyre, the Catholic Cardinal, and Los Angeles Police

16 Chief William H. Parker and his successors. Sam Yorty was elected in 1961 and

17 held office until 1973. He advanced positions hostile to Black communities and

18 the poor in general, for example by refusing to follow federal guidelines that would

19 have released millions of dollars of anti-poverty funds to develop employment

20 opportunities for youthful residents, while simultaneously supporting police

21 repression of protest and unrest in communities of color. Catholic cardinal James

22 Francis McIntyre served as archbishop of Los Angeles from 1948 to 1970. He

23 blocked or slowed the passage of reforms that would have instituted an interracial

24 council and allowed for hiring more Black teachers in Catholic schools. McIntyre

25 was also widely known for making racial slurs in public.[21] William H. Parker was

26

---

27     [21] John Cooney, The American Pope: The Life and Times of Francis Cardinal

28 Spellman (1986).

the Chief of Police in Los Angeles from 1950 to 1966. The years of his tenure were defined by the rigid enforcement of white supremacy through "unconstrained police brutality in South Central L.A. and the policing of the boundaries of the ghetto." Under his leadership, there were 100 documented incidents of White supremacist violence in Los Angeles targeting people of color. No one was held accountable for these acts. Chief Parker largely refused to hire Black police officers, and those already on the force were prohibited from having White partners for most of Parker's tenure. His officers enforced the racial boundaries of segregated Los Angeles, harassing and beating Black and Latino people who strayed too far into White-dominated communities. FHP Exh. 43 at ¶ 104.

Edward Davis and Daryl Gates followed Chief Parker as the leaders of the Los Angeles Police Department, and escalated the use of force and coercive control tactics, including "stop and frisk," a method of brief police detentions based on the low threshold of "reasonable suspicion" that allows for invidious racial profiling; and militaristic terror tactics including the use of battering rams to execute search warrants, large raids on gang strongholds, and promoting chokeholds as means of securing suspects. By the time the use of chokeholds was halted in May 1982 by the Police Commission, there were 15 documented deaths during arrests. FHP Exh. 43 at ¶ 105. "After officers were criticized for using a carotid chokehold that caused injury and sometimes death, Gates commented: 'We may be finding in some blacks that when it is applied, the veins or arteries do not open up as fast as on normal people.'"[22] His overt racism, a hallmark of the LAPD for decades, was taken to task by the Independent Commission on the Los Angeles Police Department, known as the Christopher Commission. After studying decades of police practices, the Christopher Commission found "too many patrol officers view

---

[22]  E. Woo, & E. Malnic, "*Daryl F. Gates dies at 83; innovative but controversial chief of the LAPD*," Los Angeles Times, March 8, 2014.

Petition for Writ of Habeas Corpus

1    citizens with resentment and hostility; too many treat the public with rudeness and

2    disrespect . . . the problem of excessive force in the LAPD is fundamentally a

3    problem of supervision, management and leadership." FHP Exh. 43 at ¶ 105.

4    From the time he was a young child, Lanell directly witnessed and

5    experienced police violence and its aftermath. On March 12, 1969, his stepbrother

6    Robert James Sr. was arrested under false pretenses, taken to the Foothill Division,

7    and while locked in a holding cell was beaten until his head, torso and limbs were

8    bruised and lacerated and his right shoulder was fractured. FHP Exh. 21 at 860.

9    Robert was fourteen years old. The case was settled in 1973, with the City of Los

10    Angeles agreeing to pay Doris (as Robert's guardian) two-thousand dollars in

11    damages. FHP Exh. 21 at 866-70. As a teenager, Lanell was maced during an

12    arrest, and in 1991 was beaten so severely by officers that his injuries required

13    hospitalization. He was arrested with a group of Mexican friends, and forced to

14    sign a statement which he did not understand (being largely illiterate at the time)

15    that he was a member of the gang the Piru Bloods, though he and his friends were

16    not gang members. A police officer sniffed him and told him, "You smell like a

17    Blood." FHP Exh. 43 at ¶ 106.

18    Though Lanell recognizes that he and others close to him were treated

19    violently and unfairly by law enforcement, he does not attribute his treatment or

20    feelings directly to his experiences with racism, a concept he cannot explain

21    beyond people not being "raised right." The discontinuity between Lanell's lived

22    experiences and ability to make sense of them is another example of how his

23    intellectual disability, and the lack of any parental intervention that might have

24    helped him maximize his ability to function in light of his disability, impeded his

25    daily life. FHP Exh. 43 at ¶ 107.

26    *Educational and Institutional Failure*

27    Lanell's school records and contemporaneous accounts of teachers and peers

28

109

1    illuminate the direct consequences of the substandard educational and mental

2    health services that were available to him as a young child and adolescent. During

3    these early years, Lanell was incredibly vulnerable, but also displayed keen

4    receptivity to supports on the rare occasions they were offered to him. FHP Exh.

5    43 at ¶ 108.

6        Lanell began school at Sharp Elementary in Pacoima in 1971. It was

7    apparent from the start of his educational journey that Lanell was in need of

8    supports and a tailored educational plan, but he did not receive the kinds of

9    services that would have allowed him to thrive in school. Sharp Elementary was

10   significantly underfunded, and it was not until the 1974 school year that the school,

11   along with ten other underfunded Los Angeles schools, was designated to receive

12   Title I federal funding to assist with implementing special education programing.

13   FHP Exh. 48 at 2116. Until that time, placement in special education, training for

14   teachers, and options for providing resources for students with disabilities was very

15   limited. Indeed, Lanell's earliest struggles in first grade resulted in him repeating

16   the grade, but it is unclear what, if any, additional instruction or support he

17   received. It was not until after an influx of funds, in 1976, that Lanell was afforded

18   the opportunity to attend a reading program called Miller-Unruh designed for

19   children performing in the lowest level of reading ability in comparison to their

20   peers. FHP Exh. 9 at 195, 197-98; FHP Exh. 49 at 2458-93; FHP Exh. 43 at ¶ 109.

21       In addition to the lack of resources and programs to support Lanell, by 1970

22   it became clear that a disproportionate number of students of color in California

23   were being identified as intellectually disabled, removed from regular classrooms,

24   and placed in alternate educational programs, which exacerbated stark racial

25   inequalities across the state. In 1971, the case *Larry P. v. Riles* was initiated,

26   alleging that the discriminatory administration of IQ testing of Black students

27   resulted in disproportionate placement of these students in programs for the

28

"Educable Mentally Retarded" (EMR). Though the *Larry P.* case was not resolved until the early 1980s, a preliminary injunction issued in 1974 prohibited California school districts from placing Black and Brown students in EMR programs based on IQ test scores. FHP Exh. 48 at 2366-72. Thus, even at a time when Lanell clearly displayed the need for supports and services, the Los Angeles School District and school districts across the state were in the midst of significant turmoil with regards to the identification and placement of Black and Brown students with disabilities. Given the amount of confusion and rapidly shifting standards and programs, it is indicative of the severity of Lanell's deficits that he was consistently identified as a pupil who could not function in a normal classroom without significant supports. FHP Exh. 43 at ¶ 110.

At five years old, Lanell showed signs of cognitive impairments, however his teachers inaccurately characterized his developmental difficulties as bad behavior. Lanell's needs for movement, self-expression, and individual assertion of his identity, as well as his struggles concentrating and completing tasks in comparison to his peers were documented as follows:

> Boisterous, aggressive, inattentive. Always runs instead of walking the room – talks too loudly, wrestles + fools around when he should be listening or working. Needs close supervision + numerous reminders of standards. Poor coordination in writing + coloring.

FHP Exh. 9 at 195. Lanell's development lagged behind his peers and he was unable to conform his behaviors to typical classroom standards, not because he was a poorly behaved or difficult child, but rather because he was traumatized, suffering from the trauma-related psychiatric difficulties described above, and intellectually disabled. FHP Exh. 43 at ¶ 111.

In first grade, Lanell continued to display difficulties in concentration and with verbal skills, including pronunciation and reading. He was "confused by basic facts" and still required additional individualized help and instruction. He

was asked to repeat first grade and did so with positive results. By this time, however, Lanell's physical size became a factor in his educational trajectory. The first-grade teacher of his repeated year suggested that Lanell be placed in a combination classroom of second and third graders due to his large stature in comparison to his peers, despite the fact that he had to "be reminded of classroom standards constantly." FHP Exh. 9 at 196; FHP Exh. 43 at ¶ 112.

It is unclear from the records whether Lanell was indeed placed in a combination classroom, but his size and physical abilities continued to be the primary source of strength and praise for him in his elementary records. During his second-grade year, Lanell's teacher noted that Lanell, "Doesn't instigate problems – often other children try to get him to defend them." FHP Exh. 9 at 196. This notation confirms Lanell's early gullibility and the way his size became an asset when his academic and emotional skills did not match those around him. He required the same reminders as he had in previous years of appropriate classroom behaviors and continued to struggle in the core academic subjects of reading and math. By third grade, Lanell was placed in the Miller-Unruh state program for elementary students with demonstrated learning disabilities in reading. His teacher also noted that despite his struggles, he tried hard and was good in sports. FHP Exh. 9 at 196; FHP Exh. 43 at ¶ 113.

As Lanell progressed through the upper grades of elementary school, his above-average ability in sports, aided mostly by his size, contributed to his teachers' incorrect conclusions that he lacked interest, rather than ability, in other areas. While Lanell's size and athleticism were gateways to acceptance by his peers, these abilities were not sufficiently robust to fully disguise the gravity of his cognitive deficits and emotional problems. On January 7, 1977, an elementary school counselor commented, "Lanell is very weak in auditory channel – both discrimination and memory. Strengths noted in visual channel. Good common

1   sense but weak in abstract reasoning.  Use strengths to improve weaknesses.  See

2   pink for further recommendations." FHP Exh. 9 at 196.  According to education

3   trial expert Morton Liner, a "pink" is the shorthand designation for a special

4   education referral, SHP Exh. 90 at ¶ 19, and indeed over the course of 1977, it

5   appears that Lanell received additional services at a program called Hathaway.

6   FHP Exh. 9 at 196, 200; FHP Exh. 43 at ¶ 114.

7          Hathaway School is a family services organization designed as an intensive

8   educational  program  for  "seriously  emotionally  disturbed  children,  grades

9   kindergarten through twelve, who display a wide variety of behavioral, social-

10  emotional, and learning problems.  These problems include poor reality testing,

11  low frustration tolerance, poor relations with peers and adults, severe depression,

12  verbal and physical aggressiveness, poor impulse control and severe oppositional

13  behaviors.   Additionally,  many  of  the  children  exhibit  attention  deficits,  and

14  specific developmental, communicative and language disorders."  In 1978, after

15  Lanell was able to receive support through the program, the same counselor

16  commented, "Lanell's attitude has changed this year.  Behavior improved.  Steady

17  attendance at Hathaway has helped academic progress.  He can enter 7th grade for

18  the '78-'79 school year in regular low level classes." FHP Exh. 9 at 196; FHP Exh.

19  43 at ¶ 115.

20         Lanell began attending Patrick Henry Middle School in 1978.  The school

21  was in the primarily White neighborhood of Granada Hills, and Lanell was bussed

22  from Pacoima to attend.  He was placed in basic academic classes and averaged

23  "C" and "D" grades in his coursework.  FHP Exh. 9 at 190.  Lanell looks back

24  fondly at this time.  The school was highly resourced, and Lanell began lifting

25  weights with another boy from his neighborhood who was also bussed to the

26  school.  Weightlifting gave Lanell a sense of purpose because he was able to

27  perform at or possibly above the level of his peers, and he also gained positive

28

113

attention from others who either tried to compete with him or who admired him. Lanell was in fifth grade when he realized that girls seemed drawn to boys with big muscles, thus offering him a morsel of the validation he sought at home but was not receiving. FHP Exh. 43 at ¶ 116.

As with his experiences with law enforcement, Lanell was unable to make a meaningful connection between bussing and systemic racism. He was not able to articulate, for example, that the music room, gym, and weight room at Patrick Henry were the result of greater funding for schools in predominately White neighborhoods. Rather, Lanell understood bussing as a way for people in different racial groups to get to know each other. In reality, in 1972 the Los Angeles Unified School District enacted a forced bussing plan to address the de facto segregation in the school system in Los Angeles. But "whites in the San Fernando Valley did not want their students bussed, nor did they want students of color bussed to them."[23] Students like Lanell, who were bussed, were often targets of racist attacks at their new schools. For example, Ronald Oliver, a Black student bussed to Kennedy High School in 1972, remembers pulling up in the bus on his first day of school to a spray painted sign reading "bus all n[***]s back to Africa."[24] At Maclay Junior High School, a former teacher said "[ . . . ] our black kids on the other campus had a miserable time. They had painted circles out on the blacktop where our students had to stand during lunch. They couldn't even sit and eat with the other kids."[25] During junior high school, Lanell recalls regularly having to fight students of other races after classes ended for the day. Although he reported being called "the N word," he lacked a real understanding of racism and its many consequences, and could only say that he guesses that was the way those kids who used the N word

---

[23] FHP Exh. 48 at 2188-2199.

[24] *Id.*

[25] *Id.*

114

were brought up.  FHP Exh. 43 at ¶ 117; *see also* SHP 80 at ¶ 3.  After mandatory

bussing was enacted, many White families moved to suburban districts that were

more homogeneous and were not subject to bussing orders, or pulled their children

out of public schools, which in turn decreased school funding in some districts.

Violent protests against bussing occurred in cities across the United States, from

Baltimore and Louisville to New York and Los Angeles.  FHP Exh. 43 at ¶ 117.

Lanell's middle school experience paralleled the instability he faced at

home.  Although the reasons are not known, during seventh, eighth, and ninth

grades, Lanell transferred schools four times in three years.  It is unclear what

services were offered at the different schools he attended, and it may be he returned

to Pacoima Junior High School twice, for his eighth grade year and the second half

of his ninth grade year, because they were able to place him in remedial classes for

"Educationally Retarded" pupils, designated with an "R" on his academic record.

FHP Exh. 9 at 190.  The program for students identified as educationally retarded

included students "whose subject achievement falls considerably below

expectancy" as identified by the evaluation of grades, teacher recommendations,

and standardized intelligence and achievement tests.  FHP Exh. 49 at 2438.

Functionally, Lanell's curriculum at Pacoima Junior High School, comprised of

three specialized core academic classes, two practical skills classes, and recess, is

identical to the standard curriculum for students identified as EMR.  FHP Exh. 49

at 2442, 2444, 2448.  Furthermore, Lanell was in specialized classes designed to

help him perform at a higher level on standardized testing instruments, specifically

the Performance Assessment in Reading (PAIR) and the Assessment of Skills in

Computation (ASC).  These tests measured functional competency in basic reading

and life role applications of reading (the PAIR), and basic computational problems

that would typically be encountered in school, home, and community situations.

The additional academic preparation constituted extra support not provided to

115

1   students performing on these measures at grade level.  FHP Exh. 48 at 2373-406;

2   FHP Exh. 43 at ¶ 118.

3       Apart from the difficulties and encounters with racism that accompanied

4   being a bussed student, when Lanell attended schools in his own neighborhood,

5   including his eighth and ninth grade years at Pacoima Junior High School, he was

6   exposed to community violence and pollution from the surrounding freeway

7   system. One student who attended the junior high school several years before

8   Lanell described the schools in their neighborhood as "dangerous places:"

9       I came home from school with my clothes dirtied up from getting
10      chased and beaten up by groups of kids in junior high school.  It got
        so bad at Pacoima Junior High School that I had to bring a .25
11      automatic pistol with me to school to avoid getting beaten . . . I used
12      to regularly break out in rashes from the anxiety of going to school in
13      these conditions.

14  FHP Exh. 49 at 2451, ¶ 6; FHP Exh. 43 at ¶ 119.

15      In the 1970s, during the time Lanell attended, there were significant

16  ventilation, noise, and pollution issues at Pacoima Junior High School.  The school

17  was near the Golden State Freeway and noise and fumes invaded the classrooms.

18  There was also no air conditioning, so in the hot summer months, there was little

19  choice but to leave the windows open.  It took activism by parents in the

20  community to lobby for noise protection measures to muffle the freeway roar, and

21  eventually secure funding to air condition the school to help protect against vehicle

22  fumes.  FHP Exh. 48 at 2125-28.  Given Lanell's intellectual deficits, academic

23  proficiency would have been difficult in a near-perfect educational environment

24  but was simply not possible at his middle school where he faced serious threats to

25  his physical safety and well-being.  FHP Exh. 43 at ¶ 120.

26      Lanell's first interactions with law enforcement began just a month past his

27  thirteenth birthday, less than three months after the death of his grandmother Mary

28

Petition for Writ of Habeas Corpus

Walker. In September 1979, Lanell was arrested for hitting and stealing a bicycle from another child. He was in the company of two other children who instigated the taking of the bicycle. Lanell was released to his father. FHP Exh. 11 at 221-32. It is significant to note that Lanell was charged with robbery, which carries a high level of potential criminal penalties. This fact-pattern is an example of how racially biased policing and perceptions of young Black boys negatively influence the life trajectories of children such as Lanell. What in this context was understood as criminal, in another neighborhood or perhaps if a White boy was accused of taking a bicycle from another child, could have easily been understood as typical neighborhood bullying to be resolved by parents and other community members as opposed to the police. Lanell was placed on probation for this incident, which expired on July 28, 1980. FHP Exh. 11 at 235. It is unclear if he received any counseling or mental health interventions during this time. FHP Exh. 43 at ¶ 121.

Lanell attended San Fernando Valley High School in Pacoima from September 1981 until June 1984, as well as a special school program for a semester in 1983 while he was imprisoned in the juvenile justice camp system. When Lanell started at San Fernando High School and throughout his tenure there, the school was under-resourced; students performed poorly and drop-out rates were high; and the violence and riots that had rocked the school throughout the 1960s and early 1970s were echoed in pervasive threats of violence a decade later. FHP Exh. 48 at 2413-15; FHP Exh. 48 at 2416; FHP Exh. 48 at 2417. In 1982, San Fernando High School had the highest rate of 10th graders retained in the Valley (36.2%), an achievement gap attributed to the lack of counselors and appropriate interventions for students during earlier grades. FHP Exh. 48 at 2413-15. Students also faced noisy, disruptive classroom atmospheres riddled with gang violence and racial tension as the demographics of Pacoima (and therefore San Fernando Valley High School), began to shift from predominately Black to predominantly Hispanic.

FHP Exh. 48 at 2416-17; FHP Exh 43 at ¶ 122.

Lanell's physical abilities opened some doors to him, but because of his academic difficulties many opportunities remained beyond reach. Lanell began playing football for San Fernando Valley High School his freshman year. The activity pulled him into a social circle of acceptance among other athletes and highlighted a relative strength – his athletic ability – that helped him attract girlfriends. Nonetheless, Lanell performed far below grade level on testing measures and during academic classes. He was placed on the varsity football team his 10th grade year, but he failed the class component "football" all three years and received no educational credits towards graduation for his participation despite this being the skill for which he was recognized as uniquely talented and able. FHP Exh. 9 at 191. He remained in English classes for "Educationally Retarded" students and took remedial and/or basic classes for the rest of his academic curriculum as well as special electives like "Guidance," "Career Education," and "Study Skills." FHP Exh. 9 at 191. By the time Lanell reached his final year of high school (during which he repeated 11th grade), given his limited class schedule and the high number of classes he failed, he had attained only 85 of the 150 credits he would have needed to graduate. FHP Exh. 9 at 191; FHP Exh. 48 at 2417; FHP Exh. 43 at ¶ 123.

Lanell's home life remained challenging, in part because of Doris's untreated depression and mental health symptoms, which coincided with additional academic difficulties and involvement with law enforcement for Lanell. Doris deteriorated mentally in the months following the death of her son Robert James. In June 1981, she was seen for a regular physical and was referred for additional mental health treatment. On her intake papers, she reported "having serious or disturbing problems" in the areas of marriage and family. FHP Exh. 30 at 1340. She reported physical symptoms often associated with anxiety or depression, including pain in

her chest, hot and cold sweats, and cramping in her legs and feet. FHP Exh. 30 at 1340. Her doctor indicated follow-up counselling for reactive depression, somatic complaints, and sleep disorder. The referring mental health worker, however, did little to ensure Doris received the care recommended by her physician. Instead, the counselor decided that Doris was not "motivated" for counseling, and confirmed this unsubstantiated view during a follow-up call three days later, after Doris had been unable to make an appointment at the Kaiser Psychiatric Clinic in Van Nuys. The counselor acknowledged that it was difficult for Doris to speak because she was at work, but also noted that Doris reported talking to a friend of hers who was a psychic and that she found those conversations helpful, as though that might be a sufficient replacement for mental health treatment. FHP Exh. 30 at 1346. The counselor's summaries suggest that racial stereotypes about Black patients, including the counselor's attributions to Doris of lack of motivation to seek help and mystical thinking (instead of work and family pressures resulting in inadequate time to pursue follow up), likely derailed the treatment course that may have helped Doris. Of course, this also demonstrates the failure on the part of the counselor to provide Doris with ethnoculturally competent care, as evidenced by the failure or inability to further explore and fully understand Doris' issues and continue to work to engage her in treatment. FHP Exh. 43 at ¶ 124.

On July 10, 1982, after the end of his 10th grade year, Lanell ran away from home to live with his sister, Geraldine. FHP Exh. 9 at 191; FHP Exh. 11 at 235. Less than three weeks after his sixteenth birthday, on August 29, 1982, Lanell was arrested for robbery. According to the police reports and accompanying statements, he was the only minor involved in the incident – in which two adults and Lanell were accused of attempting to take the purses of two patrons of a laundromat near the apartment building where his sister lived. FHP Exh. 11 at 235-36. Whereas the first adult stole a patron's purse, Lanell was unable to

actually take anything from a second potential victim and quickly fled.  FHP Exh. 11 at 235.  Doris spoke to the police, and relayed that Lanell was following the lead of his older sister and her boyfriend and that he was suffering from emotional problems, about which the high school had been alerted, and that his father Franky was battling terminal cancer at the time of his arrest.  FHP Exh. 11 at 236.  Instead of recognizing that Lanell was in need of significant guidance and support, the probation officer assigned to his case characterized Lanell as "strong willed," and recommended detention at juvenile hall.  FHP Exh. 11 at 237.  Records from the Division of Special Schools indicate that he attended classes at Sylmar Juvenile Hall from September 2, 1982, to September 20, 1982, FHP Exh. 9 at 206, when he was released to Doris's custody.  FHP Exh. 11 at 245.  Lanell's San Fernando High School transcript reflects that between September and December 1982, the semester following the incident, Lanell received no class credits and "F" marks in all of his classes.  FHP Exh. 9 at 191.  The charges against Lanell were dismissed without prejudice in early December of that year.  FHP Exh. 11 at 248; FHP Exh. 25 at 1208; FHP Exh. 43 at ¶ 125.

Just a few days later, on December 7, 1982, Lanell was detained and eventually arrested for making threats to the police officers assigned to patrol San Fernando High School.  The antagonism between the police and students of the high school had been on-going for several decades, and encounters between the two groups often ended violently.  Since the 1960s, the school had become a significant feeder of the school-to-prison pipeline, an inequity that continues to plague the institution in the modern era.  FHP Exh. 49 at 2494-544.  The incident began as Lanell, whose substance use had been steadily increasing along with his difficulties at home, was intoxicated.  Both the student who lodged a complaint against him and the arresting officers observed that he appeared "high" because his eyes were half closed, he had a blank expression on his face, and he was acting

strangely. FHP Exh. 11 at 251, 253. A female student reported to the principle that Lanell had followed her into the girls' bathroom where they spoke for several minutes; he told her she was pretty, asked for a hug and kiss, and touched her inappropriately without her consent. FHP Exh. 11 at 251, 253. Lanell denied any wrongdoing towards the female student, FHP Exh. 11 at 257, though he did not deny interacting with her, and had her name and telephone number in his pocket when he was approached for questioning by the police. The contradictions between the accounts of Lanell and the female student, regardless of what happened, suggest that Lanell may not have understood that his advances were unwanted or known how to respond to rejection after his initial perception of a mutual encounter was challenged because of his cognitive impairments, level of intoxication, and already burgeoning major mental health difficulties. FHP Exh. 43 at ¶ 126.

The cascade of events that followed the student's reporting of the incident is consistent with Lanell's intellectual disability, substance use, emotional dysregulation, and his developing psychotic disorder. A police officer and a school security officer handcuffed Lanell and took him into custody at the school security office. Lanell asked why he had been arrested, but the officers did not tell him anything about the suspected offense, only that they were "interviewing someone." FHP Exh. 11 at 253. Lanell became agitated and was physically restrained in a seated position in a chair by an officer, and then forced to the ground and held there. FHP Exh. 11 at 253. He attempted to leave the security office and continued to verbally dispute his detainment. He was repeatedly grabbed and physically restrained, and eventually was forced to lay supine while an officer kneeled on his chest. While he was so restrained, he was sprayed in the face with department issued chemical shield. FHP Exh. 11 at 252, 254. Lanell continued to argue with officers and is alleged to have made threats against them. He was transported to

the hospital and then to the Foothill Station where he was interrogated without a guardian or one of his parents being present. After the interview, Lanell was not handcuffed. He was directed to follow an officer to a holding cell, but instead Lanell fled the police station through an open back door and ran home, losing a shoe along the way. FHP Exh. 11 at 254, 259. Lanell told the officer preparing the case probation report that he fled the station because "two white dudes" had beaten him while he was detained in a holding cell. FHP Exh. 25 at 1199; FHP Exh. 43 at ¶ 127.

Lanell turned himself in the next day, accompanied by Doris and his father. He did not understand the *Miranda* warnings and his rights had to be further explained to him. He eventually waived his rights and was interrogated, this time with Doris present, and denied any wrongdoing. FHP Exh. 11 at 257. Both Doris and Franky offered statements to the probation officer that revealed their lack of understanding about how urgently Lanell needed professional supports and treatment during this time. Doris described Lanell as "big in appearance but a little kid at heart," FHP Exh. 25 at 1200, a characterization that simultaneously recognized and minimized Lanell's functional difficulties. She believed that the six weeks Lanell had spent at juvenile hall because of his escape attempt from the Foothill Police Station, FHP Exh. 25 at 1206, were punishment enough. FHP Exh. 25 at 1201. Franky's assessment of Lanell also demonstrated a normalization of Lanell's deficits. He described Lanell as a "fun loving kid, who likes to go with the crowd, . . . doesn't study like he should." FHP Exh. 25 at 1201; FHP Exh. 43 at ¶ 128.

At an adjudication hearing, a single felony count of threatening an official, and two separate misdemeanor counts for resisting/obstructing an official and battery were found to be true. FHP Exh. 25 at 1181, 1192. Lanell was sentenced to a maximum of three years and six months in Camp Community Placement.

FHP Exh. 25 at 1186.  He remained in custody at Sylmar Juvenile Hall in a high security unit.  FHP Exh. 11 at 263; FHP Exh. 25 at 1206.  During this time, he attempted suicide by wrapping a towel around his neck and was referred for a mental health evaluation.  FHP Exh. 25 at 1207.  Apart from a note about the referral itself, there are no records to indicate what kind of care and follow up, if any, Lanell received.  He reports that he began hearing voices for the first time after the death of his grandmother, Mary.  When he was incarcerated at camp, the voices, which he attributes to Satan, came to him at night and told him to hurt himself.  After his suicide attempt, he was transferred to Camp Mira Loma on February 11, 1983, FHP Exh. 11 at 270, and immediately placed in an "isolation cell," which is solitary confinement, for having a set of unauthorized dominos in this possession.  FHP Exh. 25 at 1217.  He was again transferred shortly thereafter to Camp David Gonzales on March 2, 1983.  FHP Exh. 11 at 273; FHP Exh. 43 at ¶ 129.

When Lanell arrived at Camp David Gonzales, he entered a closed setting camp, meaning that the youths lived behind a locked perimeter, in this case, a large red brick wall.  Over one hundred boys ages sixteen to eighteen were confined to the camp for offenses from drug infractions to crimes against other people, most often robbery.  FHP Exh. 50 at 2569-70, 2629.  The average tenure at the camp was nine months under strict, punitive conditions, including not being permitted to speak or socialize during some mealtimes.  The boys were housed either in an open dorm environment which resembled a military-style barracks, or in an isolation dorm where they were locked in solitary confinement for an average of seven to ten days for rules violations.  FHP Exh. 50 at 2569-70; FHP Exh. 43 at ¶ 130.

Despite the fact that many of the residents of Camp Gonzales such as Lanell had documented experiences with trauma and substance use issues, there was not a cohesive approach to mental health treatment.  Individual and group counselling,

required for all children confined to camps, were conducted by camp staff, who were regular probation officers with unspecified and varied degrees of training and experiences with mental health issues. Furthermore, per the camp system's own protocols from this time, "[i]ndividual crisis counselling/casework is conducted as-needed, usually by camp staff but also by mental health department (MHD) and other personnel. A part time psychiatrist or psychologist is sometimes available for crisis situations." FHP Exh. 50 at 2601, 2632. The admission criteria to the camp excluded boys who had previously been diagnosed as psychotic, pre-psychotic, or suffering from significant substance use issues – exclusion criteria which highlight the staff's lack of capacity to address Lanell's yet undiagnosed needs. FHP Exh. 50 at 2629; FHP Exh. 43 at ¶ 131.

Due to his size, negative racial stereotypes and maladaptive coping mechanisms, Lanell was initially perceived at camp as "imposing;" "an arrogant personality, who more or less wanted to have his way." FHP Exh. 25 at 1217. Nonetheless, the probation officer charged with assessing Lanell at the end of his stay recognized that Lanell was facing significant obstacles, including the death of his father and unrealistic expectations to behave as "the man of the house" from Doris, when in fact, he was "a large immature ward who had been delegated too much responsibility and too much was expected of him." FHP Exh. 11 at 273; FHP Exh. 25 at 1217. In the structured camp setting, with constant supervisions and supports, it was apparent that Lanell wanted to comply with program requirements, he participated in all athletic events, and "his overall conduct [wa]s viewed as very good." FHP Exh. 11 at 274; FHP Exh. 25 at 1218; FHP Exh. 43 at ¶ 132.

The educational programing at Camp Gonzales included student tutors who volunteered from nearby colleges and universities. An average of 95 student tutors each provided eight hours of service per month. FHP Exh. 50 at 2669. The camp

program's participants boasted a success rate of 90% passage on the high school proficiency test, with students who received tutoring jumping as many as six grade levels. FHP Exh. 50 at 2676-77. Many of the adolescents who were assigned to the camp arrived with only a third- or fourth-grade education, but because of the intensive supports provided, they were able to advance significantly. FHP Exh. 50 at 2676-77. Lanell, however, was not one of these students. FHP Exh. 43 at ¶ 133.

Shortly after arriving at Camp Gonzales, Lanell was referred for language and speech development testing and was administered several aptitude tests; a special education planning team was assembled and concluded that Lanell was functioning three to five years below his chronological age academically in language skills. FHP Exh. 9 at 206-09. He had a teacher and dedicated tutor for a time, which helped him make some academic progress, none of which he was able to continue independently either in camp or when he returned to high school. Indeed, his last marks at the Camp Gonzales School were Ds in every academic subject during the spring and summer terms. FHP Exh. 9 at 206. Though Lanell was unable to make significant academic progress, he was responsive to the interventions offered to him, and was trying to do his best. Instead of being able to meet the probation department's intake goal for him of advancing two grade levels in academics – which was unrealistic given the severity of Lanell's cognitive impairments – he made small academic gains and agreed to re-enter school in a lower grade. FHP Exh. 25 at 1219. While participating in the tutoring program, Lanell was even featured in a Los Angeles Times Article about the program. Despite the fact that the article relied heavily on stereotypes of criminality, leading with physical descriptors that highlight Lanell's imposing size, and incorrectly reported that he was confined for "robbery and sexual battery," it nonetheless depicted Lanell's readily observable sincerity and effort to work towards his goals of playing football and improving his circumstances, making his later failures to do

1    so all the more tragic. According to the article,

2        In an autobiographical essay his tutor asked him to write, Lanell told
3        about his love for football and baseball and music. He wrote about his
4        father, who taught him to play the drums and helped him start a band.
         And he described what he wants to do: "Just need to get home, so I
5        can get back to school. Get my head right so I will do right."

6    FHP Exh. 50 at 2677; FHP Exh. 43 at ¶ 134.

7        Despite his efforts, Lanell was limited by his cognitive functioning and
8    mental health issues while at camp. When he was promoted to the role of
9    "Assistant Boy Leader," he was unable to meet expectations. Lanell's abilities
10   garnered praise only when he was asked to follow instructions in simple, directed
11   settings, such as kitchen work or laundry detail. While it took good behavior and
12   the ability to follow instructions for Lanell to be offered these positions in the
13   camp, the tasks were closely monitored by camp staff and are of the nature that
14   typically do not require significant independent judgement or planning. FHP Exh.
15   11 at 275; RT 3465-83. Lanell's attitude remained positive despite his struggles
16   and he asked to be released at the beginning of the academic year so that he could
17   register for classes and participate in sports, which he understood as his only path
18   to college. FHP Exh. 11 at 276; FHP Exh. 43 at ¶ 135.

19       Although the probation officer who recommended Lanell for release in
20   September 1983 was able to see past some of the stereotypes that for so many
21   obscured an accurate picture of Lanell as a child who was desperate to perform
22   well and please those around him, this same probation officer concluded that the
23   biggest obstacle to Lanell's success was "his attitude." FHP Exh. 11 at 278. His
24   report failed to mention Lanell's psychotic symptoms, suicide attempt, substance
25   abuse history, cognitive impairments, or maladaptive trauma responses; rather it
26   treated all of Lanell's difficulties as the byproducts of Lanell's free choices coupled
27   with his difficult home life. Indeed, the report did not touch at all on the

28

126

significance of Franky Harris's death while Lanell was incarcerated, or recommend counseling or other mental health supports. Lanell was released back to Doris's custody on September 9, 1983. FHP Exh. 11 at 279. Doris's friend Mary Reeve, retrieved Lanell from the camp when his term finished, and she describes the life he returned to as follows:

> When Lanell came out of camp and returned home, he found it in chaos. His sister's [sic] had already been turned out of the house by then and were constantly bickering with Doris. His mother's new boyfriend, Tyronne Bowers and his son Bob were living at the house now. Doris was also having parties at her house with her new musician friends she had met through Tyronne. Doris had also gotten rid of many of Franky's things that Lanell thought he was going to get. She had given away Franky's instruments. And she also sold Franky's car which Lanell thought he was going to get. He felt that she had stolen them from him . . . She had a new life, really. She tried to pacify him by buying him things. She bought him a brand new large boombox and gave it to him in the driveway. He said, "Do you think this is going to make me feel better?" and then he smashed it on the pavement. There was no place for Lanell at home.

SHP Exh. 93 at 448-49.

This description of Lanell upon his return home speaks to the overwhelming nature of his grief and is illustrative of the global lack of meaningful supports Lanell encountered both while incarcerated and following his release from camp. FHP Exh. 43 at ¶ 136.

**Freedom and Freefall**

In the fall of 1983, during what should have been his senior year, Lanell returned to San Fernando High School and repeated the eleventh grade. He was in classes for "Educationally Retarded" pupils for his substantive courses of English and Health but received credit (with two Ds) for only two out of his six courses. He repeated a second semester of eleventh grade in the spring and similarly did not

127

earn any credits in regular academic classes.  FHP Exh. 9 at 191; FHP Exh. 43 at
¶ 137.

      While it may not have been apparent among the institutional handlers who
came in contact with Lanell, his peers, coaches, siblings and girlfriends understood
that Lanell's deep troubles went far beyond issues of choice or attitude.  Anthony
Thompson, a peer on the football team, recognized that the only reason Lanell was
allowed to return to school after he was sent to camp was because "[t]he coaches
were really pushing us to 'put San Fernando on the map.'  They wanted us to be
ranked, so they let Lanell back in school."  SHP Exh. 97 at ¶ 4.  While Lanell was a
talented athlete, Anthony also recognized that "he was not a smart kid."  He could
not learn the plays that the other players mastered and relied on his size and
physical strength.  Because his athleticism made him indispensable to the football
team, teachers did not require or expect Lanell to perform academically, including
in his remedial classes.  SHP Exh. 97 at ¶¶ 2-4; *see also* SHP Exh. 79 at ¶¶ 2-5.
One of his football coaches echoes that "he wasn't as bright as the other guys.  He
was just slow in some ways.  Lanell definitely wasn't going to college unless it was
on a football scholarship."  SHP Exh. 87 at ¶ 3.  Lanell acted like he understood
concepts or plays when in fact he did not, and although the coaches would have
liked him to play the position of linebacker because of his physical skills, he was
unable to learn from watching the film of past games or make "on-the-field reads
and decisions."  Reply Exh. 3 at ¶ 6.  Lanell's girlfriend Donna also understood
that Lanell was slow and that teachers "passed" him so he could remain on the
football team.  SHP Exh. 91 at 440.  Another girlfriend in high school, Linda
Shipley, noted that Lanell was able to pass English only with her help, and that his
vocabulary was so poor she helped him on a weekly basis to pass tests.  SHP Exh.
95 at 497.  Lanell could not follow basic instructions, though he often pretended to
understand.  He could not follow travel directions and tended to visit only places

that were familiar to him.  He was easily led into making poor choices by others, from behaviors ranging from skipping school to using alcohol.  Reply Exh. 4 at ¶¶ 1-3, 5-9, 13-17; FHP Exh. 43 at ¶ 138.

Lanell began escalating his use of alcohol, marijuana and PCP when he was released from camp.  Anthony recalls that Lanell drank every day and used PCP ("sherm") at least weekly.  SHP Exh. 97 at ¶ 6.  Lucinda Harris, the woman who Lanell would eventually marry, frequently drank and smoked marijuana with Lanell after he was released from camp.  SHP Exh. 85 at ¶ 4.  His friend from the football team Obadiah recalls, "I can remember seeing Lanell drink 32 ounce beers before school on a regular basis.  Lanell's eyes would get glazed over, and he would have the silly little 'Lanell Harris half-smile' we all knew him by."  SHP Exh. 79 at ¶ 6.  Lanell's neighborhood friend Ysidro used to drink and smoke marijuana with Lanell throughout their childhoods, but after the death of Lanell's father, he noticed that Lanell's substance use intensified, observing: "He started doing hard drugs like PCP and Crack [sic].  He started hanging out more and more by the Pacoima Projects where you can get every kind of drug out there.  He stopped caring.  His attitude was he'd do what he wanted to do."  SHP Exh. 88 at 422; FHP Exh. 43 at ¶ 139.

Lanell struggled with significant depression after his father's death.  He believed that his life did not have purpose and doubted he would survive past his 26th birthday, a symptom known as a foreshortened sense of future.  Lanell's girlfriend Donna observed, "He became very impulsive after his father died.  His father had always been very strict with him and controlled most aspects of his life."  Reply Exh. 4 at ¶ 22. Another girlfriend, Lucinda, also witnessed a shift in Lanell: he grew sad whenever he mentioned his father and preferred to stay inside for days at a time and watch TV rather than leave the house.  SHP Exh. 85 at ¶ 10.  Ysidro also noticed a change in his longtime friend, recounting, "Lanell went into a dark

place, into his own little seclusion. He didn't want to go to school anymore or go
out and play sports or do anything." SHP Exh. 88 at 422; FHP Exh. 43 at ¶ 140.

As noted earlier, by the time Lanell's father died he was getting into trouble,
essentially ending up as his father had always predicted he would. He reported that
then, when his football team lost their championship game, his only hope of getting
himself together was shattered. He had neither football not his father. As also
noted earlier in this declaration, Lanell had the unrealistic belief that the father he
adored, despite all he had endured at his hands, was the one person who could have
helped him pull his life back together. This denial of who his father really was, and
the attribution of such positive characteristics to his father is an immature defense
mechanism that Lanell consistently used to cope with his father's treatment of him.
The only realistic part of this belief was that Lanell did, in fact, need help. FHP
Exh. 43 at ¶ 141.

For a brief time after he returned from camp, however, football did provide
Lanell with some support, including structure, behavioral expectations, and a peer
group, but it was not all positive. Again, according to Anthony, Lanell would not
talk about his home life, and "walked on eggshells" because of a coach on the
football team who constantly threatened to paddle Lanell. Lanell, though
submissive, "lived in fear of being paddled" and felt this coach "owned him." SHP
Exh. 97 at ¶ 5. As discussed previously this was a traumatic substitution in that the
paddling mirrored the kind of violent discipline that was familiar to him from his
father. With his father gone, and football as his only remaining structural support,
the end of the football season exacerbated his sense of loss and accompanying
depressive symptoms. After his team lost their final game of the season, the few
protective factors Lanell had disappeared, and his functioning deteriorated. He
stopped attending school, continued to use alcohol and drugs, and reports
difficulties sleeping and feelings of hopelessness and despondency. FHP Exh. 43

1   at ¶ 142.

2          Four months after Lanell was released from camp, he began spending time

3   with his older brother Kenny, and in January 1984 he was arrested after he was

4   seen smashing a car window.  Both Lanell and Doris told the police that Lanell had

5   been following Kenny's instructions and was pressured to try and burgle the

6   vehicle, FHP Exh. 11 at 289, a scenario consistent with Lanell's gullibility and

7   inability to foresee consequences, which allowed him to be easily led by others,

8   especially an older sibling.   Nonetheless, in a probation assessment rife with

9   stereotypes, wherein Lanell's size was taken as an indicator of his leadership, the

10  evaluator recommended that Lanell be incarcerated.   The author of the report

11  expressed skepticism that Lanell was "forced" to participate in the crime because

12  he was physically larger than Kenny, and failed to take into account the fact that

13  Kenny was twenty-five years old to Lanell's seventeen, or any other information

14  about his background including the recent loss of his father, prior treatment with

15  anti-psychotic medications, and significant cognitive impairments, when he

16  characterized Lanell as a minor with an "extensive record of violent behavior," for

17  whom prior attempts at rehabilitation were "futile."  FHP Exh. 11 at 292; FHP Exh.

18  43 at ¶ 143.

19         The tendency towards viewing criminal behavior in young Black teens

20  simplistically as the result of free choice or inherently violent nature, and criminal

21  attributions to Lanell specifically because of his size, physique, and dark skin, and

22  distanced demeanor, explain in part the repeated failures of institutions when it

23  came to diagnosing, providing responsive supports and/or effectively treating him

24  for mental illness and cognitive impairments.   Even Lanell's regular probation

25  officer who had been supervising his progress since his release from camp and had

26  spoken to school officials and teachers, all of whom confirmed that while Lanell

27  struggled academically and was often tardy and absent, he was never a disciplinary

28

131

problem on campus, seemed to suggest that playing football and attending school regularly were the only supports Lanell needed. Despite being aware of the death of Lanell's father and the difficulties that he was having at home with Doris, Lanell's weak scholastic abilities, and the use of alcohol and/or other drugs contributing to the offense, he did not recommend any interventions, including counselling, to assist Lanell. FHP Exh. 11 at 299-310; FHP Exh. 43 at ¶ 144.

Unsurprisingly, without guidance or intervention to address his mental health and cognitive problems, Lanell continued to behave in ways that brought him to the attention of law enforcement. On April 7, 1984, Lanell was arrested for alcohol possession. Because he was responsive and cooperative, he was released to Doris's custody, but again, was not offered additional supports or counselling. FHP Exh. 11 at 318. In August 1984, after failing to complete the necessary coursework to advance beyond eleventh grade, FHP Exh. 9 at 191, Lanell was arrested one week after his eighteenth birthday. FHP Exh. 11 at 339. He was charged with a residential burglary (which occurred two days before he turned 18), and an attempted burglary a few days later at the same apartment complex, where he was identified by the initial victim. FHP Exh. 11 at 331-32; FHP Exh. 43 at ¶ 145.

At the time of his arrest, Lanell had enrolled in Valley Community College for the fall and intended to make up the credits he would have needed to graduate from high school, but he also faced increasing disruption and strife at home. Doris attempted to have Geraldine and Darlene legally removed from the house she was sharing with her new husband, Tyronne, which caused significant conflict among everyone who resided there. Further, Lanell had been experiencing stomach pains, chest pains, and headaches and was scheduled for a medical evaluation on the day he was arrested. FHP Exh. 11 at 336. When Lanell was evaluated by the probation department for the offense, the report failed to acknowledge that he was in special

education programing, and noted that there was no history of alcohol or drug abuse, trauma and neglect, or mental illness, all of which were incorrect characterizations and furthered the failures of the justice system in providing Lanell with the mental health services he required. FHP Exh. 11 at 335-36; FHP Exh. 43 at ¶ 146.

Lanell's return to the same apartment complex for the burglary and eventual attempted burglary is illustrative of deficits in his adaptive functioning but went unrecognized by those deciding the appropriate punishment for his actions. As described by his peers, Lanell rarely strayed from familiar settings, had difficulty travelling to new places, and was unable to plan in a complex manner. Therefore, he likely did not appreciate that returning to the same place would lead to his identification and arrest. The probation report, however, characterized Lanell's actions as increasingly sophisticated, "brazen," and "bold." FHP Exh. 11 at 339. The report incorrectly stated that Lanell received ample support from his sports coaches, who did nothing to assist him when he was so clearly struggling academically and was using drugs and alcohol to such an extent he was missing practices and games. FHP Exh. 11 at 340. The report also indicates that Lanell was well-supported by Doris at home and concluded, "Lanell has really not taken advantage of that support." FHP Exh. 11 at 340. The analysis determined that Lanell failed to make "any concerted effort to move away from unlawful actions," and that "Lanell must accept responsibility for the continuing threat he represents to the property of others." FHP Exh. 11 at 340. During his arrest and detainment at juvenile hall, Lanell's behavior was positive and despite the factual inaccuracies and purely volitional behaviors attributed to Lanell, the report ultimately recommended he continue to be placed in a juvenile facility rather than adult prison. FHP Exh. 11 at 342; FHP Exh. 43 at ¶ 147.

Pending trial, Lanell was released, again without any services, and arrested

twice more: in October 1984 for a residential burglary of Doris's home (taking of a

safe), FHP Exh. 24 at 990-1000, and in November for the attempted burglary of a

nearby apartment complex where one of his classmates lived.  This classmate

identified Lanell as a former star football player and told the police where to locate

him.  FHP Exh. 24 at 1002.  On December 16, Lanell got into an altercation at

Doris's house, where he was accused of stealing stereo equipment while she was in

Las Vegas, FHP Exh. 24 at 1013, and the next day, along with another unidentified

person, was accused of robbing a local 7-11 and assaulting the on-duty clerk.  Later

that afternoon, Lanell was arrested after he crashed a stolen car and was taken to

the hospital.  The next day, December 18, while in custody, Lanell admitted to the

burglaries and took officers to the locations where he sold the stolen property.  He

ran off while handcuffed and was taken back into custody the following day.  FHP

Exh. 24 at 1019-20; FHP Exh. 43 at ¶ 148.

**Psychotic Symptoms and Inappropriate Confinement in Adult Penal
Institutions**

Lanell's behavior across these three days in December is consistent with

burgeoning psychosis, which became more pronounced and observable once he

was incarcerated.  When he was interrogated by police, he claimed responsibility

for eighty to one hundred burglaries in the area and made remarks during a lineup

proceeding about causing further damage to the 7-11 store that were unrealistic,

against his interest, and consistent with his mental impairments.  FHP Exh. 24 at

1019, 1021; FHP Exh. 43 at ¶ 149.

On January 31, 1985, Lanell entered into a plea deal.  FHP Exh. 24 at 1073.

The probation report indicated that he was using drugs and alcohol during the

offenses and that he was directed to rob the 7-11 by the second suspect and had no

memory of actually harming the clerk, but nonetheless concluded that there were

no circumstances in mitigation and that placement in a juvenile facility was

1    inappropriate. FHP Exh. 24 at 1092-99. On March 5, 1985, at the age of nineteen,
2    Lanell was sentenced as an adult to ten years in prison. FHP Exh. 24 at 1102.
3    Several weeks later, the court revised its order and asked that the California Youth
4    Authority consider placing Lanell in a juvenile facility. FHP Exh. 24 at 1102. As
5    detailed below, Lanell was initially sent to CYA, and evaluated in April and May,
6    but was transferred to the adult prison, California Institute for Men ("CIM") in July
7    1985 as punishment for participating in an escape attempt. FHP Exh. 13 at 510. In
8    September, he was returned to CYA for further evaluations which occurred in
9    October 1985, and despite findings of impaired intellectual functioning and
10    psychosis, he was sent back to CIM and remained incarcerated with adults until his
11    release in late 1990. FHP Exh. 12 at 357; SHP Exh. 14; FHP Exh. 43 at ¶ 150.

12          At the age of nineteen, Lanell was operating and understanding the world at
13    a cognitive and intellectual level far below his chronological age, and his ability to
14    function was further compromised by trauma-related psychiatric difficulties and
15    psychosis. It is not simply that Lanell's development was delayed, but that given
16    his myriad impairments, his brain did not have the potential to fully develop,
17    notably in areas of executive functioning such as decision-making and planning.
18    His development was further curtailed by the additional stress and trauma of
19    having to survive in an adult penal institution. FHP Exh. 43 at ¶ 151.

20          During his initial intake evaluations at the juvenile Southern Reception
21    Center and Clinic (SRCC), Lanell was administered a series of academic and
22    cognitive tests. On the Test of Adult Basic Education (TABE) he was found to be
23    operating between a third and sixth grade level in the areas of reading, math, and
24    language, with an overall grade equivalent of 4.7. FHP Exh. 13 at 505. On May
25    13, 1985, as part of a resentencing evaluation, the CYA staff psychologist Simona
26    Reicher, Ph.D. evaluated Lanell using a clinical interview; projective drawings; a
27    Bender motor Gestalt Test; Rorschach Psychodiagnostic Test, and the Thematic
28

135

Apperception Test (TAT). Dr. Reicher found that Lanell's "delinquency seems to stem from a lack of internalized moral values" and diagnosed him with Antisocial Personality Disorder with Narcissistic Features. FHP Exh. 13 at 506-07. She unreasonably reached this conclusion despite testing that showed Lanell's far-below-average intellectual functioning, prior evidence of substance abuse and suggestions of familial trauma and loss in the records before her. During the interview, Dr. Reicher observed that Lanell displayed depressed mood; that he was unable to visualize situations in a global manner; that he was somewhat compulsive and focused on trivial matters; and that he reported he tried to escape from stressful situations and experienced past suicidal ideation. FHP Exh. 13 at 506. Despite these observations of serious symptoms of psychiatric illness and Lanell's social history, she failed to even consider the possibility that Lanell's behavior was the product of a major psychiatric disorder(s). In addition, she failed to uncover Lanell's other symptoms, especially his psychotic symptoms, which would have led a reasonable evaluator to a diagnosis other than a personality disorder. FHP Exh. 43 at ¶ 152.

On May 20, 1985, consulting psychiatrist Susan Fukushima, M.D. evaluated Lanell. Based on a single clinical interview and a review of the records on file, she concluded that Lanell had a conduct disorder. During the interview, Lanell unsurprisingly did not disclose a prior suicide attempt and suicidal ideations or hallucinations and instead self-reported that he used to drink only on the weekends and that he achieved a 3.0 GPA in high school before dropping out. Despite these attempts at masking, Dr. Fukushima still observed that Lanell was anxious, with immature judgement and evident signs of depression. FHP Exh. 13 at 509. In her report, she did not refer to the May 13 evaluation or prior cognitive testing, and she incorrectly concluded that Lanell was "of average intelligence" with no prior suicide attempts. FHP Exh. 13 at 509. She noted that Lanell would benefit from

1   positive male role models and supportive psychological counselling to help him
2   process the loss of his father, both of which he did not receive.  FHP Exh. 43 at
3   ¶ 153.

4        On June 29, 1985, Lanell was caught up in an escape attempt from CYA
5   with seven other young people that involved a level of planning far beyond his
6   capacities.  FHP Exh. 13 at 510.  Nonetheless, he was transferred to an adult
7   prison, CIM, as punishment rather than given the support and counselling
8   recommended by CYA's evaluating mental health professionals.  On September 15,
9   1985, just a month past his 19th birthday, Lanell was a victim in a racially
10  motivated riot in the dining hall involving physical fighting and weapons.  FHP
11  Exh. 13 at 511-12.  He was hit in the head with a food tray and on the side of his
12  body with a pipe and taken to the prison medical center for x-rays and observation.
13  FHP Exh. 13 at 513.  He was cleared of any wrongdoing in the incident and
14  transferred to county jail to be relocated.  FHP Exh. 13 at 518.  While in the jail,
15  between his transfer from CIM back to CYA, Lanell attempted to kill himself by
16  drinking shampoo and placing a plastic bag over his head.  SHP Exh. 14 at 64.
17  Five days later, on September 20, 1985, Lanell was transferred back to CYA for
18  further evaluation.  FHP Exh. 13 at 504; FHP Exh. 43 at ¶ 154.

19       During the next series of evaluations in October 1985, Lanell displayed
20  actively psychotic symptoms.  FHP Exh. 13 at 514.  He received both a psychiatric
21  evaluation, again by Dr. Susan Fukushima, and a neuropsychological evaluation
22  that included IQ testing.  Neither one of the evaluating mental health professionals
23  appeared to be aware that Lanell was violently assaulted at CIM; at least there is no
24  mention of how that trauma also contributed to Lanell's decompensation.  FHP
25  Exh. 43 at ¶ 155.

26       Lanell's first evaluation after his transfer took place on October 14, 1985.
27  According to Dr. Fukushima, Lanell disclosed that he had been experiencing

28

Petition for Writ of Habeas Corpus

psychotic symptoms, including auditory and visual hallucinations since the age of 14 and had been treated with antipsychotic medication, which he was no longer taking. Lanell also disclosed a prior suicide attempt in 1983, corroborated in his intake probation report as having occurred at Juvenile Hall, wherein he tried to end his life by hanging himself. SHP Exh. 14 at 64; FHP Exh. 25 at 1207. Most recently, he had been experiencing command hallucinations, usually when he was alone, three times per day that included the appearance of his deceased brother. Lanell smiled inappropriately during the interview and exhibited delusional thinking including that he was being controlled and his thoughts were being read. Dr. Fukushima recommended continual close monitoring due to the risk Lanell posed to himself and others as well as treatment with psychotropic medications. SHP Exh. 14 at 65. Dr. Fukushima recognized that Lanell was acutely psychotic and diagnosed Lanell as suffering from "Schizophrenic Reaction" with antisocial trends. SHP Exh. 14 at 65; FHP Exh. 43 at ¶ 156.

The following day, on October 15, 1985 (and without the benefit of reviewing any prior psychological evaluations) psychologist Harry Taylor, Ph.D., evaluated Lanell using the Bender Visual Motor Gestalt; Draw-a-Person; Rorschach Ink Blot Exam; and the Wechsler Adult Intelligence Scale-Revised. During the clinical interview, Lanell elaborated on the hallucinations he was experiencing that he had discussed with Dr. Fukushima, stating that four different voices had been speaking to him over the course of two years, including friends of his who had died and his deceased brother Robert James. The voices appeared as command hallucinations and told him to do "crazy stuff" including kill himself. SHP Exh. 12 at 59. He reported that when he was given Mellaril and Thorazine in the past, it helped alleviate the hallucinations. Throughout the interview, Lanell appeared "dull" and displayed deviant verbalizations, SHP Exh. 12 at 60, which is consistent with responding to internal stimuli. He appeared to have limited inner-

resources and moderate depression. On the testing, Lanell obtained a Verbal IQ score of 72 and a performance IQ score of 71, with a Full Scale IQ of 71 with deficits most pronounced in practical knowledge, abstract thinking, and differentiating essential from non-essential details. While Lanell was displaying psychotic symptoms, Dr. Taylor did not feel he could clearly diagnose Lanell as schizophrenic. SHP Exh. 12 at 60. Dr. Taylor, like Dr. Fukushima, concluded that Lanell would likely benefit from a psychiatric consultation to explore psychotropic medications and recommended individual and group therapy.[26] SHP Exh. 12 at 61; FHP Exh. 43 at ¶ 157.

Despite these evaluations and recommendations, Lanell was transferred back to the adult facility, CIM, on December 18, 1985. He was placed in a solitary cell on administrative segregation pending a classification hearing. FHP Exh. 13 at 515. He was sent for psychiatric testing on January 7, 1986 and received a write-up for his refusal to participate. FHP Exh. 13 at 516. On January 21, 1986, CIM created a classification report for Lanell, which was devoid of any information regarding his family trauma, prior psychological reports and suicide attempts, and

---

[26] Dr. Taylor's clinical observations also included that Lanell presented as "a tall, mesomorphic adolescent." The term "mesomorphic" derives from the now discredited pseudo-science called "constitutional psychology," which linked a person's personality and behavior to their appearance. "Mesomorphic" denoted muscular, broad bodies and behaviorally was associated with domineering and competitive personality traits. Developed in the 1940s, constitutional psychology had been discredited and fallen out of use by 1977. Dr. Taylor inappropriately used the term "mesomorphic" to describe Lanell in 1985. The appearance of this term in Dr. Taylor's assessment is another indication of the unreliability of his clinical conclusions about Lanell, wherein he appears to have ignored objective data points based on Lanell's observable behaviors and relied, at least in part, on stereotypes and assumptions. *See* Mull, Amanda, "*Americans Can't Escape Long-Disproven Body Stereotypes*," The Atlantic, November 6, 2018. Available at https://www.theatlantic.com/health/archive/2018/11/body-stereotypes-personality-debunked-eugenics/575041/ (last visited January 17, 2023).

his IQ score of 71, which falls in the range of intellectual disability. Instead, the report only indicated that behavioral problems from Lanell were anticipated. FHP Exh. 13 at 517-18. Such a gross failing on the part of the Department of Corrections after two evaluations indicated that Lanell needed intensive interventions, including psychotropic medication and counselling services, allowed a 19-year-old to free fall for over four years in adult penal institutions and set him up for failure once he was released from prison. FHP Exh. 43 at ¶ 158.

On January 31, 1986, Lanell was transferred to Deuel Vocation Institute (DVI). FHP Exh. 12 at 358. He received write ups for rules violations and appears to have been taken advantage of by other incarcerated people when he was accused of committing infractions, for example, because he was acting under the direction of another person and not understanding that when he was offered personal hygiene of another incarcerated person he was being propositioned for sex, and that when he rebuked such advances, it was expected he would return the personal items. He repeatedly expressed to correctional staff that he did not understand the charges of wrongdoing against him. FHP Exh. 13 at 519-25. Lanell began writing letters back and forth with Lucinda Reeve, a high school girlfriend who had been friends with his sisters, and who he dated after his release from Camp Gonzales. They married while he was incarcerated, on May 27, 1986. FHP Exh. 13 at 526; SHP Exh. 85 at ¶¶ 1, 4, 6. On July 26, 1986, he was involved in an altercation with three other incarcerated people on the yard during which he was attacked with a shank and hit with fists. FHP Exh. 13 at 527-34. Lanell was not charged with any wrongdoing in the incident and was transferred to Folsom State Prison in August. FHP Exh. 13 at 535; FHP Exh. 12 at 358-59; FHP Exh. 43 at ¶ 159.

Between August 1986 and his release in September 1990, Lanell was transferred between Folsom State Prison (Old Folsom) and the California State Prison at Sacramento (New Folsom), FHP Exh. 12 at 357-59, which were located

Petition for Writ of Habeas Corpus

on the same property.  Built in 1880, Old Folsom was known for its sweeping Gothic architecture.  By contrast, New Folsom was a modern, concrete building erected to meet the exponentially growing housing needs within the CDCR.  By the time Lanell was incarcerated, the two prisons together housed "approximately 6400 of California's most violent criminals who require the highest security possible in the prison system."  FHP Exh. 51 at 2680.  An annual Sacramento Grand Jury Report on the prison detailed the exceedingly violent conditions Lanell faced daily, including:

- 76% of Folsom's inmates have a level 4 classification because of the violent nature of their offense

- 40% of these inmates are serving life sentences

- 20% continue to act out regularly even though they are incarcerated

- 25% have been referred to Folsom Prison for violent or incorrigible activities committed while incarcerated at another prison.

FHP Exh. 51 at 2680.

Not only do these statistics demonstrate the difficulties inherent in the institutions where Lanell was housed, but also reflect the prison's (and Grand Jury's) refusal to acknowledge the role of the prisons themselves in the continuing cycle of violence.  That inmates "act[ed] out regularly" must be understood not simply as an issue of bad actors, but rather in the context of the prison environment, which encouraged division among incarcerated people typically along racial lines to assist in the maintenance of control and forced them to live in abhorrent conditions.  In contrast to the statistics noted above, Lanell was incarcerated at Folsom for offenses that were less serious than Level 4 offenses; he was not serving a life sentence; and was the target rather than the perpetrator of violence while incarcerated.  These contrasting factors, plus his young age and the apparent disregard for the mental health evaluations he received, are evidence that his placement at Folsom was a product of racism and/or a general failure of the

141

1   prison system to appropriately assess, classify and care for incarcerated people

2   rather than a reflection of Lanell's individual characteristics.  FHP Exh. 43 at

3   ¶ 160.

4        The Report goes on to acknowledge the issue of overcrowding, which had

5   been an ongoing problem across California prisons in general since the early

6   1980s, and at Old and New Folsom specifically.  FHP Exh. 51 at 2682-84.  The

7   Report found, "Although both Old and New Folsom were designed to have a single

8   occupant per cell, both facilities are currently double celling in most instances.  As

9   a result, overcrowding continues to be a problem."  FHP Exh. 51 at 2679-84.  In

10  order to address the issue, the Grand Jury recommended only prophylactic

11  measures: that "Folsom State Prison should institute a requirement that all

12  employees attend stress management and reduction training annually."  FHP Exh.

13  51 at 2681.   The proposed remedies were insufficient, and the problem of

14  overcrowding persisted.  In 2008, one expert evaluator who assessed the conditions

15  at both Old and New Folsom described the following:

16        Prisoners continue to be housed in unacceptable conditions that
17        endanger their health and safety.  Prisoners in Folsom (Building Two)
        were double-celled in six-by-eight foot cells, with two bunks, a toilet
18        and sink, and a desk crowded into the cells with the two prisoners.
19        There was hardly any unencumbered space in those cells, and they
20        were extremely narrow ... Cells in Folsom's building Five were
        seven by nine feet, double-celled, and had solid metal doors.  These
21        doors made direct supervision extremely difficult – staff cannot tell
22        what is going on in the cells.  Under these circumstances, staff are
23        even less likely to be able to respond appropriately to medical and
24        mental health emergencies ...

25  FHP Exh. 51 at 2687-88.

26        Former CDCR Secretary Jim Tilton has concluded the following about

27  overcrowding:

28

                              142

[i]dleness-related frustration increases the probability of interpersonal conflict and assaults in prison. Overcrowding simultaneously reduces the opportunities for staff to effectively monitor inmate behavior and drastically limits the options to reduce animosities between inmates by separating them or sending them to different facilities. Thus, there is less for inmates to do, fewer outlets to release the resulting tension, a decrease in staff capacity to identify inmate problems, and fewer options to solve them if and when they do.

FHP Exh. 51 at 2686-87; FHP Exh. 43 at ¶ 161.

The violence and instability at the two facilities flowed from overcrowding and were exacerbated by years of administrative mismanagement, lack of adequate staffing and training, and corrupt practices – including the misuse of funds designated for incarcerated people; lack of oversight regarding the use of state-owned vehicles; and the theft of thousands of dollars of food products meant for consumption by the people who were incarcerated. FHP Exh. 51 at 2698-870. As one person housed at New Folsom in 1988 described, "In 1988, New Folsom guards were shooting at people a lot, and when they did they often doctored their reports to cover for themselves. It was a very violent place with shootings and stabbings two or three times a week." During the years 1987, 1988, and 1989, official reports document the number of assaults among people incarcerated at Old and New Folsom at 298, 286, and 228, respectively. FHP Exh. 51 at 2871-76. Lanell was further traumatized deeply by the violence he experienced and witnessed. He saw a person strangled with an extension cord early in his incarceration and came to think of the lack of safety and threat of physical harm as "all he knew." FHP Exh. 43 at ¶ 162.

Despite the terrible living conditions at Folsom, Lanell leaned on the limited supports he was offered. He requested to begin work immediately, but it took over a year before he was offered an assignment as a trash collector for his unit. FHP Exh. 13 at 537-38, 541. He registered for classes through Sacramento Community

143

College in the fall of 1986 and continued to enroll in one class per semester through the fall of 1987. His transcript incorrectly indicates that Lanell had graduated from high school in 1984, and consistent with his cognitive impairments, he was not able to earn any credits or even grades during his three semesters at Folsom. FHP Exh. 13 at 540. Indeed, he received failing scores on his pre-GED testing across each subject in 1987. FHP Exh. 13 at 536. A minimum average score of 45, with a minimum score of 40 on each subtest was required for entry into the GED program. Lanell scored no higher than 37, with an average combined score of 34.4. FHP Exh. 13 at 536. When Lanell was permitted to enroll in the GED preparation program in 1990, no reference to this prior assessment or indication of his abilities was required to begin classes. FHP Exh. 13 at 549; FHP Exh. 43 at ¶ 163.

Lanell's impairments made it very difficult for him to function effectively at Folsom. He continued to be written up for minor infractions, ranging from having his radio volume too high, FHP Exh. 13 at 539, to picking up a package from the floor that contained two marijuana cigarettes, FHP Exh. 13 at 543, to being "out of bounds" while on yard. FHP Exh. 13 at 551. He completed simple job assignments like emptying the trash to a satisfactory level, but often struggled with any more complicated tasks and was unable to perform the quality of work expected of him. FHP Exh. 13 at 541-42. In October 1988, Lanell was charged with a more serious rules violation for participating in an assault on another incarcerated person. All accounts of the incident confirm that Lanell was not the primary perpetrator, and Lanell's comparatively minor role as a follower is consistent with his cognitive impairments and developmental difficulties. Lanell was implicated in the incident by a confidential informant and he was never offered the support of a staff assistant in hearings on the matter. FHP Exh. 13 at 544. The classification committee that reviewed the incident ultimately deemed

that Lanell should be housed in the general population, maintain his workgroup, and be assessed a loss of 90 days of good time credits, the same punishment given to the victim; the main instigator was assessed a loss of 180 days of good time credits. FHP Exh. 13 at 546-47; FHP Exh. 43 at ¶ 164.

In the six months prior to his release, Lanell again began actively participating in a GED program, including remedial reading classes and other academic programs. FHP Exh. 13 at 549, 552-64. Approximately six weeks into the program, Lanell was performing at a 4.7 grade level. FHP Exh. 13 at 554. Despite "outstanding attendance" and making significant improvements in his remedial reading course, FHP Exh. 13 at 550, Lanell was not able to advance beyond pre-GED coursework. FHP Exh. 13 at 548. On September 14, 1990, at the age of twenty-four, Lanell was released on parole. FHP Exh. 12 at 359; FHP Exh. 43 at ¶ 165.

When Lanell returned home, divorced from the familiar prison structures and routines, he did not fit in with his former peer group and he was far removed from the one aspect of his life that had given him validation and praise: being a star athlete. As his neighborhood friend Obadiah recalls, "After Lanell got out of Folsom, he and I hung out. After going to prison, things were even harder for Lanell. His hair and clothes were out of style and people made fun of him." SHP Exh. 79 at ¶ 8. His sister noted that he became a target for the police in the neighborhood, observing, "After he got out, life was hell. Any crimes went down in the neighborhood, the cops were all over him. They investigated and harassed him non-stop." SHP Exh. 82 at 406. His female partners saw the challenges Lanell faced as well. As his wife Lucinda observed "He went into prison as a kid and came out a man, but inside, he was still a kid." SHP Exh. 85 at ¶ 9; FHP Exh. 43 at ¶ 167.

During the year between his release from prison and arrest (for an unrelated

145

offense) that led to him being charged with the capital crimes, Lanell drifted through his neighborhood of Pacoima searching for community. His mental illness, exacerbated by the trauma he experienced while incarcerated, was untreated and he self-medicated with drugs and alcohol. Less than three weeks after his release, Lanell went to the emergency room for treatment of a scalp laceration he incurred after a fall. He had been drinking at the time. FHP Exh. 26 at 1258. The injury appeared superficial only, and Lanell received stitches. FHP Exh. 26 at 1259, 1264. In December 1990 or January 1991, Lanell interviewed for the Valley Community College football team. He practiced on and off from February to mid-to-late August, 1991, RT 2456-57, though his official enrollment was only for the spring semester, from February to June 1991. During this time, Lanell earned no class credits. SHP Exh. 85 at ¶¶ 7, 8; SHP Exh. 93 at 450. He tried to work, but had little success because of his limited skills, impaired cognitive functioning, and criminal record. Again, per his sister Darlene, "Lanell really wanted to get his life back on track; he wanted to work and play ball, but it was so hard with a record." SHP Exh. 82 at 406. His friend Obediah echoed, "The only job Lanell could get was for $4 an hour picking up golf balls at the Hansen Dam Golf Course in Pacoima. Even though it wasn't even enough money to get by, Lanell never complained. He just did his work, and kept hoping something better would come along." SHP Exh. 79 at ¶ 9. Unfortunately for Lanell, that something better never came. FHP Exh. 43 at ¶ 168.

On September 25, 1991, Lanell was arrested and taken into custody after he was involved in a fight with several men in Palmdale who he felt had disparaged him. He had driven a car that he said he had borrowed from a friend, and was accompanied by his nephew, Robert James Jr. (his stepbrother Robert James's son). James Jr. reported that Lanell was acting strangely, including driving erratically and becoming demonstrably upset after he was unable to remember how to drive to

146

1    the address of a female friend who lived in the area.  FHP Exh. 24 at 1114.  After

2    his arrest, the officers informed Lanell that the vehicle he was driving had been

3    reported as stolen.  Lanell maintained that he had borrowed the car from a friend

4    and admitted that he was intoxicated and could recall little of the day's events.

5    FHP Exh. 24 at 1120.  In the course of the altercation with the men in Palmdale,

6    Lanell was hit in the head with a glass object.  During his apprehension and arrest,

7    Lanell was hit by a police vehicle as he fled on foot and then beaten with a baton

8    and flashlight, which resulted in injuries that required medical treatment.  FHP

9    Exh. 24 at 1110, 1126-29; FHP Exh. 43 at ¶ 169.

10          The events of September 25, Lanell's final day on the streets, include details

11   confirmatory of his emotional distress, mental illness, and cognitive impairments.

12   Lanell's intoxication was a familiar method of continuing self-medication, which

13   also impaired his already compromised judgement and reasoning skills.  He

14   appeared emotionally dysregulated to others, including in the car with his nephew,

15   during the altercation, and later at the hospital as he first refused any assistance

16   with his injuries.  He was unable to behave in a manner which kept him physically

17   safe, including driving while intoxicated and being unable to find his intended

18   destination, and his ill-formed attempts to flee from police, which resulted in

19   multiple beatings and injuries.  Even the probation officer who later issued a report

20   about the incident characterized the circumstances leading to Lanell's arrest as

21   "rather bizarre." FHP Exh. 24 at 1164. Once incarcerated, Lanell was subsequently

22   charged with the capital offenses that had stemmed from incidents that had

23   occurred in January and August of 1991.  FHP Exh. 24 at 1139; FHP Exh. 43 at

24   ¶ 170.

25                                    *

26          A qualified expert, equipped with this robust history, would have further

27   informed trial counsel about its psychiatric significance, including explaining

28

                                    147

1   issues such as diagnostic challenges and the impact of comorbid conditions,

2   meaning diseases or medical conditions that are simultaneously present. As Dr.

3   Dudley opined,

> The singular, racialized lens through which Lanell was viewed seems
> to be, at least in part, responsible for the misdiagnoses and the lack of
> diagnostic depth and complexity in prior evaluations. Lanell's
> physical presentation as a large, muscular Black adolescent who was
> darkly complexed and not quick in his responses, led to the most
> pejorative and simplistic characterizations of his observable
> behaviors. In reality, Lanell was experiencing a constellation of
> interwoven conditions: intellectual disability, mood disorder, trauma
> and developmental issues as well as a blossoming psychotic disorder
> prior to his first conviction as an adult when he was freshly 19 years
> old. Lanell's masking behaviors – the behaviors he was able to
> develop to hide his limited capacities and vulnerabilities – included
> acting with bluster, exaggerating his abilities and past
> accomplishments, and using his size to posture threats when he
> himself felt threatened or confused.

FHP Exh. 43 at ¶ 191.

A qualified expert could have further explained Mr. Harris's intellectual
disability not only made worse the manifestations of his trauma history and
psychosis, but also impeded appropriate diagnosis because of his difficulties
understanding questions and accurately relaying information in response. Mr.
Harris has circumscribed self-insight and does not spontaneously supply
information that is critical to an understanding of his functioning; indeed, he often
declines to speak with medical, mental health, and institutional staff at all. His
difficulty engaging may be heightened or minimized depending on who is
interviewing him. With some evaluators, Mr. Harris was able to describe being
treated with anti-psychotic medication as a juvenile, his suicide attempts, and his
experiences with auditory hallucinations. At other times, including during his

1  initial intake to San Quentin, he denied any mental health history.  FHP Exh. 43 at
2  ¶ 192.

3          Mr. Harris's intellectual disability, mood disorder, psychosis, and
4  maladaptive trauma responses are distinct, comorbid conditions.  Untangling the
5  various diagnoses requires a longitudinal understanding of Mr. Harris's behaviors
6  across his life.  Mr. Harris had a long history of academic difficulties that predated
7  any incidents attributed to the onset of his mood disorder and his cognitive
8  difficulties were apparent when playing football, an activity which by all reports
9  including his own, not only did he enjoy, but also at which he was highly
10  motivated to perform to the best of his abilities.  Had his impaired intellectual
11  functioning been the result solely of a mood disorder, one would expect more
12  variability in his aptitude across different settings.  Mr. Harris, however, was
13  unable to match the cognitive performance of his peers even when highly
14  motivated, a fact which supports that his intellectual disability existed in addition
15  to, and not as a result of, the mood disturbances he experienced.  While his
16  cognitive impairments are best understood as an independent phenomenon, they
17  were exacerbated by comorbid mood disturbances and symptoms associated with
18  schizophrenia.  FHP Exh. 43 at ¶ 193.

19          Depression resulting from the deaths of Mr. Harris's mother Rosemary, step-
20  brother Robert James (who operated in the place of his largely absent and abusive
21  father), step-grandmother Mary Walker, and father James Harris, as well as the
22  incarceration of his two half-brothers, was devastating to Mr. Harris's already
23  severely compromised functioning, and is an example of a negatively synergistic
24  relationship between risk-factors.  His impaired mental functioning rendered Mr.
25  Harris more susceptible to major mental disorders as he lacked the cognitive tools
26  to develop effective coping strategies. FHP Exh. 43 at ¶ 194.

27          Thus, Mr. Harris's intellectual deficits and trauma-related psychiatric
28

149

difficulties interact with each other in various ways that make the sum of his deficits and symptoms far greater than what could be attributed to each individual disorder. A qualified expert would have explained to trial counsel that it is important to note that similarly, Mr. Harris's mood disorder and his psychotic disorder interact with each other, and then with his intellectual deficits, and trauma-related psychiatric difficulties in various ways that exacerbate his inability to function and care for himself. FHP Exh. 43 at ¶ 195.

A qualified expert also would have illuminated the ways in which multiple psychological and neuropsychological conditions contributed to explaining Mr. Harris's criminal behavior that began during his early adolescence and continued into his young adulthood. Due to intellectual disability and developmental difficulties, Mr. Harris was readily influenced by those around him and vulnerable to suggestion and encouragement; his size was often taken advantage of for others' gains. Mr. Harris searched for acceptance and connection but lacked the tools to form deep and protective relationships. He had especially limited tools to make choices and plans; to effectuate his choices and plans; and to anticipate the likely consequences of his choices and plans. He was able to express goals and dreams for his future (playing football in college, for example) but lacked the capacity to put his desires into action, or the ability to recognize that his desired outcomes were not possible, for example playing football for Stanford or the University of Southern California when he was unable to graduate from high school, let alone understand the game of football beyond the limited role in which he was able to excel. FHP Exh. 43 at ¶ 196.

Mr. Harris's juvenile offenses consistently demonstrate his failure to anticipate consequences and adjust to changing circumstances. His non-conforming behaviors happened in coordination with other people and in the rare instances when he acted alone, his behaviors demonstrated a lack of planning and

the failure to anticipate easily foreseeable roadblocks. For example, during one instance when fled from police custody, he was surprised when authorities searched for him and found him at Doris's home, which was his usual residence. The instance in which Mr. Harris was accused of a sexual assault while he was in high school is an example of his difficulties recognizing social cues and correctly interpreting information. He gave the female student his phone number, evidence that he was not trying to hide his interaction with her, and seemed genuinely confused when he learned that he acted in a way that was uninvited. Because Mr. Harris fit the stereotype of a dangerous bully, due mostly to his race and size, his interactions with the female student were interpreted unfavorably to him and, alternate and more plausible explanations of his behavior were either ignored or not considered. FHP Exh. 43 at ¶ 197.

Consistent with mental illness, Mr. Harris's behaviors escalated episodically. Thus, it appears during the times he was acutely ill, he engaged in actions that were different in degree and kind from the "typical" descriptions of him as quiet and peaceful. Some of Mr. Harris's criminal behaviors may also stem from the deep emotional wounds of his lack of parental support; at a basic level, he did not believe that his life could get better. After the death of his father, his emotional defenses were fully activated and he blocked out painful stimuli and became trapped in the idea that his life would never be right, enmeshing him in a cycle of self-defeating behaviors until his incarceration at the age of 19. FHP Exh. 43 at ¶ 198.

A qualified expert would have informed reasonable effective trial counsel who had performed an adequate social history investigation that:

> Lanell suffers from intellectual disability, schizophrenia, major depression, and trauma-related psychiatric difficulties with associated developmental difficulties. Lanell struggled to function and find happiness throughout his life due to his intellectual disability, an

151

organic condition that likely affected him since birth, and upon which
were layered the effects of physical, emotional, and environmental
trauma, and profound losses following the deaths in close succession
of his step-grandmother, stepbrother, and father that led to symptoms
of depression and worsened after each subsequent death. What
seemingly began as the friendly voices of his dead relatives speaking
to Lanell, and were likely responses to past and contemporaneous
traumas, at some point clearly evolved into psychotic symptoms
related to schizophrenia. Lanell displayed symptoms consistent with
the prodromal phase of the disease in his mid-teenage years, and the
onset to full-blown psychosis can likely be traced to when he was
between 18 and 19, after he entered the Los Angeles County jail
system and started to hear voices during the day as well as at night.
Lanell's intellectual disability limits the tools he has available to
mitigate the symptoms of his multiple mental illnesses and limits his
ability to understand and articulate what he is experiencing.
Furthermore . . . each of Lanell's psychiatric and neuropsychiatric
difficulties interact with each other in various ways that exacerbate his
difficulties and exponentially impair his ability to function.

FHP Exh. 43 at ¶ 218.

In the absence of this information, trial counsel unreasonably failed to
understand Mr. Harris's limited mental functioning and the impact of his cognitive
impairments and mental illness on his ability to understand the proceedings against
him and assist in his defense, and therefore unreasonably failed to declare a doubt
as to his competence near the outset of their representation, but at the latest, when
Mr. Harris's mental illness prevented him from meeting with Dr. White on the eve
of trial in March 1993.

          e.    Trial counsel's failures prejudiced Mr. Harris.

Where, as here, there is a reasonable probability that a defendant would have
been found unfit for trial had trial counsel investigated his competency and asked
the court to declare a doubt, he has established that his counsel's failure to move

Petition for Writ of Habeas Corpus

1    the court to hold a competency hearing was prejudicial. *See, e.g., Newman v.*

2    *Harrington*, 726 F.3d 921, 928 (7th Cir. 2013) (citing *People v. Johnson*, 794 N.E.

3    2d 294, 306 (Ill. 2002) ("To establish the prejudice prong of the *Strickland* test, a

4    defendant must show that the facts that would have raised a bona fide doubt of his

5    fitness for trial existed at the time of his trial . . . . ")). Had trial counsel retained an

6    expert to assist him in understanding Mr. Harris's competency, or even asked the

7    expert they did retain to consider the issue, such experts would have advised him to

8    declare a doubt as to Mr. Harris's competence, and/or on the basis of a full

9    investigation, been able to offer compelling testimony at a hearing as to why Mr.

10   Harris was unable to rationally cooperate with trial counsel and assist in his own

11   defense, or to rationally understand the proceedings against him.

12        Trial counsel's actions fell below the generally recognized and reasonable

13   standard of care, and were prejudicial per se, or alternatively, prejudiced Mr. Harris

14   because he was unable meaningfully to participate in his capital trial. *Odle*, 238

15   F.3d at 1087; *see also, United States v. Boigegrain*, 155 F.3d 1181, 1188 (10th Cir.

16   1998) (holding that counsel "is not only allowed to raise the competency issue, but,

17   because of the importance of the prohibition on trying those who cannot

18   understand proceedings against them, she has a professional duty to do so when

19   appropriate."); *Vogt v. United States*, 88 F.3d 587, 592 (8th Cir. 1996) ("The failure

20   of trial counsel to request a competency hearing where there was evidence raising a

21   substantial doubt about a petitioner's competence to stand trial may constitute

22   ineffective assistance of counsel.") (quoting *Speedy v. Wyrick*, 702 F.2d 723, 726

23   (8th Cir. 1983)).

24        Trial counsel's failure to seek a competency hearing, furthermore, is not

25   determinative of whether a hearing on this issue should have been held. *Odle*, 238

26   F.3d at 1088-89 (noting "counsel is not a trained mental health professional, and

27   his failure to raise petitioner's competence does not establish that petitioner was

28

153

competent."). In addition, no express post-trial admission of deficient performance is required in order to establish a prima facie case of ineffective assistance of counsel at this stage in the proceedings. *See In re Wilson*, 3 Cal. 4th 945, 955 (1992) (finding that petitioner had established a prima facie case of ineffective assistance of counsel entitling him to an order to show cause before trial counsel's declaration was filed as part of the Attorney General's return); *People v. Pope*, 23 Cal. 3d 412, 426 (1979) (contemplating that trial counsel be given "an opportunity in an evidentiary hearing to . . . fully describe his or her reasons for acting or failing to act in the manner complained of."); *see also Bolius v. Wainwright*, 795 F.2d 986, 989-90 (5th Cir. 1979).

By virtue of trial counsel's failures, Mr. Harris was denied the effective assistance of counsel, and a determination of competency to which he was entitled. Trial counsel's failings, individually and cumulatively, had a substantial and injurious effect on the jury's determination of the verdict at the guilt phase and now vacated penalty phase. But for counsel's failings, Mr. Harris would not have been convicted.

**B. Claim Two: Mr. Harris Was Deprived of His Right to the Effective Assistance of Counsel and to a Fair Trial and Reliable Determination of Guilt by Trial Counsel's Prejudicially Deficient Performance**

1. Introduction

Despite the availability of defenses that would have held the prosecution to their burden of proof, including challenges to the unprofessional crime scene investigation at Van Nuys Park and the existence of compelling evidence that Mr. Harris was misidentified by the eyewitnesses to the park shooting, trial counsel failed to conduct a timely and adequate investigation to challenge the prosecution's evidence. Trial counsel also failed to investigate and present evidence that Mr.

154

Harris's severe mental impairments, as described in Claim One, prevented him from forming the requisite intent for first degree murder and robbery at the time of the alleged offenses. Trial counsel's errors and omissions were such that a reasonably effective attorney acting as a diligent and conscientious advocate would not have performed in such a fashion. Reasonably effective counsel handling a capital case at the time of Mr. Harris's trial would have conducted a thorough investigation of the prosecution's theories of guilt, reviewed and considered all potential defenses; and developed and presented a coherent and persuasive defense. To that end, reasonably effective counsel would have investigated Mr. Harris's background and family history, including evidence of his cognitive, psychiatric, emotional, and social difficulties and impairments and the impact of those deficits on his functioning and behavior on the day of the charged offenses.

Trial counsel's failure to investigate and adequately present a defense and protect Mr. Harris's statutory and constitutional rights were prejudicial. As a result of trial counsel's failures, Mr. Harris's confinement and judgment of conviction were unlawfully and unconstitutionally imposed in violation of his rights to the effective assistance of counsel; a trial by a fair and impartial jury; a reliable, fair, non-arbitrary, and non-capricious determination of guilt; the presentation of a defense; confrontation and compulsory process; the privilege against self-incrimination; the enforcement of mandatory state laws; a trial free of materially false and misleading evidence; a fair trial; an impartial and disinterested tribunal; equal protection; due process of law; and a fair and objective judicial determination pursuant to Penal Code section 190.4, subdivision (e) as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; Article I, sections 1, 7, 9, 12, 13, 14, 15, 16, 17, 24, 27, and 28 of the California Constitution and other mandatory state rules, statutes, and decisional law, and international law as established by treaties, customary law, human rights

1  law, including Article 14 of the International Convention on Civil and Political

2  Rights, and under the doctrine of *jus cogens*.

3      2.    Summary of Applicable Law

4      The Sixth Amendment to the United States Constitution guarantees a

5  criminal defendant the right to the assistance of counsel. *Strickland v. Washington*,

6  466 U.S. 668, 687 (1984). "It has long been recognized that the right to counsel is

7  the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S.

8  759, 771 n.14 (1970).   This right extends to every critical stage of a criminal

9  proceeding against a criminal defendant. *See, e.g., Lafler v. Cooper*, 566 U.S. 156,

10  165 (2012); *Missouri v. Frye*, 566 U.S. 134, 140 (2012); *United States v. Cronic*,

11  466 U.S. 648, 659 (1984).

12      Under *Strickland*, trial counsel is constitutionally ineffective when (1) trial

13  counsel's performance was deficient and (2) the deficient performance prejudiced

14  the defense.   466 U.S. at 687.   Deficient performance is representation that falls

15  "below an objective standard of reasonableness," where "reasonableness" is

16  determined by "prevailing professional norms" that are "reflected in American Bar

17  Association standards and the like." *Strickland*, 466 U.S. at 688-89; *see also, e.g.,*

18  *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (ruling that ABA guidelines are "well-

19  defined norms" to which the Court has long referred as guides for determining

20  reasonableness).   According to the ABA Guidelines in effect at the time of Mr.

21  Harris's trial, "[t]he investigation for preparation of the guilt/innocence phase of

22  the trial should be conducted regardless of any admission or statement by the client

23  concerning  facts  constituting  guilt,"  1989  ABA  Guidelines  §  11.4.1(B).

24  Reasonably effective counsel representing a capital defendant at the time of Mr.

25  Harris's trial therefore knew that a thorough investigation of the prosecution's

26  theory and evidence of guilt; independent analysis of the evidence supporting that

27  theory; a review and examination of law enforcement's investigation; and research

28

156

1   and examination of testifying witnesses were necessary to the development and

2   presentation of a defense at trial.  Trial counsel's duties in this regard included an

3   obligation to fully investigate, develop, and present coherent and consistent

4   evidence to challenge the prosecution's case.  *See, e.g.*, 1989 ABA Guidelines,

5   Guideline 11.4.1; FHP Exh. 3 (Declaration of James Thomson) at ¶¶ 21, 25-26;

6   FHP Exh. 2 (Declaration of Jeffery Aaron) at ¶¶ 10-13, 15-19.

7        Counsel's "strategic choices made after less than complete investigation are

8   reasonable precisely to the extent that reasonable professional judgments support

9   the limitations on investigation.  In other words, counsel has a duty to make

10   reasonable investigations or to make a reasonable decision that makes particular

11   investigations unnecessary." *Strickland*, 466 U.S. at 690-91; *In re Marquez*, 1 Cal.

12   4th 584, 602 (1992) (holding that "before counsel undertakes to act, or not to act,

13   counsel must make a rational and informed decision on strategy and tactics

14   founded upon adequate investigation and preparation").  That is, "[i]n assessing the

15   reasonableness of an attorney's investigation, . . . a court must consider not only

16   the quantum of evidence already known to counsel, but also whether the known

17   evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539

18   U.S. at 527.

19        Prejudice is established when there is a reasonable probability that, but for

20   counsel's deficient performance, the result of the proceeding would have been

21   different. *Strickland*, 466 U.S. at 694.  In making the prejudice determination, a

22   court "must consider the totality of the evidence" before the finder of fact.

23   *Strickland*, 466 U.S. at 695-96; *see also Williams v. Taylor*, 529 U.S. 362, 397

24   (2000).

25        3.   Trial Counsel Performed Deficiently at the Guilt Phase of Mr. Harris's

26   Trial.

27        The facts and legal bases for this claim, in addition to those that will be

28

Petition for Writ of Habeas Corpus

presented after Mr. Harris's counsel are afforded a reasonable opportunity for full factual investigation, adequate funding and resources, complete discovery as required by the United States and California Constitutions and Penal Code section 1054.9 and other California law, access to this Court's subpoena power and other means of discovery, access to material witnesses, access to this Court's processes, and an evidentiary hearing, include but are not limited to the following:

The facts, allegations, supporting exhibits, and citations contained in each and every claim in this Petition are incorporated by this reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

On August 7, 1991, a gunman wielding a .32 caliber gun shot and killed Julian Contreras in Van Nuys Park in Van Nuys. When police arrived on the scene they spoke to various witnesses and collected items from the crime scene, but their investigation produced little physical evidence and no leads as to the identity of the shooter and second suspect. The investigating officers did not recover the murder weapon but booked into evidence two .32 caliber shell casings, a .32 caliber bullet, miscellaneous clothing, and a minor amount of U.S. currency. Also, a .32 caliber bullet was recovered by medical staff from Mr. Contreras's body. SHP Exh. 112 at 651-52.

One day after the shooting, a relative of Mr. Contreras telephoned the police and informed them they had found his wallet in the park. On the same day it was found, investigating officers released it to family members after inspecting it. SHP Exh. 112 at 635. On August 14 and again on August 16, 1991, eyewitness Roberto Sanchez Lozano brought to the police two .32 caliber shell casings he claimed to have found in the park. SHP Exh. 112 at 650-51. The little evidence collect from the crime scene was not forensically examined. Investigating officers did not request fingerprint or ballistics analysis on the shell casings, bullets, clothing, or wallet. 11 RT 1543-44. Other than this evidence, the investigating officers did not

158

1   recover any physical evidence from the park murder scene.

2       For almost two months, the paucity of evidence left the police unable to

3   arrest anyone for the killing. Then, in October 1991, an offer of a $15,000 reward

4   prompted Delsie Noble, a homeless individual with prior convictions and a history

5   of drug addiction who spent time at the park where Mr. Contreras was killed, to

6   immediately come forward and name Mr. Harris as the shooter. In response to this

7   information, Mr. Harris was arrested but did not make any statements regarding his

8   alleged involvement in Mr. Contreras's murder.

9       The prosecution's evidence at trial was limited to eyewitness identifications

10   of Mr. Harris made after witnesses participated in several suggestive lineup

11   procedures, and after the eyewitnesses had identified other individuals as the

12   perpetrator of the crime. In addition to informant Noble, the prosecution presented

13   two other informants, one of whom recanted his prior incriminating statements

14   made against Mr. Harris obtained under coercion by police and refused to identify

15   him as the shooter, while the other disavowed some of his incriminating statements

16   he made to police and acknowledged a history of animosity between his family and

17   that of Mr. Harris.

18       In preparation for Mr. Harris's trial, defense counsel delegated most of the

19   investigation to an investigator and a paralegal. SHP Exh. 101 at 529-34 (Trial

20   Counsel Declaration for Funds Request). Trial counsel's records reflect that he

21   directed his investigator to interview the eyewitnesses, Mr. Harris's wife and

22   mother, parole agent Steve Ross, alibi witnesses Johnny Hayes, as well as potential

23   suspects Johnny Garcia, Loyal Myart, Jason McCallister, and informant Robert

24   James, Jr. FHP Exh. 58 (Investigation Requests by Trial Counsel) at 3070-76.

25       a.   Trial counsel's failure to move to sever the Rodriguez homicide

26   from the Contreras homicide constituted prejudicially deficient performance.

27       The information alleged that Mr. Harris had committed two homicides. 1

28

CT 150-51. First, the murder of Marta Rodriguez was alleged to have occurred in the early morning hours of January 3, 1991, just outside a Winchell's Donut store near the Los Angeles Coliseum. The cause of death was a stab wound to the heart inflicted by a lone assailant. The sole witness was the victim's daughter Alba Rodriguez who observed the incident from inside the franchise. 15 RT 2125-34, 2143-44, 2162.

Second, the murder of Julian Contreras was alleged to have occurred shortly after 8:30 or 9:00 p.m. on August 7, 1991, at Van Nuys Park on Vanowen Street in Van Nuys. It was alleged that after a dispute with a group of Latino men who were playing cards in the park, two African American men, one armed with a handgun, shot and killed Mr. Contreras and took the wallets of some of the Latino men. 12 RT 1556-60, 1575-80. Eyewitnesses ultimately identified Mr. Harris as the shooter at a live line up after informant Delsie Noble implicated Mr. Harris in the murders in exchange for $15,000 in reward money. 12 RT 1561, 1708, 1728-29; 13 RT 1831, 1848-49, 1929-30, 1957-58; 15 RT 2076-77; 13 RT 1795, 1802.

On October 8, 1991, Mr. Harris was charged with the murder of Mr. Contreras. SHP Exh. 112 at 607; 1 CT 150. Mr. Harris was not a suspect in the Rodriguez incident until eleven months after the crime occurred. On November 18, 1991, a detective investigating that incident thought that the composite drawing of the suspect charged in the Contreras incident resembled the drawing of the suspect in the Rodriguez incident and this became the basis for Mr. Harris's arrest on murder charges arising out of that incident. 15 RT 2136-37.

Under California law, "[e]ven where joinder is permitted by the statute, the trial court has express discretion to sever counts 'in the interest of justice.'" Cal Evid. Code § 954; *People v. Balderas*, 41 Cal. 3d 144 (1985). Joinder of two unrelated murder counts is improper when there is a substantial danger of prejudice; relevant factors to consider are the cross-admissibility of evidence and

Petition for Writ of Habeas Corpus

the relative strength of the evidence for the joined counts. *People v. Ruiz*, 44 Cal. 3d 589, 605-07 (1988). Misjoinder of counts may also rise to the level of a constitutional violation "if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986).

In Mr. Harris's case, joinder of two completely unrelated murder counts deprived him of a fair trial. The similarities between Mr. Contreras's murder and that of Ms. Rodriguez were only of a general nature, applicable to many homicides, namely that suspects in the Rodriguez and Contreras murders were described as African American males, both victims in the crimes were Latino, and both crimes involved a homicide. By contrast, there were numerous differences between the two incidents that weighed heavily against a joint trial. Those differences included, but were not limited to:

1) Ms. Rodriguez' case was a weak case involving a single eyewitness while the Contreras case was arguably a stronger case involving five eyewitnesses and informant testimony. *Williams v. Superior Court*, 36 Cal. 3d 441, 452 (1984).

2) The victims in the two homicides were different genders.

3) The crimes occurred at different times of the day and in different settings. Ms. Rodriguez' murder happened in the early morning hours at a donut shop, and Mr. Contreras's killing occurred in the middle of the evening in a public park where a number of people were present. 12 RT 1702; 15 2161-62.

4) The crimes occurred in different geographical locations that had no connection. The Rodriguez crime occurred in Los Angeles near the Coliseum whereas the Contreras crime occurred in the San Fernando Valley in Van Nuys. 12 RT 1702; 15 RT 2143-44.

5) One person carried out the Rodriguez crime while there were

Petition for Writ of Habeas Corpus

1    two suspects involved in the Contreras crimes.  12 RT 1712; 15 RT 2156- 2163.

2           6)    The prosecution conceded there was no known motive for the

3    Rodriguez murder while the prosecution believed that robbery was the motive for

4    the Contreras crime.  1 RT 142; 19 RT 2804-05.

5           7)    The crimes involved the use of different weapons.    Ms.

6    Rodriguez's assailant used a knife while Mr. Contreras was killed with a handgun.

7    12 RT 1577-81; 15 RT 2151.

8           8)    The manner of confrontation was very different in each case.

9    Ms. Rodriguez was confronted in a very isolated situation whereas Mr. Contreras

10    was confronted in a very public setting.  Ms. Rodriguez' assailant accosted her in

11    the early morning hours as she approached the door of a donut shop that was empty

12    of customers.  15 RT 2156-63.  Mr. Contreras, on the other hand, was confronted

13    after the suspect spoke with a group of men, including Mr. Contreras, in a public

14    park, and was killed only after the suspect returned a short time later, who then

15    stole items from several people.  12 RT 1577-81.

16        Despite the obvious lack of similarities between the two homicides, trial

17    counsel did not move to sever the murder counts.  Severance was constitutionally

18    required because joinder of the murder charges presented a "substantial danger of

19    prejudice" to Mr. Harris and a denial of his rights to due process and a fair trial.

20    Counsel's failure to move to sever therefore constituted ineffective assistance of

21    counsel.

22        Trial counsel's stated reason for not moving to sever the two murder counts

23    was his belief that if both homicides were presented to the jury at the same time,

24    the jury might not be so quick to impose the death penalty, since they would be

25    confronted with a situation of evaluating murder charges with weaker and stronger

26    evidence of Mr. Harris's involvement.  SHP Exh. 100 at 528 (Trial Counsel's

27    Severance Memo).  This decision was objectively unreasonable because trying the

28

Petition for Writ of Habeas Corpus

two murders together made it more likely Mr. Harris would be convicted of both murder counts, which then made him eligible for an additional special circumstance finding of multiple murder, thus making it more likely, not less, that he would be sentenced to death. 20 RT 2969-70 (instructing jury as to both the multiple murder and robbery special circumstances).

Trial counsel also erroneously concluded that if a severance motion was granted the prosecution would use the Rodriguez incident as a factor in aggravation. SHP Exh. 100 at 528. Trial counsel failed to consider that even if the jury did not convict Mr. Harris on the Rodriguez count, the prosecution could still present the conduct underlying the incident as evidence in aggravation. Indeed, this is precisely what happened. The jury hung as to the count involving Ms. Rodriguez, 28 RT 3 861, but during the penalty phase, the prosecution urged the jurors who had been in favor of finding Mr. Harris guilty of the Rodriguez incident to consider it as evidence in aggravation. The prosecutor argued to the jury in her opening penalty phase argument as follows:

> The second thing [aggravating factor] is the presence or absence of criminal activity by the defendant other than the crimes for which he has been tried in the present proceedings which involve the use or attempted use of force or violence or the express or implied threat to use force or violence.

27 RT 3691-92.

After recounting the evidence of other acts of violence, the prosecutor continued:

> The last part of criminal behavior you can consider is the murder of Marta Rodriguez.

> Even though you did not convict the defendant of that murder, those of you that were convinced beyond a reasonable doubt that he committed the murder may consider it because you will see when you are instructed that these prior criminal activities each of you needs to

be convinced beyond a reasonable doubt before you can consider them, but you do not have to unanimously agree.

27 RT 3692.

Some of you were convinced beyond a reasonable doubt clearly because you hung on that count.

So somebody, either ten of you or two of you, were convinced beyond a reasonable doubt.

Those of you that were may use that.

So for those of you that believe the defendant committed the murder of Marta Rodriguez, you will be going back to consider the penalty with the belief the defendant has actually committed two murders and that is proper and you may do so.

27 RT 3692-93.

In her closing penalty argument, the prosecutor again urged jurors to consider the Rodriguez incident as an aggravating factor:

If you vote for life in this case, the defendant will be executed in a much more humane way that Julian Contreras was executed or that he attempted to execute Alfredo Calleros – and for those that believe it – - the way that he executed Marta Rodriguez . . . . If you believe that he killed Marta Rodriguez. Some of you are going to go there thinking that he killed 2 individuals. Some are going to think he killed one.

28 RT 3804. Thus, trial counsel's stated objective of avoiding the very scenario that happened at Mr. Harris's trial was not a valid strategic reason for not moving to sever the murder counts.

As a result of counsel's failure to ask for severance, Mr. Harris was tried by a jury comprised of individuals who were prejudiced by the evidence presented regarding Ms. Rodriguez's murder, even if that evidence was weak and did not persuade all of them. A separate jury hearing only evidence related to the Rodriguez incident may have acquitted Mr. Harris. Had a different jury heard the evidence and hung, the impact of any evidence presented to this jury as evidence in

164

1    aggravation would have been less prejudicial because the second jury would not

2    have had the same investment in the outcome since they were not in the position of

3    having to decide whether he was guilty beyond a reasonable doubt of those

4    charges.  Instead, ten of Mr. Harris's jurors believed that he was involved in the

5    killing of Ms. Rodriguez after considering the evidence related to both victims.

6    Their presence on the jury may have affected their verdict as to the Contreras

7    murder and certainly would have skewed the result in the penalty phase, denying

8    Mr. Harris his state and federal constitutional rights to an impartial jury.

9         Had trial counsel moved to sever, it is reasonably probable that his motion

10   would have been granted.  *United States v. Lane*, 474 U.S. at 446 n.8; *People v.*

11   *Balderas*, 41 Cal. 3d 144; *People v. Ruiz*, 44 Cal. 3d at 605-07.  Counsel's failure

12   to move for a severance therefore fell below an objective standard of

13   reasonableness for defense counsel in a capital case under prevailing professional

14   norms, prejudiced Mr. Harris, and had a substantial and injurious influence or

15   effect on the jury's sentencing determination.  *Strickland*, 466 U.S. 668.

16        b.   Mr. Harris was deprived of his right to the effective assistance of

17   counsel and to a fair and reliable determination of guilt by trial counsel's failure to

18   adequately voir dire the jurors and to adequately challenge instances of juror

19   misconduct.

20        Prospective jurors in Mr. Harris's trial were asked to fill out juror

21   questionnaires and trial counsel subsequently had an opportunity to question the

22   prospective jurors about their answers.  Five of the jurors who were eventually

23   seated indicated that they harbored "mild" bias against members of other ethnic

24   groups.  Other jurors expressed skepticism about whether a sentence of life without

25   the possibility of parole meant that the person would actually spend the rest of his

26   life in prison and appeared to have a preference for the death penalty.  Despite the

27   fact that these statements reflected a mindset that was incompatible with being a

28

165

fair and impartial juror in this case, as Mr. Harris was entitled to, trial counsel did not question these jurors to ascertain whether they could set aside their biases.

### Juror Renger

In her juror questionnaire, Juror Renger stated that she had a Master Degree in biological sciences, that she had a friend who was a Deputy Sheriff in Los Angeles County, that she knew Judge Dick Kolostian, and that a friend of hers had been raped prior to Juror Renger knowing her. She indicated that when a person intentionally kills two or more people she doubted that the person had any inherent goodness. In response to questions about sentences of life without the possibility of parole (LWOP), Juror Renger noted she did not believe LWOP was a severe punishment and felt the death penalty was imposed too seldom. 2 CT 22-249.

During voir dire, the trial court briefly questioned Juror Renger about her beliefs regarding LWOP, and while the juror acknowledged that LWOP was a serious punishment, the totality of her comments raised more questions than they provided answers. 7 RT 794-95.

Although trial counsel expressed concern that Juror Renger did not believe LWOP was a severe punishment, his voir dire did not explore with her why she held that belief and limited his questions to whether she could weigh aggravating and mitigating evidence in the penalty phase before voting for a sentence. Once she answered that she could, trial counsel ceased his questioning despite the obvious red flags. 7 RT 933-835. Counsel did not question this juror about concerns noted in his file that Ms. Renger "seems liberal minded but not in views toward blacks – seems resentful of them." FHP Exh. 55 (Excerpt from Trial Counsel's Juror Notes) at 3048. Counsel's voir dire of Juror Renger was objectively unreasonable as it failed to even ascertain the juror's ability to follow the court's instructions in either phase of Mr. Harris's trial or whether she harbored bias against Mr. Harris that she was unable to set aside.

Petition for Writ of Habeas Corpus

Counsel also rendered deficient performance by failing to challenge for cause or exercise a peremptory challenge to excuse Juror Renger. Competent counsel would not have accepted a juror who did not believe LWOP was a severe punishment and was "resentful" of people who shared Mr. Harris's race. As counsel only exercised eleven out of twenty available peremptory challenges, counsel had sufficient peremptory challenges to excuse this juror and every other juror who did not believe that LWOP was a severe punishment or harbored racial bias. 11 RT 1499. Petitioner was prejudiced by counsel's deficient performance because studies have shown that death-prone jurors such as Juror Renger are more likely to find a person on trial guilty of the charges. *See, e.g.*, Susan D. Rozelle, *The Principled Executioner: Capital Juries' Bias and the Benefits of True Bifurcation*, 38 Ariz. St. L. J. 769, 777-93 (2006).

Juror Ilejay

In his questionnaire, Juror Ilejay stated that he was the father of three children, had some college experience and had been the victim of a burglary and car theft. Juror Ilejay described the burden of proof in a criminal case as "preponderance of doubt," and stated that he would not test the credibility of a police officer in the same way as other witnesses, and that he would automatically accept everything an expert said merely because they were an expert. In response to the LWOP and death penalty questions on the questionnaire, Juror Ilejay offered many conflicting and confusing responses, including expressing concern that LWOP was too costly of a punishment. 6 CT 1603-32.

The trial court questioned Juror Ilejay about his answers. For the most part, Juror Ilejay responded that his questionnaire answers were a mistake. He claimed to have mixed up the burden of proof, to have been mistaken when he answered that he would be reluctant to view some of the evidence, and to have been mistaken when he said he would not test the credibility of a police officer in the

167

same way as other witnesses.  Contrary to his answers on the questionnaire, Juror Ilejay claimed that he would consider background information in reaching a penalty verdict and had simply misunderstood the question.  Juror Ilejay reiterated his concerns that LWOP was a costly punishment, however after the trial court informed him that cost was not an element the jury could consider, he characterized his concerns as merely "general" concerns.  10 RT 1425-29.

Trial counsel expressed concern that Juror Ilejay's questionnaire answers suggested problems in his ability to follow the law and sit as a fair and impartial juror and.  FHP Exh. 55 at 3048.1.  Juror Ilejay's answers to the court's voir dire, *i.e.* his admission of mistakes without explanation and his acknowledgment of the "correct" answers the court was seeking, did nothing to alleviate trial counsel's concerns.    Yet, remarkably, trial counsel made no attempt to clarify the contradictory and confusing responses offered by Juror Ilejay and did not ask Juror Ilejay any voir dire questions.  11 RT 1467.

This failure and the failure to use a peremptory to excuse a potentially biased and unqualified juror constituted prejudicially deficient performance.  At the very least, counsel should have questioned Juror Ilejay as to his contradictory answers regarding his view of the burden of proof, the credibility assessment of witnesses, and his concerns about LWOP sentences.

Juror Gardner

On her questionnaire, Juror Gardner stated that she had some college experience, that a drunk driver had killed her mother, and that she had previously served as a juror on four different cases.  10 CT 2692-719.

Although trial counsel expressed concern that Juror Gardner did not thoroughly answer the questions, and that the answers she did provide were very short, not insightful, and made it very difficult to discern what Juror Gardner believed with respect to the criminal justice system generally, and the death penalty

168

and LWOP in particular, counsel conducted only a cursory and superficial voir dire of Juror Gardner relating solely to her prior jury service. 10 RT 1377- 1378; FHP Exh. 55 at 3046.

Trial counsel's failure to question Juror Gardner about her incomplete and cursory answers on the questionnaire constituted deficient performance. Mr. Harris was also prejudiced by counsel's failure to exercise a peremptory challenge with respect to a juror about whom he knew so little that it was impossible to assess her ability to be fair and unbiased. 11 RT 1499.

Juror Rueda

On his questionnaire, Juror Rueda stated that he was married and the father of four children. Juror Rueda noted he was born in Mexico and currently worked as a postman. Juror Rueda explained that he was not sure he would consider "background" (*i.e.* mitigating) information in reaching a penalty verdict and admitted that if he disagreed with the court's instructions he would not be able to follow the instructions. 9 CT 2499-527.

During voir dire, the trial court questioned Juror Rueda about some of his answers. The court asked the juror if he really would not consider background information in reaching a penalty verdict. Juror Rueda responded that he would "possibly" be able to give it consideration. The court continued to ask Juror Rueda leading questions regarding his consideration of background information until Juror Rueda finally responded that he could envision a set of circumstances where LWOP was the appropriate punishment and a set of circumstances where a sentence of death was the appropriate punishment. The court also questioned Juror Rueda's response to a question about whether he considered his contacts with law enforcement or the criminal justice system to have been pleasant or rewarding, and Juror Rueda stated that an unspecified "incident" would not affect his deliberations in Mr. Harris's case. The court also questioned Juror Rueda regarding his negative

Petition for Writ of Habeas Corpus

responses to questions on whether he could put aside penalty issues during the guilt phase and whether he could follow the instructions provided by the court. Juror Rueda explained that his questionnaire answers were a mistake and of course he would not consider penalty issues during the guilt phase and would follow the court's instructions even if he disagreed with them. 9 RT 1217-19.

Prior to voir dire of the juror, trial counsel expressed uncertainty about Juror Rueda and felt he needed to observe him in voir dire before he could make a decision. On voir dire, however, trial counsel asked Juror Rueda just one question relating to the weight he would give to the testimony from the Latino witnesses. Despite Juror Rueda's problematic questionnaire responses and his noncommittal response to the court's leading questions regarding his ability to consider "background" information or aggravating/mitigating circumstances, trial counsel did not ask Juror Rueda for clarification on his position regarding these issues. Trial counsel also failed to ask Juror Rueda to elaborate on his bad experience with law enforcement or the criminal justice system. Trial counsel did not voir dire Juror Rueda to determine whether he in fact could consider the law and instructions or whether he truly believed his questionnaire answers had been a mistake. In short, trial counsel made no effort to meaningfully voir dire Juror Rueda to enable him to make an informed decision about whether to exercise a peremptory to excuse the juror. 10 RT 1289. That failure prejudiced Mr. Harris because he was left with a juror who was potentially biased against him and unable to follow the court's instructions.

Juror Nesbitt

Juror Nesbitt stated in his questionnaire that he had served in the United States Army, had college experience and had prior civil and criminal jury experience. In response to questions about LWOP, he stated that he believed LWOP meant that a person may not spend the rest of his life in prison. Juror

Nesbitt stated he believed in "an eye for an eye," although he did not believe in it literally, and that he would have to force himself to put aside any thoughts of punishment during the guilt phase. 12 CT 3288-317.

The voir dire of Juror Nesbitt was very brief. The court questioned him regarding his prior jury service and elicited a recantation from him regarding his belief that LWOP did not mean life in prison for the rest of one's natural life. 8 RT 978-79.

Trial counsel asked Juror Nesbitt just one question. He asked whether Juror Nesbitt, given his prior jury service, was aware that "there is a difference between the burdens of proof necessary in a civil versus criminal trial." Juror Nesbitt responded that he was aware of the difference but trial counsel did not ask the juror to articulate that difference. 9 RT 1013-14. Trial counsel asked no questions at all about Juror Nesbitt's feelings about the death penalty and LWOP.

This cursory voir dire of a juror who was eventually seated constituted prejudicially deficient performance. Trial counsel failed to ascertain whether the Juror's belief in an "eye for an eye" and that an LWOP sentence did not mean a person must spend the rest of his life in prison biased the juror against Mr. Harris. Counsel also rendered deficient performance by failing to clarify what Juror Nesbitt meant when he answered that he would have to force himself to put aside any thoughts of punishment during the guilt phase.

Counsel's additional failure to exercise a peremptory challenge prejudiced Mr. Harris because it left him with a juror who was conviction prone due to his difficulty setting aside considerations of punishment during the guilt phase and his belief in the concept of "an eye for an eye" and lack of confidence in the finality of an LWOP sentence. *See, e.g.,* Susan D. Rozelle, *The Principled Executioner: Capital Juries' Bias and the Benefits of True Bifurcation*, 38 Ariz. St. L. J. 769, 777-93 (2006). Indeed, the jurors discussed their belief that prisoners get out of

Petition for Writ of Habeas Corpus

1  prison even though they have been sentenced to LWOP.  FHP Exh. 52 (Declaration

2  of Marci Pantiliat) at ¶ 20.

3      Juror McGowan

4      Juror McGowan indicated in her questionnaire that she was divorced,

5  disabled and self-employed as a photojournalist.  She had college and trade school

6  educational experience and was an active member in the Republican Party.  Juror

7  McGowan, in her past, had on different occasions observed or been affected by

8  violent crime.  Her aunt was murdered during a robbery, Juror McGowan had been

9  the victim of rape and sodomy, and she observed the father of a child she was

10  babysitting shoot the mother of the child following a drunken argument.

11      Juror McGowan indicated in her response to various LWOP questions that

12  she did not believe an LWOP sentence meant a person would stay in prison for the

13  remainder of his natural life.  She explained that LWOP "is the most harsh

14  punishment possible – however when new officials come into office and make new

15  laws, this sentence might be changed."  Juror McGowan further stated "If they do

16  indeed stay there- the thought of being in prison 'forever' is unbearable."  The

17  notion that LWOP does not mean LWOP was again raised in Juror McGowan's

18  response to question 102C where she stated that LWOP was only a deterrent "If it

19  was a dead-sure thing that they would be kept there, no matter who was governor."

20  7 CT 1813-42.

21      On voir dire, Juror McGowan was not questioned at all about her belief that

22  LWOP did not mean LWOP.  The trial court asked her about her prior experience

23  as a photographer with the Sheriff's Department, and about the effect of her aunt's

24  death, the rape committed against her, and her son's drunken disturbance arrest, if

25  she were chosen as a juror.  11 RT 1450-52.

26      Trial counsel's voir dire was also very limited.  Counsel asked whether the

27  juror could put her aunt's murder out of her mind given that it occurred during a

28

172

robbery and Mr. Harris was also charged with committing a murder during a robbery. Trial counsel asked the juror why she thought the death penalty was seldom imposed, and he asked about her disability. 11 RT 1473-75.

Counsel rendered deficient performance by failing to conduct a reasonably thorough voir dire, particularly about Juror MeGowan's answers to questions about LWOP, indicating she did not believe LWOP meant life in prison for the rest of one's natural life. Competent counsel would have explored these answers because it was known at the time of Mr. Harris's trial that jurors who believe LWOP means a person will die in prison as opposed to being released is more likely to impose an LWOP sentence rather than the death penalty. *See, e.g.*, Finn, *Given Choice, Va. Juries Vote For Life; Death Sentences Fall Sharply When Parole Is Not An Option*, (Feb. 3, 1997); Washington Post at A1; Dieter, *Sentencing For Life: Americans Embrace Alternatives to the Death Penalty*, Death Penalty Information Center (Apr. 1993). Furthermore, Juror MeGowan's answers revealed a potential bias due to her experiences with violent crime and her potential difficulty following the court's instructions about how to determine the proper punishment.

Trial counsel further rendered deficient performance by not exercising a peremptory challenge to excuse Juror MeGowan. No constitutionally competent counsel would have allowed a juror to sit in a capital case who repeatedly expressed skepticism about the lesser available punishment and potentially harbored bias due to her multiple experiences with violent crime. Consistent with her questionnaire responses, Juror MeGowan told trial counsel's paralegal in a post-trial interview that during deliberations the jurors considered that LWOP could never mean what it says because there were several ways a person could get out of prison if they had an LWOP sentence, including a change in administrations, an escape, or a natural disaster such as an earthquake. FHP Exh. 52 at ¶ 20.

Juror Reed

173

Juror Reed stated on his questionnaire that he was a practicing engineer. He had a brother-in law who was a policeman and another brother-in-law who had been robbed at gunpoint. In response to questions about potential racial bias, Juror Reed indicated that he harbored "mild" bias, admitting that "as a child and to some extent as an adult I have associated crime areas with the Black areas of the community." He admitted that he had no contact whatsoever with the Black community in Southern California and his only information about that community came from "television and radio talk shows." He tried to counter his bias by trying to "disregard the overexposure of Black crime in the media." He felt the seriousness of the case would require him to look beyond his own prejudices and negative attitudes, and he did not look forward to participating in Mr. Harris's trial. 5 CT 1322-23. His response to a question about his views on mitigating evidence was that such background evidence was relevant only "to some extent." Juror Reed further indicated he would consider the appellate process in making a penalty determination, noting that the death penalty was imposed "too seldom" because the "appeal process seems to deter completion of the penalty process." 5 CT 1310-39.

Trial counsel expressed concern that Juror Reed was too conservative to be on the jury. Trial counsel's limited voir dire did nothing to dispel that concern. Trial counsel asked Juror Reed whether his view that a person convicted of a crime "should pay the price that the victim paid," meant the death penalty should be automatic. Juror Reed answered "no' and trial counsel asked no further clarifying questions. 8 RT 918-19.

Trial counsel rendered deficient performance by failing to question this juror about his prejudices, his consideration of the appellate process in making a penalty determination, and the limited consideration he would give mitigating evidence. Given the jurors answers in his questionnaire, counsel also rendered deficient performance by failing to exercise a peremptory challenge. No reasonable attorney

174

would fail to dismiss a juror who admitted harboring racial bias against African Americans, clearly held strong pro-death penalty views that also made him more likely to be conviction prone, and who would fail to give full consideration to the evidence in mitigation. Any reasonable attorney would have recognized these red flags as requiring the use of a peremptory challenge.

Juror McGraw

Juror McGraw stated on her questionnaire that she was a high school graduate and worked in the area of accounts receivable. Her son had been the victim of a shooting while he was driving, causing him to total his car. While candidly admitting she had never given much thought to the consideration of background information in deciding punishment, she stated she would only consider aggravating and mitigating circumstances in certain cases. 2 CT 710-39.

The trial court briefly questioned Juror McGraw about whether her husband's DUI arrest and her prior jury service would affect her ability to serve as a juror. 7 RT 805.

Trial counsel asked no questions of this juror and thereby rendered deficient performance because any reasonable attorney would have asked questions to ascertain whether this juror was conviction prone and unlikely to impose a sentence other than death. 8 RT 828-37.

Juror Simon

On her questionnaire Juror Simon stated that she grew up in the South (where she witnessed racial prejudice), attended the Police Academy, and was in therapy with a psychologist. In response to questions about attitudes toward members of other "ethnic groups," she stated she had "mild" racist or negative attitudes toward other ethnic groups that she characterized as "learned behavior." 12 CT 3377-406. Although the juror also indicated that she did not harbor bias against Black people and could be fair, her responses at least raised the inference

1    that she in fact harbored such bias. 12 CT 3389

2        The trial court briefly questioned Juror Simon about law enforcement classes
3    she had taken and about whether she would be affected as a result of an incident
4    where she found it necessary to call the police. 8 RT 985.

5        Trial counsel believed he needed to learn more about Juror Simon through
6    voir dire because she had not provided enough detailed information in her
7    questionnaire. Yet, counsel did not ask any questions of Juror Simon. 9 RT 1015.
8    His failure to inquire about her prejudicial beliefs that may have deprived Mr.
9    Harris of his right to be tried by an impartial, unbiased jury, constituted
10   prejudicially deficient performance, as did counsel's failure to exercise a
11   peremptory challenge given the red flags in her questionnaire.

12       Juror McDonald

13       In her questionnaire, Juror McDonald stated that she had some college
14   experience and maintained strong personal Christian beliefs. She had known
15   California Highway patrolmen and her nephew had once been an attorney at the
16   United States Attorney's Office. Juror McDonald had financial concerns regarding
17   jury participation noting that she could sit as a juror only as long as her employer
18   continued to pay her. She stated "I am self supporting & need to work." Juror
19   McDonald noted that she harbored "mild" racist or negative attitudes toward other
20   ethnic groups, and stated that her friends growing up "had to be WASPs." Juror
21   McDonald indicated that she felt discrimination against White people impacted her
22   life, stating "Now I sometimes feel in the job market that I am denied." 6 CT
23   1753-82.

24       Juror McDonald's responses to questions about LWOP questions suggested
25   that she preferred the death penalty and did not believe LWOP meant lifetime
26   incarceration ("Where there is life, there is hope (of escaping punishment), I
27   think."). Juror McDonald stated that LWOP was a severe punishment only in

28

certain situations: "I've never been in a prison, but I have seen some 'represented' as not as bad as having to be a responsible, wage earning, bill paying citizen." 6 CT 1753-82.

Despite these multiple areas of concern raised in Juror McDonald's answers in the questionnaire, her court voir dire consisted of just one question relating to her familiarity with persons in law enforcement. 11 RT 1448. Unbelievably given Juror McDonald's stated bias against members of other racial and ethnic groups and preference for White people, as well as her negative views on LWOP as a punishment, trial counsel did not ask Juror McDonald a single question. 11 RT 1459-75. This unprofessional failure to question the juror, challenge her for cause based on her express racial bias and/or to exercise a peremptory challenge to exclude her prejudiced Mr. Harris. Trial counsel's failures denied Mr. Harris his constitutional right to be tried by an impartial, unbiased jury.

Juror Lettelleir

On the questionnaire Juror Lettelleir stated that she had a college degree in sociology and she knew Judge Sanford Schulhoffer. She described herself as a "follower but not to the extent that I compromise myself," and as someone with mild racist or negative attitudes toward other ethnic groups. Her answers to the questions regarding LWOP were vague, confusing and contradictory. She stated she believed LWOP was a fair penalty for "specific cases" and was not a severe penalty for murder ("I don't think it is too severe – it may be the appropriate penalty based on the circumstances"). In answering another question about LWOP, she stated it was generally a severe penalty ("It is severe and should be used in such appropriate cases"). Juror Lettelleir also noted that "more severe punishment" was needed to control crime. 4 CT 921- 948.

The trial court asked a couple of non-death penalty related questions of Juror Lettelleir. 7 RT 817-18. Despite the judge's limited questioning, trial counsel did

177

not ask the juror any questions at all.  8 RT 828-37.  Juror Lettelleir's answers raised a question whether she believed LWOP would not be a sufficiently severe punishment in murder cases.  Again, trial counsel's failure to ask any questions about a juror's stated prejudicial beliefs or to exercise a peremptory challenge constituted deficient performance and deprived Mr. Harris of his right to an impartial jury.

Juror Georgilas

Juror Georgilas stated in his questionnaire that he had a college degree in history, spoke and read Greek, and had a cousin who was a reserve police officer. Juror Georgilas' questionnaire responses indicated a belief that background information should not necessarily be considered in determining the penalty verdict.  He acknowledged that background information was only "somewhat" important and stated: "A persons [sic] history is part of who they are.  But sentencing should be based mostly on the given facts of the particular crime in question."  Consistent with this answer, Juror Georgilas responded to another question that he believed that consideration of background information was just a "small part of the decision making process." 6 CT 1723-52.

During voir dire, the court questioned Juror Georgilas about whether his cousin being a reserve police officer would affect his ability to sit as a fair and impartial juror.  11 RT 1447-48.  Trial counsel expressed concern about Juror Georgilas' answers indicating he felt the death penalty was appropriate in certain types of crime without stating what crimes warranted the punishment.  Trial counsel was also uncomfortable with Juror Georgilas' responses indicating the juror would not give full consideration to background information (*i.e.* mitigation). Despite these critical areas of concern, trial counsel did not ask Juror Georgilas a single question, in contravention of prevailing professional norms requiring counsel to make sure that Mr. Harris was tried by jurors who were at least open to

considering mitigation evidence.  11 RT 1459-75.

In sum, trial counsel's failure to adequately question prospective jurors and to use available peremptory challenges to dismiss the multiple jurors who admitted they harbored bias against people of color, articulated skepticism about LWOP and appeared to have a preference for the death penalty, prejudiced Mr. Harris.  As a result of trial counsel's failures, Mr. Harris was tried by a jury that was conviction prone and included at least four people (Simon, Reed, McDonald and Lettelleir) who admitted to having attitudes of bias.  A majority of the seated jurors were not asked a single question by trial counsel who inexplicably accepted four jurors (Renger, Nesbitt, MeGowan and McDonald) who did not believe LWOP meant that Mr. Harris would remain in prison for the rest of his life and were therefore more likely to vote for death, with two additional jurors (McGraw and Lettelleir) expressing the view that LWOP was not a severe punishment.  Two other jurors' responses on this issue were vague and confusing and were never brought into focus due to trial counsel's abdication of his role as an advocate for Mr. Harris.  Trial counsel exercised only eleven of twenty peremptory challenges, so had no reason not to excuse the death prone, racially biased jurors that convicted and sentenced Mr. Harris to death.  11 RT 1499.

Trial counsel's failures rendered the trial proceedings fundamentally unfair and had a substantial and injurious effect in the determination of the jury's verdict, and unconstitutionally deprived Mr. Harris of a fair and reliable determination of guilt and penalty.

c.   Trial counsel prejudicially failed to move to strike the jury panel after a prospective juror made an improper and inflammatory remark against Mr. Harris in front of other prospective jurors.

During the jury selection process, a male prospective juror made an improper and inflammatory remark while turning in his questionnaire, stating, "we

1    will give him a fair trial and hang him." 6 RT 605-08. The court clerk who was
2    present when the remark was made believed three jurors, Mr. Ulrich, Mr.
3    Monahan, and Mr. Condelli looked similar to the man who made the remark, but
4    the clerk believed it was Mr. Monahan who actually made the remark. 6 RT 632.
5    Prospective Jurors Ulrich and Condelli denied making or hearing the remark. 6 RT
6    639-41. Prospective Juror Monahan denied making or hearing the remark but
7    admitted it was an expression he used from "time to time." 6 RT 633-34, 642-45.
8    The court, via written form, inquired of all other prospective male jurors in the
9    panel whether they made the remark, whether they heard the remark, and whether
10   the remark was a type of expression they used. All of the male jurors denied
11   making the remark, denied hearing it and denied ever using the phrase. 6 RT 642-
12   45, 653. The court concluded prospective Juror Monahan made the remark, and by
13   stipulation between the parties, he was excused from the panel. 6 RT 653-54; 8 RT
14   890.

15       Trial counsel's acquiescence to the removal of prospective Juror Monahan
16   without also moving to excuse the entire panel fell below the standard of care at
17   the time of Mr. Harris's capital trial. Although prospective Juror Monahan
18   acknowledged having used the expression occasionally in the past, he denied
19   making or hearing the remark. Thus, neither counsel nor the court could be sure
20   that he in fact was the one who had potentially tainted the jury panel. The only
21   way to be sure that the offending prospective juror was removed would have been
22   to excuse the entire panel.

23       Even if the court identified and removed the correct juror, there was still an
24   unacceptable risk that the panel was tainted by the racist comment because the
25   court limited its inquiry regarding the improper remark to male jurors. This may
26   have been a legitimate way to determine who *made* the remark, but it certainly was
27   insufficient to determine who *heard* it. There may have been female jurors on the
28

180

panel who heard and were improperly influenced by the remark. The group of 125 prospective jurors who could have heard the comment included five female jurors who were eventually selected to sit and found Mr. Harris guilty of capital murder (Jurors Renger, McGraw, McDonald, Gardner, and Lettlellier). 3 CT Supp. 620, 710; 4 CT Supp. 921; 6 CT Supp. 1753; 10 CT Supp. 2692.

It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant the right to an impartial jury. *Ross v. Oklahoma*, 487 U.S. 81, 85-86 (1988). The presence of even one biased juror requires reversal. *Id.*; *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977). Reasonably effective counsel would have moved to excuse not only prospective Juror Monahan, but the entire panel. It was far from certain that Mr. Monahan was the person making the improper and inflammatory remark, leaving an unacceptable risk that a biased juror remained on the panel, and that the jury panel was tainted because the court did not ask female prospective jurors if they had heard the remark. Thus, there was no way to ensure that the improper and inflammatory remark did not taint the female jurors selected to sit in judgment of Mr. Harris. In addition, the comment's racist connotation invoking the lynching of a black man who was presumed guilty contributed to an environment of bias in which it was highly unlikely Mr. Harris received a fair trial.

Mr. Harris was prejudiced by trial counsel's failure to safeguard his right to a fair trial before an impartial jury and the error had a substantial and injurious effect on the jury's verdict. It is at least reasonably probable that a more favorable outcome would have been obtained had counsel sought to remove the tainted jury panel.

d. Trial counsel further performed deficiently by failing to investigate and present evidence that a juror who received threats during the guilt phase of Mr. Harris's trial was thereafter unable to function as an impartial and unbiased juror.

As alleged in Mr. Harris's appellate brief to the California Supreme Court and in Claim Four below, the trial court erred in denying Mr. Harris's motion to excuse the guilt phase jury foreman after he had been threatened with death in an anonymous phone call received by the juror's father.  Mr. Harris incorporates the facts outlined in that argument by this reference.  As trial counsel argued in a New Trial Motion regarding the trial court's refusal to excuse Juror Georgilas after he received a death threat:

> Although a hearing was conducted in chambers, Mr. Georgilas [the juror] was clearly so upset by the series of events, coupled with his assumption re: this was the result of the trial, that the defense contends that it was error for the court to leave him as a juror, and that the jury should have begun deliberations anew. There is a great likelihood that these events affected Mr. Georgilas's fact-findings [sic] process, for he admitted his concern not only for his safety, but for his fathers. The verdict may not truly have been the result of his independent thought processes, but also the result of fear for personal safety.

> This is not the type of person [] should have remained on the jury, especially in light of the complexity and serious consequences of the trial.

2 CT 431.

Trial counsel was aware of evidence that could have corroborated this argument but inexplicably failed to request an evidentiary hearing about the matter, failed to advise the court of, and failed to include in Mr. Harris's New Trial Motion information that Juror MeGowan had advised the defense that Juror Georgilas' demeanor and participation in the jury process changed markedly after he received the death threat.  Prior to the death threat, Juror Georgilas had been very engaged in the deliberation process, but after he received the death threat, he pulled way back, just like a turtle in a shell and hardly spoke to anyone.  Before the threat he was very social with the other jurors but after the threat, he isolated himself from

182

the other jurors during breaks.  SHP Exh. 92 at 443-44 (Declaration of Marie McGraw); 2 CT 431.

When a trial court is aware of possible juror misconduct, the court "must 'make whatever inquiry is reasonably necessary'" to resolve the matter which may include an evidentiary hearing.  *People v. Hayes*, 21 Cal. 4th 1211, 1255-56 (1999); *People v. Hedgecock*, 51 Cal. 3d 395, 415- 416 (1990).  Reasonably effective counsel would have brought to the court's attention the fact that the death threat was obviously impacting Juror Georgilas' ability to sit as an impartial and unbiased juror and would have requested an evidentiary hearing to determine the scope of the death threat's impact on Juror Georgilas. Reasonably effective counsel would also have supported his New Trial Motion with the available corroborating evidence of Juror Georgilas' change in demeanor.

It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury. *Ross v. Oklahoma*, 487 U.S. at 85-86. The presence of even one biased juror requires reversal. *Id.*; *United States v. Hendrix*, 549 F.2d at 1227.

It is reasonably probable that the evidentiary hearing would have revealed that Juror Georgilas had become a biased and partial juror as a result of the death threat and that the court would have granted a new trial on that basis. Trial counsel was therefore ineffective for failing to investigate Juror Georgilas' behavior and failing to bring the apparent behavior change to the Court's attention.

Trial counsel had no valid strategic reason for his failures, which rendered the trial proceedings fundamentally unfair and had a substantial and injurious effect in the determination of the jury's verdict.  It is at least reasonably probable that a more favorable outcome would have been obtained had counsel challenged the juror's ability to remain impartial after his father received a death threat that he believed might have been related to his jury service in Mr. Harris's trial.

e.    Trial counsel unreasonably and prejudicially failed to investigate and challenge the unreliable eyewitness testimony against Mr. Harris.

Trial counsel unreasonably and prejudicially failed wholly or adequately to investigate, develop, and present evidence challenging the reliability of the prosecution's eyewitness identification evidence. At the time of Mr. Harris's trial in 1994, reasonably effective counsel knew or should have known that eyewitness evidence is highly unreliable and that there were conditions present in this case that cast doubt on the reliability of the eyewitness identifications. *See* FHP Exh. 2 at ¶ 17 ("Where counsel knew or should have known that the prosecution intended to present eyewitness testimony to establish his or her client's identity, and knew or should have known that there were conditions present that made the eyewitness's identification suspect, counsel was required to investigate and raise this issue.").

Jurists have long noted that eyewitness identifications are particularly susceptible to a range of environmental and psychological factors that can render them unreliable. Ninety-five years ago Justice Felix Frankfurter observed:

> What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent – not due to the brutalities of ancient criminal procedure.

Felix Frankfurter, The Case of Sacco and Vanzetti: A Critical Analysis for Lawyers and Laymen 30 (1927), quoted in United States v. Wade, 388 U.S. 218, 228 (1967).

And fifty-five years ago, the United States Supreme Court reiterated that "[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *Wade*, 388 U.S. at 228; *see also Wade*, 388 U.S. at 228 (eyewitness identification evidence is "peculiarly riddled with innumerable dangers and variable factors which might seriously, even

184

crucially, derogate from a fair trial"); *Perry v. New Hampshire*, 565 U.S. 228, 249-50 (2012) (Sotomayor, J., dissenting) ("This Court has long recognized that eyewitness identifications' unique confluence of features – their unreliability, susceptibility to suggestion, powerful impact on the jury, and resistance to the ordinary tests of the adversarial process – can undermine the fairness of a trial.").

At the same time that eyewitness identification evidence is especially susceptible to unreliability, it is also highly compelling evidence in the minds of jurors. As one court explained,

> There can be no reasonable doubt that inaccurate eyewitness testimony may be one of the most prejudicial features of a criminal trial. Juries, naturally desirous to punish a vicious crime, may well be unschooled in the effects that the subtle compound of suggestion, anxiety, and forgetfulness in the face of the need to recall often has on witnesses. Accordingly, doubts over the strength of the evidence of a defendant's guilt may be resolved on the basis of the eyewitness' seeming certainty when he points to the defendant and exclaims with conviction that veils all doubt, "[T]hat's the man!"

*Kampshoff v. Smith*, 698 F.2d 581, 585 (2d Cir. 1983) (internal footnote and citation omitted). Reasonably effective counsel at the time of Mr. Harris's trial, aware of the unreliable nature of eyewitness testimony in general, and aware of the particular facts suggesting that the witness identifications of Mr. Harris were unreliable, would therefore have investigated, developed, and presented evidence regarding the unreliability of the eyewitness identifications at trial.

Discovery provided to the defense included the names of several eyewitnesses to Mr. Contreras's murder: Jose Sanchez Lozano, Reynaldo Villatoro, Efren Reyes, Roberto Sanchez Lozano, Leopoldo Munoz, Juan Quijas and Alfredo Calleros. These witnesses identified Mr. Harris as the shooter from a live lineup and many of them later identified him in court during Mr. Harris's trial. Because there was no physical evidence connecting Mr. Harris to the Park shooting, trial

1    counsel expected the prosecution to rely heavily on the eyewitness identifications

2    obtained by law enforcement through several identification procedures, as well as

3    the testimony of three informants who came forward after the police department

4    offered a reward for information about the shooter.   Indeed, the prosecution's

5    theory regarding Mr. Harris's involvement in the commission of crimes at the park

6    depended almost entirely on eyewitness identifications of Mr. Harris.

7              1)    Trial counsel failed adequately to investigate the eyewitnesses.

8        Although trial counsel made some attempts to locate and interview the

9    eyewitnesses, by the time of trial, no one from the defense team had met face-to-

10    face with any of them.  The defense investigation yielded only a few very brief and

11    inconsequential telephonic interviews with some of the eyewitnesses, while others

12    were not spoken to at all.  However, the prevailing standard of care for capital

13    defense attorneys mandated that counsel interview all witnesses who provided

14    relevant statements to law enforcement, as well as others who may have possessed

15    knowledge about the circumstances of the crime. FHP Exh. 2 at ¶ 11.

16        Alfredo Calleros

17        Mr. Calleros testified that the gunman approached him first, tried to sell him

18    a camera and became angry when Mr. Calleros told him he had no money.  Mr.

19    Calleros picked up a milk crate to throw at the gunman when the perpetrator

20    attempted to pull a pole out of the ground near them. 13 RT 1831-32. The gunman

21    left but returned a short time later and again exchanged words with Mr. Calleros.

22    The suspect chased Mr. Calleros around a tree and then pointed and fired his gun at

23    him, but the gun failed to fire. 13 RT 1839-40. Mr. Calleros admitted that he had

24    consumed about six beers that evening. 13 RT 1863. Police reports indicate that

25    when officers attempted to interview Mr. Calleros and Mr. Munoz the day after the

26    shooting at around 7 p.m., they were "too drunk" to be interviewed. SHP Exh. 112

27    at 675; SHP Exh. 106 at 568; 14 RT 1864.

28

Petition for Writ of Habeas Corpus

1     As trial counsel was aware, Mr. Calleros carried a picture of Mr. Harris in

2    his pocket that had been published in the local newspaper when Mr. Harris was

3    arrested, and made a positive identification of Mr. Harris at a live lineup after

4    previously seeing a photo of Mr. Harris in a photo array and noting that the photo

5    resembled the shooter.  13 RT 1853-55.  Yet, trial counsel did not interview Mr.

6    Calleros and was unable to conduct an effective cross-examination of him.  Trial

7    counsel's investigator made only one unsuccessful attempt to locate Mr. Calleros

8    and there is no indication in trial counsel's files that he ever followed-up with his

9    investigator or made additional efforts to locate Mr. Calleros.

10      Jose Sanchez Lozano

11     Mr. Sanchez Lozano provided the police with two .32 caliber shell casings

12    about a week after the park shooting, claiming he had found the casings at the

13    crime scene.  SHP Exh. 112 at 654-55.  Mr. Sanchez Lozano later identified Mr.

14    Harris in a photo and live lineup and tainted the entire live lineup proceeding when

15    he shouted out and gestured that Mr. Harris was the perpetrator in the presence of

16    other eyewitnesses.  Despite the obvious importance of this witness, trial counsel

17    did not speak with Mr. Sanchez Lozano prior to his trial testimony.  Trial counsel's

18    records reflect no efforts to locate the witness or follow-up with his investigator

19    after his initial request that the investigator interview Mr. Sanchez Lozano.

20     Trial counsel's failure to conduct an adequate investigation of Mr. Sanchez

21    Lozano prevented counsel from effectively cross-examining him to impeach his

22    memory of the events at the park, including based on his intoxication at the time of

23    the crime and his inability to accurately observe the events.  Trial counsel's

24    inadequate investigation also prevented him from effectively challenging Mr.

25    Sanchez Lozano's identification of Mr. Harris based on the suggestiveness of the

26    photo and/or live lineup procedures and media exposure, and from learning

27    whether he harbored any racist views against African Americans or had

28

Petition for Writ of Habeas Corpus

1    information about the other suspect.

2          During cross-examination, Mr. Sanchez Lozano revealed that he believed he

3    had seen Mr. Harris in the park for several days prior to the shooting.  12 RT 1601-

4    1602.  Trial counsel questioned Mr. Sanchez Lozano about the fact that he could

5    not have seen Mr. Harris in the park at that time because Mr. Harris was in custody

6    until the day before the shooting.  SHP Exh. 112 at 646.  Had trial counsel

7    interviewed Mr. Sanchez Lozano, he would have learned that some of the

8    eyewitnesses believed they knew Mr. Harris because he used to gamble with them

9    in the park. As a result, their identification of him may have been the result of their

10   familiarity with him rather than his actual participation in the park shooting.  SHP

11   Exh. 81 at 396-402 (Declaration of Gail Greco); SHP Exh. 86 at 418-20

12   (Declaration of Mark King); *see also*, SHP Exh. 96 at 498-519 (Declaration of Dr.

13   Robert Shomer).  Alternatively, Mr. Sanchez Lozano could have observed the

14   actual perpetrator days before the shooting and mistaken Mr. Harris for that person.

15         Mr. Sanchez Lozano was a crucial witness for the additional reason that he

16   claimed to have found additional ballistics evidence at the crime scene that was

17   used against Mr. Harris and that he tainted the live lineup – perhaps deliberately –

18   with his outburst claiming Mr. Harris was the perpetrator.  Yet, trial counsel's

19   cross-examination of Mr. Sanchez Lozano failed to discredit him as a witness.

20         Leopoldo Munoz

21         Trial counsel also did not thoroughly interview witness Leopoldo Munoz,

22   who was one of two witnesses who was too intoxicated to be interviewed by law

23   enforcement the day after the shooting.  SHP Exh. 112 at 673; SHP Exh. 106 at

24   568. According to police reports, investigating officers obtained a statement from

25   Mr. Munoz on August 9, 1991, in which he acknowledged that "the guy with the

26   gun was standing behind me, I didn't get a good look at him."  SHP Exh. 112 at

27   673.  Despite this limited opportunity to observe the perpetrator, Mr. Munoz made

28

Petition for Writ of Habeas Corpus

a positive identification of Mr. Harris at the live lineup after Mr. Sanchez Lozano
had blurted out that he was certain Mr. Harris was the perpetrator.

Although a defense investigator contacted Mr. Munoz by phone once, the
interview did not cover Mr. Munoz's identification of Mr. Harris at the live lineup
or any information relating to his level of intoxication on the night of the shooting.

Efren Reyes

Witness Efren Reyes initially identified photographs of other individuals in
the photo arrays as "looking like" the perpetrator but then went on to identify Mr.
Harris in the live lineup. A defense investigator conducted a phone interview with
Mr. Reyes that took less than a page to memorialize and did not cover Mr. Reyes'
initial identification of other individuals, the intoxication level of the eyewitnesses
and other factors impacting the accuracy of his identification. Once again, the
defense investigator did not probe the eyewitness regarding the identification
process, even when the witness stated falsely that he had been able to identify Mr.
Harris from a photo array and then requested a live lineup to be sure of his
identification. Contrary to this statement, Mr. Reyes was never shown the only
photo array that included Mr. Harris's photo so did not have an opportunity to
identify Mr. Harris prior to the live lineup. SHP Exh. 112 at 635-36, 638, 641. Yet
trial counsel did not investigate this red flag indicating that the identification had
been wholly suggestive and also did not question Mr. Reyes about how he might
have been influenced by Mr. Sanchez Lozano's outburst during the live lineup.

As a result of trial counsel's failure to conduct in depth follow up interviews
with this witness, he was unable to effectively cross-examine Mr. Reyes to
demonstrate to the jury his unreliability as an eyewitness. 14 RT 1959-2003.

Juan Quijas

As trial counsel was aware from police reports, Mr. Quijas told the
investigating officers on the evening of the shooting that there was a Black man

189

1    named "Boogie" who was in jail and who might know the identity of the shooter.
2    SHP Exh. 112 at 674.    Had trial counsel investigated this lead, he would have
3    learned that Boogie was a transient who smoked crack cocaine and hung out at Van
4    Nuys Park with Delsie Noble, the informant who implicated Mr. Harris only after
5    the police offered a reward and had significant credibility issues.    SHP Exh. 86 at
6    418-20 (Declaration of Mark King).    Trial counsel also knew that Mr. Quijas
7    identified an individual named Damon Keith Napier in a photo lineup as looking
8    like Mr. Contreras's shooter and pointed out dissimilarities to law enforcement
9    between Mr. Harris photo in Lineup G and the perpetrator just a couple of weeks
10   earlier.

11           Had trial counsel conducted an adequate investigation, he would have
12   learned that some of the eyewitnesses knew Mr. Harris from prior encounters at the
13   park and therefore should have been able to identify him immediately.    Mr. Quijas'
14   later identifications may have been the result of his familiarity with Mr. Harris
15   from encounters other than the day of the shooting.    SHP Exh. 81 at 396-402; SHP
16   Exh. 86 at 418-20; *see also* SHP Exh. 96 at 498-519.

17           Instead, trial counsel's investigation of Mr. Quijas was extremely limited,
18   consisting only of a telephonic interview that produced one page of notes,
19   including Mr. Quijas' assertion that he was "positive" of his identification of the
20   shooter even though he had previously picked someone other than Mr. Harris from
21   a photo lineup and stated that Mr. Harris's photo did not resemble Mr. Contreras's
22   shooter.    The investigation report indicates that the defense investigator did not ask
23   Mr. Quijas anything about the identification process, including the suggestive live
24   lineup procedures, Mr. Sanchez Lozano's outburst and observable gestures
25   identifying Mr. Harris as the perpetrator, and Mr. Calleros showing the other
26   eyewitnesses a photo of Mr. Harris that he kept in pocket.    The defense investigator
27   also did not ask Mr. Quijas any questions about "Boogie" and whether Boogie
28

Petition for Writ of Habeas Corpus

1   knew Damon Keith Napier, the person Mr. Quijas initially identified as the shooter
2   or any other suspects, and whether Boogie knew Mr. Harris.  Had trial counsel
3   pursued this line of inquiry and investigation, he may have found evidence that
4   someone other than Mr. Harris killed Mr. Contreras.

5       The defense interview also failed to probe the issue of intoxication as the
6   investigator failed to ask Mr. Quijas whether he or any of the other witnesses
7   present in the park on the night of the shooting had been drinking.  Trial counsel's
8   files reveal that after conducting this perfunctory interview, the investigator made
9   an unsuccessful attempt to locate Mr. Quijas again but obtained no further
10  information.

11      Trial counsel's lack of investigative preparation is further reflected in the
12  ineffectual cross-examination of Mr. Quijas.  Trial counsel never questioned Mr.
13  Quijas about "Boogie," his level of intoxication at the time of the shooting or the
14  intoxication of other witnesses at the scene, or the suggestiveness of the
15  identification procedures which led Mr. Quijas to identify Mr. Harris after initially
16  identifying someone else from a photo lineup as looking like the shooter.  12 RT
17  17030-38; 13 RT 1744-64.

18      Reynaldo Villatoro

19      As trial counsel was aware, Mr. Villatoro identified two other individuals he
20  thought looked like Mr. Contreras's shooter prior to identifying Mr. Harris.  When
21  presented with a photo of Mr. Harris in Lineup G, Mr. Villatoro stated that Mr.
22  Harris looked only 30% like the shooter.  Yet, at the live lineup just a few weeks
23  later Mr. Villatoro stated being 100% sure of Mr. Harris's identity.

24      Yet, trial counsel made only minimal efforts to interview this witness.
25  According to counsel's records, an investigator left a business card with Mr.
26  Villatoro's wife and asked that Mr. Villatoro contact him as soon as possible.
27  Despite trial counsel's intention to interview Mr. Villatoro, counsel and the defense
28

Petition for Writ of Habeas Corpus

1   investigator did not pursue any further contact or investigation.

2       As a result, trial counsel was unprepared to effectively cross-examine Mr.

3   Villatoro on the accuracy of his identification, including his level of intoxication at

4   the time of the shooting, his opportunity to observe the events, the suggestiveness

5   of the photo and live lineup procedures, the media influence on his identification,

6   any racist views he may have held, and whether Mr. Villatoro was familiar with

7   any of the other suspects and a target of the gunman.

8       Instead, trial counsel's cross-examination of Mr. Villatoro consisted mostly

9   of open-ended questions regarding the sequence of events the night of the shooting

10   and inconsistencies between the statements Mr. Villatoro made to law enforcement,

11   at the preliminary hearing and at trial, with only a few questions targeting his

12   impediments to an accurate identification.  15 RT 2084-111.  Specifically, trial

13   counsel's questioning failed to apprise the jury that when Mr. Villatoro picked Mr.

14   Harris from a photo lineup he stated he was only 30% sure of the identification but

15   then became very certain Mr. Harris was the shooter when he identified him at the

16   tainted live lineup. 15 RT 2108-10; SHP Exh. 112 at 665, 680; *see also* SHP Exh.

17   96 at 498-519. As with the other eyewitnesses, trial counsel's failure to thoroughly

18   interview the eyewitnesses also prevented him from questioning Mr. Villatoro

19   about his prior encounters with Mr. Harris and how they may have tainted his

20   identification of him as the shooter.  SHP Exh. 81 at 396-402; SHP Exh. 86 at 418-

21   20; *see also* SHP Exh. 96 at 498-519.

22       <u>Ramon Mosqueda</u>

23       Trial counsel knew from police reports that Jose Sanchez's older brother,

24   Ramon Mosqueda, reported to police that his brothers Jose Antonio Sanchez and

25   Jose De Jesus had witnessed the shooting in the park from a bedroom window.

26   SHP Exh. 112 at 634.

27       Trial counsel made several efforts to contact Jose Sanchez, who was a minor

28

at the time, but made no efforts to contact Ramon Mosqueda.  Had trial counsel contacted Mr. Mosqueda he would have learned that he was also a witness to the shooting.  Mr. Mosqueda looked out of the window after hearing the shots and saw a black man waving a gun around.  Mr. Mosqueda described the man as having a beard and appearing to be about 35 to 40 years old.  SHP Exh. 81at 396-402.  This description did not match Mr. Harris's appearance who was much younger and did not have a beard.  Testimony from Mr. Mosqueda therefore would have cast doubt on the prosecution's case and the identification of Mr. Harris as the shooter.

Despite an obvious and excessive risk that Mr. Harris was misidentified by the eyewitnesses at the park shooting due to the extreme suggestiveness in the various identification procedures and the fact that the identifications were cross-racial, trial counsel failed to challenge the identifications of Mr. Harris by (1) moving to suppress them, (2) adequately cross-examining the eyewitnesses about their identifications, (3) objecting to the prosecutions blatant (and successful) attempt to lead one of the eyewitnesses into a courtroom identification, (4) present testimony from an expert on memory and eyewitness identifications (addressed below), and (5) present compelling argument to the jurors as to why they should reject the eyewitness testimony.  In support of this claim, Mr. Harris alleges the following facts, among others to be presented after fully discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

2)    Trial counsel failed to challenge the reliability of the eyewitness identifications based on the suggestive use of multiple photo lineups.

Between August 9, 1991 and September 26, 1991, eyewitness Efren Reyes was shown photo lineups A, B, C, E and F.  SHP Exh. 112 at 635-36, 638, 641. Eyewitness Juan Quijas was shown photo lineups A through G.  SHP Exh. 112 at 635-636, 638,641, 644.  Eyewitness Roberto Sanchez Lozano was shown photo

lineups A, B, E, F and G.  SHP Exh. 112 at 636, 638, 641, 644.  Eyewitness Reynaldo Villatoro was shown photo lineups A through H.  SHP Exh. 112 at 641,645, 649.  Eyewitness Alfredo Calleros was shown photo lineups A, Band G.  SHP Exh. 112 at 644, 662, 685.  Eyewitness Leopoldo Munoz Feliz was shown photo lineups A through E and H.  SHP Exh. 112 at 636, 638, 649.  Lineups A through F did not include Mr. Harris's photograph.

During the photo lineup identification process, various eyewitnesses identified different individuals in Lineups A through F as resembling the man who shot Mr. Contreras.  Leopoldo Munoz did not make any identifications during the photo lineup process.  SHP Exh. 112 at 636, 638, 649.

On August 9, 1991, eyewitnesses Efren Reyes, Juan Quijas, and Roberto Lozano[27] identified Damon Keith Napier, a black man with medium colored skin, very short dark hair and a dark moustache, in photograph A-2 of Lineup A as looking like the person who shot Mr. Contreras.  SHP Exh. 99 524 (Photo Lineups).  Mr. Reyes thought Napier (A-2) was similar to the shooter because he had the same mouth, nose, eyes, hair, eyebrows, and his color was exactly the same.  14 RT 1950.  Mr. Quijas thought Napier (A-2) looked like the shooter because he had the same face, eyes and nose.  His skin was a little bit darker and his lips were a little bit thicker than the shooter.  12 RT 1725.  Mr. Lozano also identified Napier (A-2) in Lineup A as a person who looked like the man that shot Mr. Contreras.  12 RT 1591.

After Mrs. Reyes, Quijas, and Lozano made these "looks like" identifications of Damon Keith Napier (A-2), on August 15th and 16th, 1991, the police showed them additional lineups.  SHP Exh. 112 at 635-44.

After looking at Lineup E, Mr. Reyes made a positive identification telling police that unless Alexander Wallace (E-4) had a twin, he was the shooter of Mr.

---

[27]   Also referred to as Roberto Sanchez.

194

1   Contreras.  SHP Exh. 112 at 615, 660.  Mr. Lozano told police that Alexander
2   Wallace (E-4) looked like the shooter because he had the same eyes, nose, mouth
3   and forehead as Mr. Contreras's shooter.  12 RT 1592.

4        The witnesses' identification of Alexander Wallace (E-4) illustrates the
5   suggestive nature of the photo lineup process because Alexander Wallace (E-4)
6   looked nothing like Damon Keith Napier (A-2), the first person the eyewitnesses
7   identified as looking very similar to Mr. Contreras's shooter.   Specifically,
8   Alexander Wallace (E-4) had noticeably lighter colored skin than Napier, and
9   unlike Napier, Wallace had longer curlier dark hair and did not have a moustache.
10  SHP Exh. 99 at 525.  The witnesses' statements during the lineup procedures also
11  strongly suggest that they did not have sufficient opportunity to observe the
12  perpetrator so as to be make reliable identifications.

13        On September 16, 1991, eyewitness Villatoro, was shown Lineups A through
14  F.  After reviewing the six photo lineups, he decided two people "looked like" the
15  person who shot Mr. Contreras.  Mr. Villatoro thought the person in photo E-3
16  looked like Mr. Contreras's shooter from the front, in the cheeks and a little in the
17  nose.  SHP Exh. 112 at 660.  He also thought Alex Watkins (F-4) looked like Mr.
18  Contreras's shooter in the eyes and forehead.  SHP Exh. 99 at 526.

19        The entire identification process constructed by police in an effort to find
20  Mr. Contreras's shooter was unduly suggestive and conducive to irreparably
21  mistaken identifications.  Research has shown that,

22        the decision to pick the suspect is often a product of police procedures
23        that are likely to produce an outcome that is consistent with the
          expectations of the police.  The expectations of the police can be so
24        powerful that the behaviors of those administering the photo spread
25        can supplant the independent memory of the witness.  Psychologists
26        who have studied eyewitness identification argue that the very
27        methods used by the police in conducting a lineup or photo spread can

28

be the source of 1) an eyewitness' decision as to whom to identify and

2) the eyewitness' confidence in his or her identification.

Nettles, B., Nettles, Z.S., Wells, *I Noticed You Paused on Number Three*, The
Champion 10 (November 1996); *see also*, SHP Exh. 96 at 498-519.

Further compromising the identification process, police officers showed Mr.
Quijas, Lozano and Villatoro yet another photo linup (Lineup G).[28]  SHP Exh. 99,
Photo Lineups; SHP Exh. 112 at 644.  Lineup G was impermissibly suggestive, in
part, because the men depicted in Lineup G looked nothing like the men previously
identified by the eyewitnesses as men who looked very similar to Mr. Contreras's
shooter.  Lineup G contained six photos of dark-skinned black men, including Mr.
Harris's photo (G-2).  Lineup photo G-2 depicted Mr. Harris as having dark hair
and a dark moustache.  SHP Exh. 99 at 527; SHP Exh. 112 at 644.  Mr. Quijas and
Mr. Villatoro thought Mr. Harris in G-2 might look like the shooter and Mr.
Lozano, despite his two prior "looks like" identifications, now identified Mr.
Harris as Mr. Contreras's shooter.  SHP Exh. 112 at 660- 661; RT 1591-92.

Mr. Quijas stated that Mr. Harris looked darker skinned than the shooter and
that his hair and facial features were completely different than the shooter's.  SHP
Exh. 112 at 683-84.  Mr. Villatoro thought Mr. Harris's photo looked 30% like the
shooter as there were some similarities in the eyes, forehead and face.  He noted
that of all the photos he had seen, G-2 looked the most like shooter.  SHP Exh. 112
at 680; see also SHP Exh. 96 at 498-519.

The use of multiple photo lineups and the suggestibility inherent in that
procedure undermined the reliability of the resulting eyewitness identifications.  "If
a suggestive identification procedure has been used, the witness's memory has
been irrevocably tainted.  The actual memory is lost.  The actual perpetrator may

---

[28]  On October 18, 1991, Eyewitnesses, Reynaldo Villatoro and Leopoldo
Munoz Feliz, were shown an additional Lineup, Lineup H.  SHP Exh. 112 at 649.

1    never be identified or prosecuted." Lisa Steele, *Identification Law Reform*, The
2    Champion 24 (April 2005).

3          After the eyewitnesses were shown the seven photo lineups A through G,
4    and despite their prior identifications, on October 22, 1991, the eyewitnesses were
5    present at a live lineup wherein it was apparent that Mr. Harris was the only
6    individual to appear in both the photo lineup and live lineup.  SHP Exh. 98 (Live
7    Lineup); SHP Exh. 112 at 665, 675; *see also* SHP Exh. 96 at 498-519.  Not
8    surprisingly, all of the eyewitnesses identified Mr. Harris at the live lineup as the
9    person who shot Mr. Contreras.  After the investigating officers received positive
10   identifications of Mr. Harris from all eyewitnesses, they did not present any further
11   photo or live lineups to the eyewitnesses.

12         The identification procedures used to identify Mr. Harris were inherently
13   suggestive and unreliable and fundamentally risked irreparable misidentification,
14   yet trial counsel never brought this issue to the court's attention. *See* SHP Exh. 96
15   at 498-519.  Trial Counsel did not file any motions or otherwise challenge the
16   admissibility of the suggestive eyewitness identification process and the resulting
17   unreliable identification of Mr. Harris and failed to move to suppress the
18   identifications of Mr. Harris made by witnesses Efren Reyes, Juan Quijas,
19   Reynaldo Villatoro, Roberto Sanchez Lozano, Alfredo Calleros, and Leopoldo
20   Munoz.

21         Trial counsel was ineffective in failing to challenge the procedure whereby
22   the police continued to show the eyewitnesses multiple photo lineups and
23   conducted a live lineup after the eyewitnesses had already made a positive or
24   tentative ("looks like") identification of Mr. Contreras's shooter who did not look
25   anything like Mr. Harris.  These impermissibly suggestive and unreliable
26   identification procedures created an unacceptable risk of misidentification and
27   should have been excluded in their entirety. *See Neil v. Biggers*, 409 U.S. 188, 198

28

197

(1972); *Manson v. Braithewaite*, 432 U.S. 98, 114 (1977); *Simmons v. United States*, 390 U.S. 377, 383 -384 (1968); *United States v. Wade*, 388 U.S. 218, 240 n.31 (1967).)

Had trial counsel filed motions to exclude the identifications, it is likely the trial court would have granted them and excluded these unreliable identifications. Counsel's failures to protect Mr. Harris's statutory and constitutional rights, singly or cumulatively, prejudiced the defense and had a substantial and injurious influence or effect on the jury's sentencing determination. The prejudice to Mr. Harris was overwhelming because the eyewitness identifications were central to the prosecutions' case and the only other evidence against Mr. Harris was highly unreliable informant testimony obtained in exchange for reward money.

3) Trial counsel failed to challenge the reliability of the eyewitness identifications based on the use of unduly suggestive live lineups.

Six eyewitnesses, Reyes, Quijas, Villatoro, Munoz, Lozano and Calleros, identified Mr. Harris in a live lineup on October 22, 1991. Trial counsel was present at the live lineup and thus able to observe that the live lineup identifications were the product of an unfair, and unduly suggestive process resulting in unreliable identifications. Yet, trial counsel failed to object to the live lineup procedure and move to suppress the tainted identifications.

The police used a very suggestive ploy when it arranged the photographic and live lineups so that Mr. Harris was the only person to appear in both. SHP Exh. 112 at 644. Studies show that the "chances of a mistaken identification rise dramatically in these situations, and so such lineups have been referred to as 'photo-biased lineups.'" Elizabeth Loftus, *Eyewitness Testimony* 15 (1996); *see also* SHP Exh. 96 at 498-519.

As discussed above, prior to the live lineup police officers had shown the eyewitnesses several photographic lineups in which the eyewitnesses made clear

Petition for Writ of Habeas Corpus